David Boyer, OSB # 235450
Meghan E. Apshaga, OSB #232137
Disability Rights Oregon
511 SW 10th Ave., Suite 200
Portland, OR 97205-2748
dboyer@droregon.org
mapshaga@droregon.org
(503) 243-2081 ext. 301

Julian Clark*
Jenn Rolnick Borchetta*
American Civil Liberties Union
Foundation, Inc.
125 Broad Street, 17th Floor
New York, NY 10004-2400
jclark@aclu.org
jborchetta@aclu.org
(929) 969-4365

Brian Dimmick*
Westley Resendes*
American Civil Liberties Union
Foundation, Inc.
915 15th Street NW
Washington, DC 20005-2302
bdimmick@aclu.org
wresendes@aclu.org
(202) 638-2210

Wilson Baker*
American Civil Liberties Union
Foundation, Inc.
425 California Street
San Francisco, CA 94104-2102
wbaker@aclu.org
(415) 570-8011

Kelly Simon, OSB #154213
American Civil Liberties Union
Foundation of Oregon, Inc.
PO Box 40585
Portland, OR 97240-0585
ksimon@aclu-or.org
(503) 227-3186

Daniel L. Brown*
Laura L. Chapman*
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112-0015
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
dbrown@sheppardmullin.com
lchapman@sheppardmullin.com
NY Telephone: (212) 634-3095
SF Telephone: (415) 434-9100

Attorneys for Plaintiffs

*pro hac vice application forthcoming

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **DISABILITY RIGHTS OREGON**, on behalf of its clients and constituents, and **JOSHUA WESLEY**,<br><br>                    Plaintiffs,<br>v.<br><br>**WASHINGTON COUNTY**, a political subdivision of the State of Oregon; and the **WASHINGTON COUNTY CONSOLIDATED COMMUNICATIONS AGENCY**, an intergovernmental entity in the State of Oregon,<br><br>                    Defendants. | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>Civil Rights Action (42 U.S.C. § 12131; 29 U.S.C. § 794)<br><br>**DEMAND FOR JURY TRIAL** |

1.      Plaintiffs Disability Rights Oregon ("DRO") and Joshua Wesley by and through their attorneys, bring this action under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, to challenge the systemic failure of Defendant Washington County, Oregon ("the County") and Defendant Washington County Consolidated Communications Agency ("the Agency") (collectively, "Defendants") to provide non-discriminatory, safe, and effective emergency response services to people with mental health disabilities. Plaintiffs hereby allege as follows:

## INTRODUCTION

2.       In Washington County, Oregon, people with mental health disabilities do not have equal access to, and equal opportunity to benefit from Defendants' emergency response services and programs. When someone in the County suffers a physical health crisis, such as a heart attack or allergic reaction, they can call Defendants for emergency help and Defendants respond with qualified health professionals, who are specifically trained to assess an emergent health issue, offer stabilization and treatment at the point of contact, and if necessary, transport them to a specialized treatment facility. However, when someone in Washington County experiences a mental health crisis and they call Defendants for emergency help, Defendants respond to their health emergency in the same manner and means they would a crime or a public safety threat—sending tactically-trained and armed law enforcement officers who are more likely to exacerbate, rather than resolve, the mental health crisis they were sent to address.

3.       The discrepancy between these two emergency responses is not only evidence of systemic discrimination but is counter-productive to resolving mental health emergencies and oftentimes, dangerous for the person in crisis. As a result of the County and Agency's policies and practices, people with mental health disabilities who experience a mental health crisis in the County frequently do not receive the urgent medical care they require and instead, face an array of adverse outcomes.

4.       Plaintiff Joshua Wesley knows too well the tragic consequences of Defendants' unequal and discriminatory emergency response services system. On the early morning of October 24, 2022, Joshua Wesley, then twenty-seven years old and soon to be a father, called a suicide hotline in an attempt to save his life. Mr. Wesley was experiencing suicidal ideation for the second time in three months and desperately wanted help from a qualified mental health professional.

5.      After Mr. Wesley's call was transferred from the hotline to an Agency dispatcher, he explicitly requested non-police responders be sent to assist him.

6.      Understandably, Mr. Wesley wanted an emergency response from medical professionals who are specifically trained to assess his condition, stabilize or treat him at the point of contact, and, if necessary, transport him to a specialized treatment facility.

7.      In other words, Mr. Wesley wanted and, in fact, requested an emergency response service providing the same benefit as the service afforded to County residents experiencing physical health emergencies. And for good reason—suicidal ideation, like a physical health emergency, is a matter of health, not law enforcement.

8.      Moreover, Mr. Wesley did not want armed law enforcement officers to respond to his mental health emergency because he had previously contemplated law enforcement-assisted suicide.[1] He was concerned that a tactical response from armed officers might escalate his paranoia and inadvertently push him into a more dangerous situation that he was desperately trying to avoid.

9.      In spite of Mr. Wesley's adamant requests for medical services and the existence of a non-police response program in the County, the Agency dispatcher followed the Agency's policy and dispatched County deputies—five to be exact—to Mr. Wesley's residence and staged one Metro West ambulance nearby. Ultimately, as further detailed herein, one of the five deputies sent to save Mr. Wesley very nearly killed him.

10.     Tragically, Mr. Wesley's horrific experience with Defendants' discriminatory emergency response system is not an anomaly.

---

[1] Law enforcement-assisted suicide is form of suicide in which an individual experiencing suicidal ideation behaves in a manner intended to provoke a lethal response from a law enforcement officer. *See* Vivian B. Lord, *Law Enforcement-Assisted Suicide*, 27 CRIM. JUST. & BEHAVIOR 401 (2000).

11.    As a matter of course, Defendants send an armed police response—instead of an emergency health response—to people experiencing mental health crises in the County. As a result, people with mental health disabilities experiencing a mental health crisis in the County frequently do not receive the urgent health care they need—and are entitled to—and instead, are involuntarily hospitalized, arrested and jailed, or like Mr. Wesley, subjected to use of force by responding officers. Fears of these adverse outcomes lead an untold number of County residents to forgo seeking mental health assistance from Defendants' emergency response system altogether.

12.    Defendants' emergency response programs and services are therefore ineffective for those experiencing a mental health crisis. They are also unlawful because they violate the federally-protected rights of people with mental health disabilities, deny them the benefits of the County's emergency response programs and services, and fail to provide them equal access to those programs and services.

13.    The County itself appears to recognize the need for reform. It created a Mobile Crisis Team ("MCT")—the sole non-police response available in the County—that is comprised exclusively of mental health clinicians. MCT is intended to be available 24/7, and provide a service to patients that police cannot— "face-to-face crisis evaluation, intervention, and stabilization."[2]

14.    Yet, the County has failed to sufficiently fund and adequately staff the Mobile Crisis Team. In practice this means that the only non-police crisis response option in the County is largely unavailable—and certainly not at scale and available 24/7 like physical health emergency response services.

---

[2] Quoting "Contract 22-1371" between Washington County and LifeWorks NW titled "Washington County Community Human Services Program Contract Agency Agreement" at 362 (hereinafter referred to as "Contract 22-1371").

15.    Compounding this problem, the County has not incorporated the Mobile Crisis Team into the Agency's dispatch system. Thus, the Agency cannot directly dispatch the Mobile Crisis Team to mental health crises.  As a result, the Agency routes mental health crises calls to the various law enforcement agencies in the County, including the Washington County Sheriff's Office ("WCSO").

16.    In fact, the Agency nearly exclusively dispatches armed officers as primary and often, sole responders to mental-health-related calls—even in instances where calls for service do not involve violence, weapons, allegations of criminal activity or threats of harm to the public.

17.    For example, for the one-year period spanning March 1, 2022 to February 28, 2023, the Agency dispatched and the County (or the municipalities it encompasses) sent armed officers to 100% of calls coded by Agency call takers as "Behavioral Health Incidents." The same is true for all calls coded as "Welfare Checks"—a code often used for mental-health-related calls—and for all calls coded as "Suicide Threat."

18.    The Agency's inadequate and unequal emergency dispatch system results from both its policies and procedures currently in effect and its case-by-case decisions about which responders to dispatch to assist people with mental health disabilities in crisis.

19.    And the County's failure to fully integrate its Mobile Crisis Team into the Agency's dispatch system has deprived people with mental health disabilities in the County of direct, immediate, and meaningful access to the emergency medical services that are provided to people without such disabilities.

20.    Recurring incidents in the County demonstrate that police-based interventions not only fail to meet the psychiatric needs of vulnerable patients, but also expose people with mental health disabilities to avoidable criminal justice system contacts or worse.

21.     And as Mr. Wesley's experience demonstrates, providing an appropriate response for people experiencing a mental health emergency can be a matter of life or death, with deadly and entirely avoidable consequences frequently resulting from police responses to mental health emergencies.

22.     The dire shortcomings of police responses to mental health crises are reflected in the disproportionate number of people with mental illnesses and substance use disorders held in jails and prisons and killed by law enforcement in the United States every year.[3]

23.     Indeed, data shows that people with untreated severe mental health disabilities are sixteen times more likely than the general public to be killed during a police encounter and make up as many as half of all people killed by the police.[4] From January 1, 2015, to January 24, 2024, national data compiled by the Washington Post showed that police officers shot and killed at least 1,851 people who had mental health disabilities—more than one in every five people they killed.[5]

24.     In part because of jarring statistics like these, experts now recognize that dispatching law enforcement officers to mental health crisis calls is more likely to exacerbate, rather than alleviate, the mental health issue for which help is sought.[6]

---

[3] Amam Z. Saleh et al., *Deaths of People with Mental Illness During Interactions with Law Enforcement,* 58 INT'L J.L. & PSYCHIATRY 110, 110-116 (2018); Jennifer Bronson & Marcus Berzofsky, *Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-12,* 2017 U.S. DEP'T OF JUST., BUREAU OF JUST. STAT., https://perma.cc/4933-5BRQ; and Jennifer Bronson et al., *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009,* 2017 U.S. DEP'T OF JUST., BUREAU OF JUST. STAT., https://perma.cc/T9FE-ZEKN.

[4] Doris Fuller et al., *Overlooked in the Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters*, TREATMENT ADVOCACY CTR. 1 (Dec. 2015), https://perma.cc/5FKB-TYGQ.

[5] *Fatal Force,* WASH. POST (Jan. 24, 2024), https://perma.cc/8FYB-KW38.

[6] SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit* 33 (Feb. 2020), https://perma.cc/AD6S-HXA6.

25.     Defendants routinely fail to provide the critical service of emergency response services equally to County residents with mental health disabilities, compared to County residents without mental health disabilities.

26.     Plaintiff Disability Rights Oregon ("DRO"), an organization empowered by federal law to protect the rights of all Oregonians with mental health disabilities, has clients and constituents whose rights have been violated by Defendants' discriminatory, and unlawful emergency response programs and services.

27.     Individual Plaintiff Joshua Wesley is a person with mental health disabilities who called for emergency mental health services and received an unequal, Agency-dispatched, County-operated police response because of his mental health disabilities.

28.     Each of the experiences of Plaintiff Wesley and Plaintiff DRO's clients and constituents is a result of Defendants knowingly dispatching law enforcement officers to mental health crises, which are not matters of law enforcement but rather, are matters of health that require the services of qualified mental health professionals.

29.     Defendants' failure to provide County residents with mental health disabilities emergency response services that are as effective in affording equal opportunity to obtain the same benefit as provided to others and their practices in administering their crisis response services violate the rights of individuals with disabilities under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

30.     Plaintiff Disability Rights Oregon, on behalf of its clients and constituents with mental health disabilities in Washington County, and Plaintiff Joshua Wesley, on his own behalf,

therefore bring this action against Defendant County and Defendant Agency under the ADA and Section 504.

31.    Plaintiffs seek a permanent injunction enjoining Defendants from continuing their discriminatory provision of mental health emergency response services, and requiring Defendants to take appropriate steps to ensure that people in Washington County with mental health disabilities are provided equal access to, and equal opportunity to benefit from, Defendants' emergency response services and programs.

## JURISDICTION AND VENUE

32.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States of America.

33.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

34.    Venue is proper in the U.S. District Court for the District of Oregon pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), because Defendant County comprises and is situated in this judicial district and this division, and the events that gave rise to Plaintiffs' claims occurred in this judicial district.  Plaintiffs all operate or reside within this district and division.

## PARTIES

35.    Plaintiff, Disability Rights Oregon is the Protection and Advocacy System (P&A) mandated under federal law to "ensure that rights of individuals with mental illness are protected." 42 U.S.C. §10801(b)(1). The Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801, provides for the establishment and funding of systems within each state designed to protect and advocate for the rights and individuals with mental illness, as well as to investigate incidents of abuse and neglect of those with mental illness. Federal funding is provided to independent agencies or organizations which have the capacity to protect and advocate for the

rights of individuals with mental illness. 42 U.S.C. §§10804, 10805. The system established by each state to protect and advocate for the rights of individuals with mental health disabilities must have the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. §10805(a)(1)(B). Disability Rights Oregon is designated as the P&A for the State of Oregon under the Protection and Advocacy for Individuals with Mental Illness Act.

36.     Further, federal law also provides the authority and responsibility of advocacy for other clients with disabilities. The Developmental Disabilities Assistance and Bill of Rights Act ("DD Act") authorizes a protection and advocacy system for individuals with developmental disabilities. 42 U.S.C. §§ 15041.  The DD Act provides roughly the equivalent mandate as the PAIMI Act. Other statutes that provide DRO authority to protect and advocate for people with disabilities incorporate the DD Act's mandate. *See* Protection and Advocacy for Persons with Traumatic Brain Injury, 42 U.S.C. § 300d-53; Protection and Advocacy for Individual Rights, 42 U.S.C. § 794e. These and other statutes provide DRO with the ability to advocate on behalf of anyone with a disability in Oregon.

37.     As a P&A, Plaintiff Disability Rights Oregon is tasked under law to protect and advocate for the rights of individuals with disabilities ensuring the enforcement of the Constitution and Federal and State statutes. 42 U.S.C. §10801(b)(1). Disability Rights Oregon has the legal responsibility to investigate allegations of abuse and neglect involving individuals with disabilities and to advocate for appropriate programs for such individuals. Disability Rights Oregon also has the legal responsibility to ensure that the legal and civil rights of individuals with disabilities are protected; that these individuals are treated with dignity and respect, and that they receive appropriate services to address their needs. To ensure that it fulfills these legal responsibilities,

Disability Rights Oregon has the authority and standing to sue the County, the Agency, and their agents to protect its numerous clients and constituents with disabilities who are receiving care or treatment in the State of Oregon. 42 U.S.C. §10805(a)(l)(B).

38.     Plaintiff Disability Rights Oregon is the functional equivalent of a membership organization for people with disabilities.  DRO has a multi-member board of directors that includes people with disabilities. It also has an advisory council composed of people with disabilities who have significant input on the policies and priorities that the organization carries out to protect and advocate for the rights of individuals considered to be mentally ill in Oregon. Disability Rights Oregon provides the public, including its stakeholders, the opportunity to comment on its goals and objectives and DRO has established a grievance policy for its clients. Investigating public entities' failures to comply with laws protecting its members, clients, and constituents is one of Disability Rights Oregon's primary responsibilities.

39.     Plaintiff Joshua Wesley has been a resident of Washington County, Oregon since 2022, including at all times relevant to this lawsuit. He lives with depression and Post Traumatic Stress Disorder ("PTSD") and on occasion, experiences bouts of psychosis that involve auditory hallucinations and/or suicidal ideation. These conditions substantially limit one or more of his major life activities, including but not limited to thinking, communicating, caring for himself, and interacting with others.  Mr. Wesley is thus a qualified person with a disability within the meaning of the ADA and Rehabilitation Act. He is an ongoing recipient of emergency mental health services in the County. Mr. Wesley continues to be subject to discrimination and harm by Defendants.

40.     Defendant Washington County Consolidated Communications Agency ("the Agency") is an intergovernmental entity created pursuant to Oregon Revised Statutes Chapter 190 (ORS 190) by agreement of the following local governments: Washington County; Banks,

Beaverton, Cornelius, Durham, Forest Grove, Gaston, Hillsboro, King City, North Plains, Sherwood, Tigard, and Tualatin. Defendant WCCCA provides countywide 911 service and public safety communications for police, fire, and emergency medical service for the participating jurisdictions and for other governments under contract. As a local governmental entity receiving federal financial assistance, the Agency is subject to suit under the ADA and Section 504. 42 U.S.C. § 12131(1); 29 U.S.C. § 794(a).

41.    Defendant Washington County ("the County") is a political subdivision of the State of Oregon. As a Local Mental Health Authority under Oregon Revised Statute 430.630, the County is responsible for establishing and administering or operating a community mental health program with an array of services, including mental health crisis services. As a local governmental entity receiving federal financial assistance, the County is subject to suit under the ADA and Section 504. 42 U.S.C. § 12131(1); 29 U.S.C. § 794(a).

## STATEMENT OF FACTS

**I.    Mental Health Experts Agree That Police Should Not Respond to Typical Mental Health Emergencies.**

42.    Although determining the appropriate response to any particular call for crisis response services is a fact-specific inquiry, the default response to mental health crises should be one anchored in public health that does not involve armed law enforcement officers. A safe, effective, and non-discriminatory crisis response system that promotes positive outcomes for its patients requires mental health professionals to be the primary responders to calls for mental health crises.

43.     Experts agree that it is typically not necessary to dispatch police to typical mental-health related calls for service. These calls often involve no allegations of criminal conduct, violence, use or possession of a weapon, or threat of harm to others.[7]

44.     The Substance Abuse and Mental Health Services Administration ("SAMHSA") is an agency within the U.S. Department of Health and Human Services that was established by Congress in 1992 to lead the advancement of behavioral health research, intervention, and treatment. In February 2020, SAMHSA released "National Guidelines for Behavioral Health Crisis Care" ("SAMHSA Guidelines") to help states and communities implement effective crisis response systems for people experiencing behavioral health crises.

45.     The SAMHSA Guidelines note that, like the County, many U.S. communities have made "local law enforcement the *de facto* mental health mobile crisis system" which is "unacceptable and unsafe."[8] The federal guidelines indicate that this practice is inappropriate because armed police presence alone has a propensity to escalate individuals in crisis.[9]

46.     In its June 2023 investigation into Minneapolis and its police department, the United States Department of Justice similarly concluded that "a law enforcement-led response can cause real harm in the form of trauma, injury, and death to people experiencing behavioral health issues, as well as other impacts."[10] The Justice Department reached parallel conclusions in its March 2023 investigation into the Louisville Metro Police Department.[11]

---

[7] *See, e.g.,* U.S. DEP'T OF JUST., *Investigation of the Louisville Metro Police Department and Louisville Metro Government* 59 (Mar. 2023), https://perma.cc/Z3ZW-8VRA.

[8] SAMHSA, *supra* note 6, at 33.

[9] *Id.*

[10] U.S. DEP'T OF JUST., *Investigation of the City of Minneapolis and the Minneapolis Police Department* 64 (June 2023), https://perma.cc/2WC6-PSLT (hereinafter "Minneapolis Investigation Report").

[11] U.S. DEP'T OF JUST., *Investigation of the Louisville Metro Police Department and Louisville Metro Government* 60 (Mar. 2023), https://perma.cc/Z3ZW-8VRA.

47.    Both the Minneapolis and Louisville investigations concluded that the municipalities violated the ADA by relying on police officers as the primary first responders to mental health emergencies, diverting only a small share of 911 mental health emergency calls to alternative first responder programs that mental health professionals staffed.[12]

48.    The National Alliance on Mental Illness (NAMI), a non-profit organization that serves people with mental health disabilities and their families, has similarly concluded that for people in mental health crises "the primary response should come from mental health crisis response professionals."[13]

49.    Contrary to these data-driven best practices, Defendants default to dispatching a law enforcement response to mental health crises.

**a.    Mental Health Emergencies Typically Arise from Mental Health Disabilities and Do Not Pose Public Safety Risks That Warrant a Police Response.**

50.    Mental health crises demand a mental health response—not a law enforcement response—because they are, at base, health emergencies.

51.    Most mental health emergencies arise from mental health disabilities, including depression, anxiety, and post-traumatic stress disorder (PTSD). Bipolar disorder and schizophrenia may also underlie mental health crises, but both are much lower incidence disabilities in the general population.[14] Depression, anxiety, PTSD, bipolar disorders, and schizophrenia are all disabilities covered under the ADA and the Rehabilitation Act.

---

[12] *See id.* at 59, 65–67; *see also* Minneapolis Investigation Report, *supra* note 10 at 57, 65.

[13] NATIONAL ALLIANCE ON MENTAL ILLNESS, *Crisis Response for Mental Health,* https://perma.cc/MT8R-2PNP (last accessed July 6, 2023).

[14] NATIONAL INSTITUTE OF MENTAL HEALTH, *Mental Illness*, NIMH, https://perma.cc/3H24-PP7C (last accessed February 2, 2024).

52.    These mental health emergencies, including ones involving thoughts of suicide or self-harm, typically do not present a danger to others; if such emergencies involve a risk of danger to anyone at all, it is to the person in crisis alone.

53.    Yet, a great deal of stigma attaches to mental health disabilities, often involving stereotypes that people with mental health disabilities are violent.

54.    In reality, "the overwhelming majority of people with mental illness are not violent…"[15] and are no more likely to be violent than anyone else.

55.    As the U.S. Department of Health & Human Services explains, "[m]ost people with mental illness are not violent and only 3%–5% of violent acts can be attributed to individuals living with a serious mental illness. In fact, people with severe mental illnesses are over 10 times more likely to be victims of violent crime than the general population."[16]

56.    Yet, Defendants have not decoupled emergency mental health care from policing and instead, routinely send armed law enforcement officers as primary responders to mental health crises as though these crises are inherently criminal and/or exceptionally at risk for violence.

      **b.  Law Enforcement Responses to Mental Health Emergencies Not Only Fail to Meet the Psychiatric Needs of Individuals in Crisis, but also Increase the Risk of Harming Them.**

57.    Discriminatory mental health crisis response systems, like Defendants', prioritize the reduction of *perceived* risk of public harm [17] over the *actual* need for medical aid and treatment

---

[15] John S. Rozel & Edward P. Mulvey, *The Link Between Mental Illness and Firearm Violence: Implications for Social Policy and Clinical Practice*, 13 ANN. REV. CLINICAL PSYCH. 445, 448 (2017), https://www.annualreviews.org/doi/pdf/10.1146/annurev-clinpsy-021815-093459.

[16] U.S. DEP'T OF HEALTH & HUM. SERVICES, *Mental Health Myths and Facts* (Aug. 2019), https://perma.cc/V9DN-MF3V. *See also* COUNCIL FOR STATE GOVERNMENTS, *Addressing Misconceptions about Mental Health and Violence* 1 (Aug. 2021), https://perma.cc/L4Z9-25W4**.**

[17] These perceived risks are deeply rooted in antiquated biases and misconceptions about people with mental health disabilities.

for people in crisis. This practice of sending armed law enforcement officers as primary responders to mental health emergencies instead of qualified mental health professionals reflects these distorted priorities.

58.    When armed law enforcement officers are dispatched to mental health crises before, or in lieu of, qualified mental health professionals, people with mental health disabilities are deprived of the immediate medical care they need.

59.    Law enforcement officers are not qualified mental health professionals and therefore cannot provide on-site psychiatric assessment and treatment to individuals in crisis. In the County, responding officers are directed to de-escalate the situation and only then divert the person in crisis to *appropriate* resources and services.[18] Officers are asked to do this even though the vast majority of their training and tactics are wholly inappropriate to de-escalation.

60.    WCSO deputies receive limited training on interacting with individuals during mental health crises but significant training on engaging individuals as suspects. This disparity in training frequently leads deputies to employ law enforcement strategies to address mental health emergencies.

61.    The most advanced training WCSO deputies—including those assigned to the Washington County Sheriff's Office Mental Health Response Team ("MHRT")—receive for responding to mental health crises is Crisis Intervention Training ("CIT").

62.    And while CIT is designed to reduce the risk of serious injury or death during interactions between individuals with mental health disorders and law enforcement officers, there

_____

[18] Washington County Sheriff's Office's Policy #1310-R03, "Responding to Persons with Mental Health Issues," at 2.

is little evidence in peer-reviewed literature "that shows CIT's benefits on objective measures of arrests, officer injury, citizen injury, or use of force."[19]

63.     Predictably, most training for law enforcement officers, including WCSO deputies, focuses on law enforcement. In these settings, WCSO deputies are generally taught to adopt "command-and-control mentality," which assumes that non-compliance with police orders constitutes a threat to personal or public safety. Officers are thus taught to always be prepared to defend themselves from attack; they assume a tactical stance during patrols that involves both keeping their hands at the ready in case they need to use force, and deterring non-compliance with their orders by adopting an authoritative presence that emphasizes they are in charge.

64.     This type of training leaves law enforcement officers especially ill-suited to merely interact with people experiencing a mental health crisis, let alone de-escalate and stabilize the crisis.

65.     Indeed, a law enforcement approach can actually exacerbate a mental health crisis. Using aggressive tones, crowding someone, touching them without consent, and attempting to assert control over them can make a person feel stressed and anxious. This effect is likely to be particularly pronounced for individuals in a mental health crisis, who may endure greater trauma and fear when police respond to them using command-and-control tactics.

66.     Moreover, an individual experiencing a mental health crisis may have difficulty immediately complying with an officer's commands for myriad reasons, including because they may be experiencing active psychosis (i.e., hallucinations and/or delusions). "Such noncompliance may be misinterpreted as active or passive resistance, which in turn is perceived as threatening (to

---

[19] Michael S. Rogers et al., *Effectiveness of Police Crisis Intervention Training Programs*, 51 J. AM. ACAD. PSYCH. L. 1, 1 (2019).

officer safety, etc.)."[20] This may prompt an officer to use force. Thus, the command-and-control framework in which officers operate renders people experiencing a mental health crisis especially vulnerable to police use of force, including deadly force.[21]

67.    Police nationwide are twelve times more likely to use force against people with serious mental health disabilities than other individuals,[22] and sixteen times more likely to kill people with untreated mental health disabilities than other individuals.[23]

68.    But even when the worst possible outcomes are set aside, police interventions to mental health crises are still more likely to exacerbate than alleviate the trauma of the person in crisis. Police responses to mental health crises also expose people with mental health disabilities to a variety of collateral risk, such as criminal or civil arrests, that are wholly absent from non-police interventions.

69.    Data that Defendants provided demonstrates that County residents with mental health disabilities are at significantly greater risk of being arrested than those who receive a trauma-informed response from qualified mental health professionals.

70.    For example, according to data that the Washington County Sheriff's Office ("WCSO") produced, of the 12,159 mental-health-related calls that the WCSO responded to from January 1, 2020 to November 30, 2022, 1,226 incidents, or 10%, had a recorded disposition of arrest.[24] By contrast, data that the Washington County Department of Health and Human Services,

---

[20] Jamelia Morgan, *Disability's Fourth Amendment*, 122 COLUM. L. REV. 489, 558 (2022).

[21] *See, e.g.*, *Glenn v. Washington Cnty.*, 673 F.3d 864, 880 (9th Cir. 2011) (analyzing the reasonableness of deadly force used by WCSO deputies against Lukas Glenn).

[22] Ayobami Laniyonu & Phillip A. Goff, *Measuring disparities in police use of force and injury among persons with serious mental illness*, 21 BMC PSYCHIATRY 1, 6 (2021), https://perma.cc/WR32-YSNR.

[23] Fuller, *supra* note 4 at 1.

[24] According to the WCSO's Criminal Records Department, mental-health-related calls encompasses "all calls with a "mental health" call type (BHI, SUA, SUT), any call regardless of

produced showed that, of the 1,054 calls that the County's non-police response program responded to from January 1, 2021 to December 31, 2022, only 16 incidents, or 1.5%, had a recorded disposition of arrest.[25]

71.     The County also vests WCSO deputies, with the authority and broad discretion to place individuals under a "Police Officer Hold"—a form of involuntary detention—and involuntarily transport them to a mental health facility for evaluation.

72.     Involuntarily detaining a person carries with it additional authority to complete that detention, including searching their person and property, using physical force and restraint, and summoning paramedics for the administration of chemical sedation.

73.     Mental health professionals and patients alike report that "involuntary detention is a traumatic, humiliating and often frightening experience, particularly when involving police or law enforcement agencies, which negatively impacts their overall mental wellbeing."[26] It is consistently demonstrated that involuntary detention invokes loss of perceived independence, worsening of paranoid beliefs, terror and distress, re-traumatization and powerlessness, particularly for those who experienced restrictive practices such as restraint and forcible giving of medications.[27]

74.     WCSO deputies routinely restrain individuals under a police officer hold, even though handcuffing an individual during a mental health crisis often significantly exacerbates the

---

call type flagged as having a mental health component, and all calls cleared with the [Mental Health Response Team] form by an MHRT team member."

[25] According to this same HHS dataset, the County's co-response team, the Mental Health Response Team (comprised of an officer and clinician) responded to 2,681 mental-health-related calls over the same two-year period and 84 incidents or 3.1% had a recorded disposition of arrest.

[26] Julia Heffernan et al., *Tri-Response Police, Ambulance, Mental Health Crisis Models in Reducing Involuntary Detentions of Mentally Ill People: A Systematic Review*, 12 NURSING REPORTS 1004, 1005 (2022), https://perma.cc/SZV7-F6P3.

[27] *Id.*

trauma the person experiences, increases the risk of conflict, and breeds mistrust of police officers. For these reasons, among others, mental health professionals believe such an extreme measure should occur as rarely as possible.[28]

75.    A trained mental health professional can provide expert assessment in the field— the safest and least restrictive setting possible—negating the need to invoke involuntary detention or transporting a person in crisis to a hospital for assessment. Indeed, a study of non-police mobile crisis teams found that approximately 70% of their engagements resulted in patient stabilization in the field.[29]

76.    But instead of using qualified mental health professionals to respond to the scene and promptly assess individuals experiencing mental health crises, the County relies on WCSO deputies to use their lay judgment to decide whether there's probable cause to believe the individual in crisis is a danger to themselves or any other person and is in need of immediate care, custody or treatment.[30]

77.    Concerningly, deputies frequently rely on this authority as a means of resolving crisis calls and opt to involuntarily detain people in crisis far too often—approximately 10% of the 12,159 mental-health-related calls that the WCSO responded to from January 1, 2020 to November 30, 2022 had a recorded disposition of "hold" or involuntary detention.

78.    These high rates of involuntary detentions have significant resourcing impacts on emergency services and hospital emergency departments in the County, who are required to receive these individuals and undertake their assessments.

---

[28] SAMHSA, *Civil Commitment and the Mental Health Care Continuum: Historical Trends and Principles for Law and Practice* 23 (2019), https://perma.cc/4ELX-XGGJ.
[29] SAMHSA, *National Guidelines*, *supra* note 6, at 13.
[30] OR. REV. STAT. § 426.228(1) (2024).

79.    Making matters worse, upon information and belief, the vast majority of patients involuntarily detained by WCSO deputies were detained unnecessarily, given most do not go on to be hospitalized and are subsequently discharged.[31] Having not received the psychiatric care they need, the patients are often left in the same position than they were in before calling for help, if not worse. Then the cycle continues.

## II.    **Defendants' Public Safety Dispatch and Emergency Response Services Are Not Equally Effective for Members of the Public Who Have Mental Health Disabilities as They Are for Others.**

80.    Not only is a law enforcement response to a mental health crisis inappropriate in its own right, it is also discriminatory.

81.    Obtaining quality emergency health care in a mental health crisis should be as routine and assistive as calling for medical care in other health crises. Yet—as the experiences of Plaintiff Wesley and Plaintiff DRO's clients and constituents demonstrate—it isn't.

82.    When someone in Washington County suffers a physical health crisis, such as a heart attack or allergic reaction, they can call for emergency help and expect a response from qualified health professionals specifically trained to assess emergent health issues, offer stabilization and treatment at the point of contact, and if necessary, transport them to a specialized treatment facility. However, when someone in the County experiences a mental health crisis and calls for help, the County treats their health emergency like a crime, sending tactically-trained,

---

[31] According to at least one study, this pattern is not uncommon. *See* Karim Al-Khafaji et al., *Characteristics and outcome of patients brought to an emergency department by police under the provisions (Section 10) of the Mental Health Act in Victoria, Australia*, 37 INT'L J. L. & PSYCHIATRY 1, https://perma.cc/JCA7-U2GC (67% of patients involuntarily detained by police did not go onto be hospitalized, were deemed as not requiring immediate treatment or care, and were subsequently discharged).

armed law enforcement officers who are more likely to exacerbate, rather than resolve the mental health crisis.

> **a.  Defendants Dispatch Safe, Appropriate, and Effective Responses for People Experiencing Physical Health Emergencies but They Do Not Do So for People Experiencing Mental Health Emergencies.**

83.    The Washington County Consolidated Communications Agency operates an emergency telecommunications facility, or 911 dispatch center, for the County and for other local jurisdictions under contract.[32] WCCCA receives all 911 emergency and non-emergency calls for service in the County, and as needed, routes the calls to an appropriate public or private safety agency that may then dispatch responding personnel to the scene.

84.    To determine how to respond to 911 calls, including which services, if any, should be dispatched, Agency call takers are instructed to follow all applicable rules, regulations, policies, and procedures, many of which are provided in the Washington County Consolidated Communications Agency Call Taking Manual ("the Manual").

85.    The Manual defines the Agency's organization, establishes employees' functions and responsibilities, and sets forth Agency policies and procedures.

86.    When an Agency call taker receives an emergency call for service regarding a fire, injury, crime, or medical emergency in the County, the call taker: 1) actively listens and gathers information about the emergency, 2) determines the nature and severity of the incident being reported, 3) categorizes and prioritizes the reported situation based on established Agency policy and procedure, 4) utilizes a computer-aided dispatch (CAD) system to create and distribute calls for service, and 5) sends the call to a queue for a designated Agency dispatcher to route the call to

---

[32] Washington County; Banks, Beaverton, Cornelius, Durham, Forest Grove, Gaston, Hillsboro, King City, North Plains, Sherwood, Tigard, and Tualatin. *About WCCCA*, Washington County Consolidated Communications Agency, https://perma.cc/3PPV-GK7D (last visited Jan. 25, 2024).

a private or public agency, including police,[33] fire,[34] and emergency medical services (American Medical Response or "AMR").[35]

87.    Once an emergency call is routed to an agency, that agency dispatches its personnel to respond to the emergency. Thus, where the Agency determines to route the call for service is critical in determining what personnel will actually respond.  For example, in the event of a physical health emergency, the Agency routes 911 calls to AMR, and AMR will then dispatch both paramedics and EMTs to respond to the incident.  In the event of a mental health emergency, the Agency routes 911 calls to a law enforcement agency, which first responds to the scene, and only then may request assistance from the Washington County Sheriff's Office Mental Health Response Team ("MHRT"), the Washington County Mobile Crisis Team, EMTs, or other County services.

88.    For example, the Washington County Sheriff's Office's Policy #1310-R03, "Responding to Persons with Mental Health Issues," instructs deputies responding to "a call that involves a person who appears to have mental health issues" to "obtain as much information as possible to assess and stabilize the situation," and only "once a situation is stabilized" should deputies "attempt to resolve the mental health crisis by applying suitable available resources listed in this policy."[36]

89.    Due to the design of the Agency's dispatch system, 911 calls for mental health crises in the County cannot be routed by the Agency to the County's contracted-for mental health

---

[33] The following policing agencies are dispatched by the Agency: Washington County Sheriff's Office, Cornelius Police Department, North Plains Police Department, Gaston Police Department, and Banks Police Department.

[34] The following fire departments are dispatched by the Agency: Forest Grove Fire & Rescue, Banks Fire District, Gaston Fire, Tualatin Valley Fire & Rescue, and Hillsboro Fire & Rescue.

[35] *See generally* WCCCA Call Taking Manual, Call Taking 101: An Introduction to Call Taking

[36] Washington County Sheriff's Office's Policy #1310-R03, "Responding to Persons with Mental Health Issues" at 1.

service provider, LifeWorks NW, or any of its non-police-involved mental health crisis services, including its Mobile Crisis Team ("MCT")—an expert-approved, clinician-endorsed response to mental health crises.

90.    The MCT is a non-police response team comprised of "mental health practitioners who respond to behavioral health crises onsite at the location in the community where the crisis arises and who provide a face-to-face therapeutic response."[37]

91.    As the contract between the County and LifeWorks NW demonstrates, MCT services are intended to provide a health intervention capable of stabilizing a person experiencing a mental health crisis. As the contract explains, MCT services "include face-to-face crisis assessment and evaluation by qualified mental health professionals; consultation with families, other professionals, or community partners such as law enforcement and community members; medication evaluation, if needed; psychiatric consultation; emergency medications; hospital diversion; stabilization services/follow-up care, as needed; referral to appropriate services; flexible funding to assist with emergency housing, transportation or other unmet needs contributing to the crisis episode; and language/culturally specific services."[38]

92.    The County has even agreed that the goal of the MCT is to "help an individual resolve a psychiatric crisis or emergency in the most integrated setting possible, and to avoid unnecessary emergency room visits, hospitalization, inpatient psychiatric treatment, child welfare involvement, placement disruption, houselessness, involuntary commitment, and arrest or incarceration."[39]

---

[37] Contract 22-1371, *supra* note 2, at 114.
[38] *Id.*, at 362.
[39] *Id.*, at 114.

93.    Although the MCT is contractually obligated to be available to respond to mental health crises in the County 24 hours per day, seven days a week, 365 days per year, the Agency does not dispatch the MCT in response to 911 calls for mental health crises. This is in part because the LifeWorks NW call center is not integrated into the Agency's dispatch system,[40] though the Agency has the telecommunication capability to do so. The Agency currently incorporates other services, such as the Washington County Sheriff's Office, into its dispatch system and could do the same for LifeWorks NW.

94.    Because the LifeWorks NW call center is not integrated into the Agency's dispatch system, the MCT may only be referred via the Washington County Crisis Line, 988, LifeWorks NW, responding law enforcement agencies, such as WCSO, local emergency departments, and emergency medical response staff.[41]

95.    Critically, law enforcement agencies that the Agency dispatches as primary responders to mental-health-related calls routinely respond themselves rather than immediately contacting the MCT. When responding law enforcement officers *do* contact the MCT, it is only after the officers determine—with their *sole* discretion—that the MCT is appropriate. As a result of this inefficient and counterintuitive system, all 911 calls for mental health crises in the County receive a separate law enforcement response before the MCT can even be summoned.

---

[40] *Id.*, at 304.
[41] *Id.*, at 362. When individuals experiencing a mental health crisis call a non-911 service line for help, such as the Washington County Crisis Line or LifeWorks NW, non-police mobile crisis teams are rarely deployed directly to those crises; and in the rare instances they are, their responses are not timely.

96.     And as data from the Washington County Department of Health and Human Services shows, MCT is not summoned often. In 2021 and 2022, responding law enforcement agencies referred MCT to the scene of only 106 calls.[42]

97.     By the sheer nature of this arrangement, County residents experiencing a mental health crisis are forced to interact with armed officers before they even have an opportunity, however rare, to see an MCT clinician capable of stabilizing them and providing treatment for the crisis that gave rise to the call for emergency medical service.

98.     Because Defendants do not dispatch the MCT in response to 911 mental health crises calls, they do not provide direct, immediate, and equal access to effective emergency response for individuals with mental health disabilities.

99.     In contrast, AMR is contractually obligated to respond to physical medical emergencies in the County 24 hours per day, seven days per week, 365 days per year. Moreover, in stark contrast to how it handles the MCT, the Agency routes physical emergency calls to AMR. This allows AMR personnel to provide immediate medical treatment, stabilize the individual, and in many cases transport that individual to a hospital or other medical facility where they can receive further specialized treatment.

100.    Further, AMR EMTs and paramedics who respond to physical health emergencies in the County require specialized training and certifications.

101.    In order to be licensed as an EMT in Oregon, an individual must complete an EMT educational course, and pass both the cognitive and psychomotor examinations designated by the National Registry of Emergency Medical Technician Exams.[43]

---

[42] For comparison, responding law enforcement agencies referred MHRT to the scene of 865 calls over that same period of time.
[43] OR. ADMIN. R. 333-265-0023 (2024).

102.    Paramedics must receive an associate's degree or higher from an accredited institution of higher learning, be previously certified as EMTs, complete an additional paramedic educational program that usually ranges from 1,200 to 1,800 hours, and pass a paramedic certification examination.[44]

103.    AMR's responses to physical medical emergencies thus deliver a specialized medical care that cannot be provided by a police officer (especially one who is not certified as an EMT or paramedic).

104.    Additionally, individuals experiencing physical health emergencies—unlike their counterparts suffering mental health crises—face little risk of entanglement with the criminal legal system when they request and receive emergency response services to which they are entitled.

105.    Individuals experiencing physical health emergencies face lower risks of criminal legal system involvement, at least in part, because law enforcement officers do not respond to their emergencies.

106.    According to data provided by the Agency, for the one-year period spanning March 1, 2022 to February 28, 2023, the Agency received 1,826 calls coded by Agency call takers as "AB – Abdominal Pain." For all 1,826 calls for service, the Agency dispatched emergency medical services only. The same is true for a litany of other physical health emergencies, including all calls for service coded as "AL – Allergic Reaction," "BA – Back Pain," "BL – Bleeding Problem," "CVA – Stroke," "CH – Chest Pain/ Heart," and "DI – Diabetic Problems."[45]

107.    As a result of Defendants' discriminatory policies and practice of dispatching law enforcement officers in response to mental health crises—before qualified mental health

---

[44] *Id.*
[45] According to data produced by the Washington County Consolidated Communications Agency.

professionals can even be summoned—County residents with mental health disabilities are left dependent on officers who are wholly unqualified to make critical medical treatment determinations, let alone administer stabilizing treatment themselves.

  **b. Defendants Dispatch Law Enforcement Officers to the Vast Majority of Mental Health Emergencies in the County**

  108. While Defendants consistently provide appropriate responses to physical health emergencies, their responses to mental health emergencies are usually woefully inadequate, and often harmful.

  109. As the Agency's data demonstrates, when someone in the County experiencing a mental health crisis calls for help, the County routinely responds to their health emergency in the same manner as it responds to a crime or threat to public safety. It sends tactically-trained, armed law enforcement officers who are more likely to exacerbate, rather than resolve the mental health crisis.

  110. The Agency documents all 911 calls received based on the call type, and records behavioral health emergencies by using these types, including "BHI – Behavioral Health Incident," "WCK – Welfare Check," and "SUA – Suicide Attempt." For calls designated as one of these categories, the Agency does not dispatch a specialized behavioral health responder, and instead, dispatches law enforcement, occasionally accompanied by Fire/EMS as a co-responders.[46]

  111. According to the Manual, "BHI – Behavioral Health Incident" calls should be coded as a "Dual Call-Type"—one that requires both Fire/EMS *and* law enforcement to respond.

  112. Agency call takers assign the "Dual Call-Type" designation "BHI – Behavioral Health Incident" calls irrespective of whether the incident involves people who pose a public safety

---

[46] *Id.*

threat, or whether an alleged crime is reported.[47] In other words, anyone who appears to be experiencing a mental health crisis, or who is otherwise categorized as having a behavioral health incident, is treated automatically as a threat—requiring law enforcement response—under the Agency's emergency response system. They are not treated as a person in need of health care services.

113.    For example, when the Agency receives an emergency call for service that involves a person "reported to be mentally unstable" the Agency's manual advises call takers to code the call as "BHI – Behavioral Health Incident" and to assign it a "Priority 2" response priority, meaning irrespective of its individual details, the incident is deemed "an immediate threat that is "occurring now and [where] there appears to be an immediate threat to people or property."[48]

114.    Therefore, *all* calls coded as behavioral health incidents in the County automatically receive an armed law enforcement response, instead of a qualified mental health professional or peer responder. As the Agency reminds its dispatchers throughout its policies and training materials, "It is better to over send than under send: when in doubt, send them out!"[49]

115.    This Agency motto and the accompanying ideology are rooted in harmful stigma and stereotypes about people with mental health disabilities. These common myths and misconceptions about people with mental health disabilities incorrectly characterize them as violent and dangerous. These myths persist even though nationwide, "the overwhelming majority of people with mental illness are not violent…."[50]

---

[47] WCCCA Call Taking Manual, Chapter 13: Police Call Types & Other Emergent Type Calls, at 1 (hereinafter referred to as "WCCCA Call Taking Manual, Chapter 13")
[48] *Id.*
[49] WCCCA Call Taking Manual, Chapter 14: Fire Call Types, at 1.
[50] Rozel & Mulvey, *supra* note 15, at 448.

116.    These misconceptions and assumptions prime law enforcement officers—even those with Critical Incident Training ("CIT")—to expect and prepare for combatant and violent subjects, despite overwhelming empirical evidence that there is unlikely to be a threat. This priming can lead to overreactions that culminate in unnecessary arrest, uses of force, and unwarranted hospitalizations.

117.    One need look no further than the Agency's training materials to see how ingrained these misunderstandings, fears, and stereotypes about disability are in its policies and practices.

118.    For example, in Agency materials for a January 2023 training, instructors advised dispatchers that when they are considering whether to downgrade a call's response, dispatchers should err on the side of caution and dispatch law enforcement because:

- "A 93yo woman with dementia can be as strong and dangerous as a 23yo male. It's their frame of mind at the time. Same with a 7-year-old child with behavior/mental health issues."[51]

- "Sometimes responders need the "manpower" to make sure the person needing help doesn't get injured when being detained or treated."[52]

119.    This instruction, however misguided, has not gone unheeded. According to data provided by the Agency, for the one-year period spanning March 1, 2022 to February 28, 2023, the Agency received 1,319 calls that Agency call takers coded as ""BHI – **Behavioral Health Incident." For all 1,319 calls, the Agency dispatched law enforcement officers as primary responders.[53]

---

[51] Washington County Consolidated Communications Agency, Training Outline—Instructor Guide, January 2023, at 8 (hereinafter referred to as "WCCCA Instructor Guide")
[52] *Id.*
[53] Per its policy, the Agency also dispatched and staged ambulances as a precaution.

120.    Similarly, per its training materials, the Agency directs call takers to advise dispatchers to send *only* law enforcement officers—not qualified behavioral health professionals—to respond to two other types of behavioral health related calls, Welfare Check Only (WCK only), and Suicide Threat (SUT). The Agency defines these categories by way of example as follows:

- Welfare Check Only (WCK only): "Male laying [sic] on the sidewalk covered in a blank[et]—caller passed by and didn't check person or see anything else to indicate a medical problem."[54]

- Suicide Threat (SUT): "[Person] saying the[y] will take pills but no meds in the house; say[ing] they want to shoot themselves, but no access to the gun; sitting in their house saying they want to jump off a bridge." [55]

121.    For the one-year period spanning March 1, 2022 to February 28, 2023, the Agency received 1,826 calls that Agency call takers coded as "Welfare Check (WCK)," and predictably, the Agency dispatched law enforcement officers to 100% of those calls.

122.    Similarly, during the same one-year period, the Agency received 1,631 calls that Agency call takers coded as "Suicide Threat (SUT)." The Agency also dispatched law enforcement officers to 100% of those calls.

123.    As the examples above highlight, 911 calls for a mental health crisis in the County are met immediately with an ineffective law enforcement response that is only occasionally followed by a response from qualified mental health professionals.

---

[54] WCCCA Instructor Guide, *supra* note 51, at 6.
[55] *Id.*, at 7.

III.    **Defendants Administer Their Public Safety Dispatch and Emergency Response Services in a Manner that Substantially Impairs the Objectives of Those Services**

124.    Structural barriers of the County's own creation also prevent appropriate responses to mental health crises.

125.    Each county in Oregon provides local mental health services—including emergency response services for mental health crises—through a Community Mental Health Program ("Program").[56]

126.    The County's Program is responsible for planning the delivery of services to all of its residents with "mental or emotional disturbances, developmental disabilities, alcoholism or drug dependence, and persons who are alcohol or drug abusers."[57]

127.    Instead of providing all its statutorily-required services directly, the County elected to contract with a private company, LifeWorks NW, to provide a portion of these services, including "behavioral health crisis and safety net services."[58]

128.    These crisis services include, among others, mobile crisis services that are available twenty-four hours a day, seven days a week and provide a face-to-face therapeutic response within one hour of notification of the crisis event; crisis lines that operate twenty-four hours a day, seven days a week; and peer services.[59]

129.    The state statute that governs the provision of these services defines mobile crisis team as "a team of qualified behavioral health professionals that may include peer support specialists…and other health care providers such as nurses or social workers who provide timely, developmentally appropriate and trauma-informed interventions, screening, assessment, de-

---

[56] OR. REV. STAT. § 430.630(3)(b) (2024).
[57] OR. REV. STAT. § 430.610(1) (2024).
[58] Contract 22-1371, *supra* note 2, at 304.
[59] *Id.*; OR. ADMIN. R. 309-0019-0150 (2021).

escalation and other services necessary to stabilize an individual experiencing a behavioral health crisis…."[60]

130.    LifeWorks NW, as the Program's designee, is required to "provide mobile crisis services as a component of crisis services for individuals experiencing mental health crisis within [Washington County] to meet the following objectives:

- Reduce acute psychiatric hospitalization of individuals experiencing mental health crisis; and

-  Reduce the number of individuals with mental health diagnoses who are incarcerated as a result of mental health crisis events involving law enforcement."[61]

131.    Similarly, the Oregon Administrative Rules define the goal of mobile crisis services as: "help[ing an individual resolve a psychiatric crisis in the most integrated setting possible and… avoid[ing] unnecessary hospitalization, inpatient psychiatric treatment, involuntary commitment, and arrest or incarceration."[62]

132.    The current contract between the County and LifeWorks NW to provide mobile crisis services offers guidance for achieving these objectives: "[t]he effectiveness of Mobile Crisis Services in de-escalating a Crisis and diverting emergency room, hospitalization, child welfare involvement or arrest is enhanced by team members competent in performing an assessment and delivering an effective course of intervention."[63]

---

[60] OR. REV. STAT. § 430.626 (2024).
[61] OR. ADMIN. R. 309-019-0150 (5)(a)(b) (2021).
[62] OR. ADMIN. R. 309-019-0105(72) (2021).
[63] Contract 22-1371, *supra* note 2, at 115.

133.    Despite clear statutory[64] and contractual requirements[65] that both mandate a default non-policing response for mental health crises, the County, through its contractor, LifeWorks NW, primarily deploys its Mental Health Response Team ("MHRT")—a co-response team comprised of a law enforcement officer and a clinician outfitted with a ballistic vest, as required by WCSO policy[66]—to respond to mental health crisis episodes after non-MHRT law enforcement officers respond first. These responses are inexplicably in fulfillment of the services intended to be provided by mobile crisis teams comprised of qualified behavioral health professionals *only*.

134.    Therefore, prior to sending the County's non-police response to mental health emergencies, Defendants send armed Washington County Sheriff's Office deputies as default primary responders. These responding deputies are not qualified mental health professionals capable of providing on-site psychiatric assessment, stabilization, and treatment to individuals in crisis. And their very presence creates a substantial risk that they will exacerbate, rather than alleviate, the mental health crises they are intended to address.

135.    As a result, Defendants administer their public safety dispatch and emergency response services in violation of state law, and in a way that substantially impairs the ability of those services to fulfill their essential purposes of providing adequate dispatch and emergency response services for mental health emergencies.

IV.    **The Experiences of Plaintiff DRO's Clients and Constituents, Including Plaintiff Wesley, Demonstrate that Defendants' Emergency Response Services Harm and Discriminate Against People with Mental Health Disabilities.**

136.    As the following experiences of Plaintiff Wesley and Plaintiff DRO's clients and constituents demonstrate, calling for emergency psychiatric aid in the County is fraught with the

---

[64] OR. REV. STAT. § 430.626 (2024).
[65] *See generally* Contract 22-1371, *supra* note 2.
[66] *Id.*, at 365.

risk of adverse outcomes. These include but are not limited to, being subjected to police use of force, citation, arrest, and unnecessary hospitalization. These outcomes are inevitable consequences of Defendants' discriminatory policies and practices that increase the likelihood that armed officers will exacerbate, rather than resolve, mental health crises.

### a. Plaintiff Joshua Wesley

137.    Mr. Wesley is a 28-year-old bi-racial man diagnosed with depression and PTSD, and who has a history of suicidal ideation and substance-use psychosis.

138.    At the time of the incident on October 24, 2022, described below, Mr. Wesley had at least one prior incident involving Defendants' mental health crisis response system.

139.    In August 2022, Mr. Wesley had a dispute with his then-partner (hereinafter referred to as "Ms. C.R.") during a depressive episode. Ms. C.R. called the Agency for assistance and explained that Mr. Wesley was experiencing suicidal ideation and specifically, that Mr. Wesley was contemplating law-enforcement-assisted suicide.

140.    Based on this information, Defendants knew or reasonably should have known that Mr. Wesley was at heightened risk of attempting law-enforcement-assisted suicide and that a police response to any suicidal crisis involving Mr. Wesley may heighten the risk of harm to Mr. Wesley instead of decreasing it.

141.    Nevertheless, Ms. C.R.'s call for help during Mr. Wesley's August 2022 mental health crisis was met with a response from armed WCSO deputies, just as was the case during his mental health crisis less than three months later.

142.    After the August 2022 incident, Mr. Wesley was prescribed medication and received counseling at the Hawthorn Walk-In Center, operated by the County through LifeWorks NW.

143.    On the night of October 23, 2022, Mr. Wesley was again experiencing suicidal ideation.

144.    After a night out in downtown Portland, Mr. Wesley called Ms. C.R. and told her he hadn't been taking his medication and that he was suicidal.

145.    Ms. C.R. persuaded Mr. Wesley to leave Portland and go back to his apartment in Washington County. Mr. Wesley complied. When Mr. Wesley arrived at home, he continued to tell Ms. C.R. that he was suicidal.

146.    A short while later, in the early morning of October 24, 2022, Mr. Wesley began a three-way call with the Veterans Crisis Line and Ms. C.R.

147.    Mr. Wesley called the Veterans Crisis Line specifically because he did not want police to be sent to his aid and he thought that calling 911 would almost certainly elicit a police response.

148.    During the conversation with the Crisis Line call taker, Mr. Wesley was asked whether he had any weapons in the house or if he had hurt himself recently. Mr. Wesley communicated to the call taker that he had cut himself recently, that he had knives in the house but did not have any on his person, and that he was suicidal. At no point during the incident did Mr. Wesley express any intention or desire to harm anyone but himself.

149.    After receiving this information, the Crisis Line call taker forwarded the call to the Washington County Consolidated Communications Agency (Agency).

150.    Soon after receiving the transferred call and relevant background information, the Agency call taker coded the call as "WCK – Welfare Check – PD"—a Priority 2 call, meaning that the incident is "an immediate threat that is 'occurring now' and there appears to be an immediate

threat to people or property."[67] The Agency call taker then changed the call type to "SUA-Suicide Attempt – FD" after receiving more information about the crisis from Mr. Wesley and Ms. C.R. The Agency call taker also upgraded the call's priority to "Priority 1." According to the Agency's policy, this means that the incident is "an emergency where there appears to be an imminent threat to life."[68]

151.    On information and belief, the Agency call taker knew or reasonably should have known that Mr. Wesley had a mental health condition, that he was experiencing a mental health crisis, and that he wanted an emergency response from mental health professionals, not armed police.

152.    Contrary to Mr. Wesley's wishes, the Agency dispatched the closest WCSO deputies to Mr. Wesley's residence. WCSO Deputy #1 was the primary responder. WCSO Deputies #2, #3, and #4 along with WCSO Sergeant #1 also responded to the parking lot of Mr. Wesley's apartment complex.[69]

153.    Deputy #1 reported that his partner radioed that according to the records management system Mr. Wesley had cautions for "poss weapons," "resists arrest" and "suicidal."[70]

154.    Deputy #1 then placed a call directly to Mr. Wesley, which Mr. Wesley answered. During their brief conversation, Mr. Wesley told Deputy #1 he was feeling anxious, paranoid, and that he wanted to kill himself.

---

[67] WCCCA Call Taking Manual, Chapter 13, *supra* note 47, at 1.
[68] *Id.*
[69] The identity of the WCSO deputies who responded to Plaintiffs' calls for service have been obfuscated in this complaint because this lawsuit seeks to magnify and remedy the issues with Defendants' emergency response system, not draw attention to or scrutinize the individual actions of the WCSO deputies that operate within that system.
[70] Information from a computer-aided dispatch report of Plaintiff Wesley's call for service on October 22, 2022.

155.    After being asked to come outside by Deputy #1, Mr. Wesley explained to him that he was intimidated by the five deputies on site and that he was reluctant to come outside.

156.    Despite his concerns, Mr. Wesley agreed to leave his apartment and came outside; he remained on the phone with Ms. C.R. Once outside, Mr. Wesley was compliant with the deputies' instructions, did not display any aggression, and did not threaten any violence.

157.    Deputy #1 explained to Mr. Wesley that he was going to place Mr. Wesley under a Police Officer Hold ("POH") because Mr. Wesley had previously expressed that he wanted to kill himself and Deputy #1 alleged he saw evidence of Mr. Wesley cutting himself.

158.    Even though Deputy #1 believed that Mr. Wesley had a mental health disability and was in the midst of a mental health crisis, neither Deputy #1 nor any responder on the scene ever took the following steps a qualified mental health professional would have taken before telling Mr. Wesley that he would be placed under a POH:

- Provide Mr. Wesley with on-site psychiatric assessment, stabilization, and treatment; or

- Request assistance, as needed, from other mental health crisis services available in the County.

159.    Instead, Deputy #1 told Mr. Wesley that in order to transport him to the hospital he would need to handcuff him and put him in the back of his patrol car. Mr. Wesley told Deputy #1 that he neither wanted to be handcuffed nor taken to the hospital by the WCSO deputies.

160.    Deputy #1 arranged for the ambulance staged near Mr. Wesley's residence to transport him to the Kaiser Westside Hospital ("Kaiser"). Deputy #1 followed the ambulance to the hospital.

161.    Critically, because WCSO deputies were the sole responders to Mr. Wesley's crisis, he was not provided with on-site psychiatric assessment, stabilization, and treatment by a qualified mental health professional. Thus, Mr. Wesley continued to experience suicidal ideation while he was transported to the hospital.

162.    Upon arrival at Kaiser, Mr. Wesley was taken by stretcher to an unsecured room in the emergency department, though the hospital has a secured room for patients experiencing suicidal ideation.

163.    Then, a nurse practitioner, assigned to tend to mental health patients, began taking Mr. Wesley's vitals. Midway through his vitals check, Mr. Wesley—not yet stabilized and still actively experiencing suicidal ideation —walked out of the unsecured room.

164.    Mr. Wesley then approached Deputy #1 and attempted to take his firearm while repeating "Let me kill myself." A struggle ensued between the two and ultimately, Deputy #1 stabbed Mr. Wesley several times with a knife, purportedly to prevent Mr. Wesley from taking his firearm.

165.    Mr. Wesley suffered serious injuries to his chest, stomach, and head as a result of the stabbing and remained in the hospital for nearly three weeks before being transferred to the Washington County Jail for the various criminal charges he faced arising from his altercation with Deputy #1.

166.    Mr. Wesley's case was adjudicated by the Mental Health Court of Washington County. There he pled guilty and was sentenced to five years of probation.

167.    Mr. Wesley suffered life-threatening physical injuries, emotional trauma, incarceration, and continued entanglement with the criminal legal system as a result of Defendants dispatching armed police as primary responders to Mr. Wesley's mental health crisis. Although

Mr. Wesley will likely need Defendants' emergency response services again in the future, he is hesitant to call for help because of the traumatizing experience he endured.

168.    By dispatching WCSO deputies to Mr. Wesley's crisis instead of qualified mental health professionals, Defendants denied Mr. Wesley the opportunity to be clinically assessed and stabilized at his home.  Instead, they exacerbated his crisis and provided him with an emergency response service that is unequal to the service provided to people experiencing a physical health emergency in the County.

### b. Jane Doe[71]

169.    At around 8:20am on February 6, 2021, multiple people called 911 to report that a woman was walking in traffic throwing unknown items near passing cars on SW Farmington Road in Beaverton, a city in Washington County, Oregon.

170.    Consistent with the Agency's call-taking policies, an Agency call taker coded the incident as a "Welfare Check."

171.    On information and belief, the Agency call taker and the Agency dispatcher responsible for managing the response for these calls knew or reasonably should have known that Jane Doe was experiencing a mental health crisis.

172.    Yet, the Agency dispatcher sent only four armed WCSO officers to the scene.

173.    Upon arriving at the scene, responding WCSO Deputy # 5 observed that Jane Doe was "walking in the road" toward him and "appeared to be manic and have either Bipolar or Schizophrenia."[72]

---

[71] Jane Doe is pseudonym for an unidentified person in Washington County. The factual basis of the allegations pleaded in Section IV(b) are redacted police reports produced by the Washington County Sheriff's Office pursuant to a public records request.

[72] WCSO Deputy #5's Use of Force Report, at 7.

174.    Deputy #5 then told Jane Doe "multiple times to get out of the roadway" and told her "that if she continued to walk in the roadway blocking traffic she would be arrested."[73]

175.    Even though Deputy #5 believed that Jane Doe had a mental health disability and was in the midst of a mental health crisis, at no point before telling Jane Doe that she would be arrested did Deputy #5—or any responder present—take any steps that a qualified mental health professional would take, such as:

- Displaying non-threatening, inviting body language;

- Assessing Jane Doe's needs by asking, among other things, what precipitated the crisis, whether he could help her, or whether there was anyone he could call for her;

- Attempting to de-escalate the situation and give Jane Doe time and space for her symptoms to dissipate; or

- Requesting assistance, as needed, from other mental health crisis services available in the County.

176.    Instead, Deputy #5 immediately told Jane Doe "she was under arrest" and proceeded to use force on her to effect the arrest.[74]

177.    According to the narrative Deputy #5 provided in his own use-of-force report, when Deputy #5 first grabbed Jane Doe's arm, she "immediately began trying to pull her arm away from [him] and continue walking away" so he "used a takedown to take the female to the ground."[75]

---

[73] *Id.*, at 8.
[74] *Id.*
[75] *Id.*

178.    After Deputy #5 performed the takedown, Jane Doe fell onto her back and screamed while kicking her legs and flailing her arms. As Jane Doe was flailing her legs, she inadvertently kicked Deputy #5.

179.    During the ensuing struggle to arrest Jane Doe, Deputy #5 grabbed Jane Doe's right arm while a second deputy, Deputy #6, grabbed her left arm and rolled her onto her stomach.

180.    Then, to handcuff Jane Doe, Deputy #5 placed his "right knee on the small of her back and applied downward pressure."[76]

181.    Only after Jane Doe was handcuffed did the deputies request medical support to "medically sedate her due to her very aggressive and resistive behavior."[77]

182.    Then, less than twenty minutes after he arrived on the scene, Deputy #5 placed Jane Doe on a police officer hold and had the responding paramedics strap her to an ambulance stretcher and transport her to St. Vincent Hospital.

183.    At the hospital, Deputy #5 then proceeded to issue Jane Doe criminal citations for her actions during the course of her arrest and involuntary hospitalization.

184.    Jane Doe was subjected to physical force, unnecessarily involuntarily hospitalized, and charged with three criminal offenses, including one felony, as a result of Defendants dispatching armed police as primary responders to Jane Doe's mental health crisis.

185.    In addition to these adverse outcomes, by dispatching armed WCSO deputies to Jane Doe's crisis instead of qualified mental health professionals, Defendants exacerbated, rather than resolved, her crisis.

---

[76] *Id.*, at 1.
[77] *Id.*, at 9.

186.     Instead of benefiting from Defendants' emergency response services, like people experiencing a physical health emergency in the County routinely do, Jane Doe endured being thrown to the ground, arrested, involuntarily hospitalized, and charged with criminal offenses because she experienced a mental health emergency.

### c.  John Doe[78]

187.     At approximately 1:52am on January 21, 2022, WCSO Deputy #7 was dispatched by the Agency to a call for service at the residence of John Doe regarding a "Behavioral Health Incident."[79]

188.     On information and belief, Defendants knew or reasonably should have known at the time the call was received that John Doe had a mental health disability and was in crisis.

189.     Deputy #7 had responded to the same location for another mental-health-related call for service just days earlier on the morning of January 18, 2022, and was aware of John Doe 1's mental health disability.

190.     In fact, according to Deputy #7, at the time of the incident on January 21, John Doe had been the subject of four previous calls for service in the prior three days, one of which resulted in the WCSO deputies placing John Doe in a police officer hold.

191.     Even though these prior police responses made clear that John Doe's psychiatric needs required a response from qualified professionals and an on-going intensive case management approach that could not be met by any police intervention, Defendants still dispatched only WCSO deputies to John Doe's residence instead of qualified mental health professionals.

---

[78] John Doe is pseudonym for an unidentified person in Washington County. The factual basis of the allegations pleaded in Section IV(c) are redacted police reports produced by the Washington County Sheriff's Office pursuant to a public records request.
[79] WCSO Deputy Use of Force Report at 10.

192.    Even though Deputy #7 believed that John Joe had a mental health disability and was in the midst of a mental health crisis, at no point before telling John Doe that he would be detained did Deputy #7—or any responder present—take any steps that a qualified mental health professional would take, such as:

- Assisting John Doe with on-site psychiatric assessment, stabilization, and treatment; or

- Connecting John Doe to other mental health crisis services available in the County.

193.    After a brief conversation with John Doe on his front porch and a separate discussion with John Doe's step-daughter, Deputy #7 determined he was going to detain John Doe on a police officer hold for fear John Doe was a danger to himself.

194.    When John Doe began moving from his front porch to his front door, Deputy #7 stepped in front of him to prevent John Doe from entering his home. John Doe brushed by Deputy #7 and proceeded to enter his home.

195.    Immediately after John Doe entered his home, Deputy #7 and the other three WCSO officers present began to use physical force in an attempt to move John Doe back outside.

196.    According to Deputy #7's narrative in his use-of-force report, the four officers "pushed and pulled [John Doe], who was physically resistive and hard to control just by his size alone." Deputy #7 went on to describe what transpired next: "At this time, although physically resistive, I did not sense that [John Doe] was trying to hurt me or us but I did fear if he broke loose, and perceived us as threats, he could easily become violent and we would have to escalate force."[80]

---

[80] *Id.*, at 11

197.    Confronted with this hostile escalation, John Doe did not respond in kind. Even though John Doe neither accosted nor once made any threat whatsoever to the responding officers, when John Doe began to slip away from Deputy #7's grip, Deputy #7 "retrieved [his] Taser and activated it...and initially intended on deploying the Taser to his back...." Another deputy also drew and activated his Taser and trained it on John Doe.[81]

198.    Ultimately, Deputy #7 did not deploy his Taser on John Doe but not because Deputy #7 did not deem its use appropriate under the circumstances. Deputy #7 wrote in his use-of-force report that he "did not deploy the Taser for fear that [John Doe] would fall onto Deputy [#8] and with all the various tools, bicycles and toys strewn all over the patio, I believed Dep. [#8] would have been hurt, as well as [John Doe], since we could not likely control his fall."[82]

199.    A short time later, the four deputies handcuffed John Doe and placed him on a police officer hold. John Doe was then involuntarily sedated by paramedics and taken to St. Vincent's Hospital via ambulance where he was involuntarily hospitalized.

200.    John Doe needed and was entitled to a crisis response from qualified mental health professionals on January 18, 2022. Had John Doe received an appropriate response—one that was designed specifically to meet his emergency need to psychiatric care—he likely would not have remained in crisis for an additional three days until January 21, 2022.

201.    However, Defendants did not afford John Doe such a response and instead, routed his calls for help to armed WCSO deputies, who responded and subjected John Doe to unwarranted police force and unnecessary hospitalization twice in a matter of only three days.

---

[81] *Id.*
[82] *Id.*

d.  **Mary Roe**[83]

202.    Shortly before 11:00am on June 1, 2022, the Agency received multiple emergency calls for service regarding a woman running in the middle of Tualatin Valley Highway in Hillsboro, flagging down cars, and asking drivers to call 911.

203.    On information and belief, the Agency call taker and the Agency dispatcher responsible for managing the response to these calls understood the incident was mental-health-related and knew or reasonably should have known that Mary Roe was experiencing a mental health crisis.

204.    Nevertheless, pursuant to the Agency's call taking policies, the Agency call taker coded the incident as a "Welfare Check," and the Agency dispatched only the closest available law enforcement officers to the scene.

205.    Hillsboro Police Department ("HPD") Officer #1 and HPD Officer #2 were the first to respond to the scene and located the woman who was "moving extremely quickly in random directions" and "speaking rapidly about threats."[84]

206.    On information and belief, HPD Officers #1 and #2 understood that Mary Roe was experiencing a mental health crisis.

207.    HPD Officers #1 and #2 tried to speak with Mary Roe but she ran from them each time they got close to her. Unable to successfully de-escalate the situation and stabilize Mary Roe, the HPD officers then requested assistance from the County's Mental Health Response Team ("MHRT").

---

[83] Mary Roe is pseudonym for an unidentified person in Washington County. The factual basis of the allegations pleaded in Section IV(d) are redacted police reports produced by the Washington County Sheriff's Office pursuant to a public records request.
[84] MHRT Deputy's Use of Force Report at 10.

208.    The responding MHRT was comprised of one Washington County Sheriff's Office deputy ("MHRT Deputy"), one Hillsboro Police Department officer ("MHRT Officer"), and one licensed clinician employed by LifeWorks NW ("MHRT Clinician").

209.    Prior to the MHRT Clinician interacting with Mary Roe, HPD Officers #1 and #2 apprehended Mary Roe by her arms and forcibly tried to make her keep still—actions that contravene the best practices of a "no force first" approach to de-escalating a mental health crisis.

210.    This ill-advised course of action caused Mary Roe further distress and agitation and ultimately, undermined the MHRT Clinician's subsequent attempt to de-escalate the situation and stabilize Mary Roe.

211.    While Mary Roe was being restrained by HPD Officers #1 and #2 she became "so upset" that she pulled away from their grasp and attempted to flee, telling them they "were not real police."[85]

212.    Before Mary Roe could break free, MHRT Deputy, who stands 5'10" and weights between 200-249 pounds, grabbed Mary Roe's arm, secured her around the waist, and used a "take down" to get Mary Roe to the ground.[86] MHRT Deputy then pulled Mary Roe's left arm behind her back as she laid on her stomach. The 200-plus-pound MHRT Deputy then "took up a position with [his] right knee across her lower back and hips while [his] left knee rested on her left shoulder."[87]

213.    According to MHRT Deputy's own report, he remained on Mary Roe's back while HPD Officer #2 gained control of Mary Roe's right arm and then, "after sometime [sic] passed to

---

[85] *Id.*
[86] *Id.*
[87] *Id.*

let [Mary Roe] calm down," placed her in handcuffs.[88] As MHRT Deputy finished placing Mary Roe in handcuffs, she began kicking and flailing her legs. Only after HPD Officers #1 and 2 assisted with placing a hobble around Mary Roe's legs did MHRT Deputy dismount Mary Roe's back.

214.    A short time later, the MHRT Clinician placed Mary Roe on a Director's Hold and Roe was taken to Kaiser Westside Hospital via ambulance where she was involuntarily hospitalized.

215.    Like so many others who have experienced a mental health crisis in Washington County, instead of benefiting from Defendants' emergency response services—like people experiencing a physical health emergency in the County routinely do—Mary Roe suffered an array of harms. Not only did she endure being thrown to the ground, arrested, and involuntarily hospitalized but she was also subjected to a highly dangerous restraint technique.

216.    The restraint technique MHRT Deputy used on Mary Roe—who committed no crimes and posed no threat to the safety of others—is considered a police use of force and is known as a form of prone restraint. There is widespread agreement in the policing community that officers should not keep a restrained individual in the prone position because of the significant risk of positional asphyxia (i.e., suffocation because of body position).

217.    The risks of suffocation are exacerbated when, like here, "physical restraint includes the use of behind-the-back handcuffing combined with placing the subject in a stomach-down position."[89]

---

[88] *Id.*
[89] U.S. Dep't of Just., *Nat'l Law Enforcement Tech. Ctr. Bulletin: Positional Asphyxia—Sudden Death* 2 (June 1995), https://perma.cc/2G7S-P4LF.

218.    The MHRT Deputy's use of this restraint tactic on Mary Roe represents one of many reasons why law enforcement officers—even those with crisis intervention and advanced mental health trainings—should not be included, in any capacity, in responses to mental health crises where there are no allegations of criminal activity and no legitimate threat of violence to others. The role of police is inextricably tied to their unique capacity and authority to use force against members of the public[90] and thus, police resort to the use of force to overpower resistance and seize or control individuals perceived to be dangerous or noncompliant, irrespective of whether those individuals are suspected of a crime or patients in crisis.

## V.    Non-Police Mobile Crisis Services Are the Appropriate Response to Mental Health Emergencies in the County

219.    As demonstrated by the experiences of Plaintiff Wesley and Plaintiff DRO's clients and constituents, police-based interventions not only fail to meet the psychiatric needs of patients in vulnerable situations, but they expose people with mental health disabilities to avoidable criminal justice system contacts or worse. People experiencing non-violent mental health emergencies, such as hallucinations or other distortions of reality or situations when people threaten or at are at risk of self-harm, do not require an armed police response. Instead, experts agree they require responses from non-police responders who are specifically trained to assess the condition, stabilize or treat the patient at the point of contact, and if necessary, transport the patient to a specialized treatment facility

220.    The SAMHSA Guidelines explain that one of the essential elements of a mental health crisis response is "mobile crisis teams," consisting of mental health professionals, including

---

[90] *See* Egon Bittner, *The Functions of the Police in Modern Society* 39 (1970) ("[T]he police are nothing else than a mechanism for the distribution of situationally justified force in society."); Rachel A. Harmon, *The Problem of Policing*, 110 MICH. L. REV. 761, 762 (2012) ("Police officers are granted immense authority by the state to impose harm.").

peer support specialists, who can be deployed to provide in-person medical care to people experiencing mental health emergencies and who can "[r]espond without law enforcement accompaniment" absent special circumstances.[91]

221.    Mobile crisis team services should include two-person teams—a licensed or credentialed clinician and a peer support specialist—who are able to properly assess an individual's needs and offer appropriate community-based interventions wherever they are, at any time. The mobile crisis team should respond without law enforcement, when possible, and attempt to de-escalate the encounter within a comfortable environment that is likely to produce more effective results than hospitalization.

222.    Mobile crisis services have well-documented positive impacts, including decreasing unnecessary and expensive hospitalizations.

223.    Peer supporters, who have experienced mental health crises and are trained in peer support processes, provide people in crisis with acceptance, understanding, and compassion that other crisis professionals may not be able to provide, leading to an array of positive outcomes, including reduction of psychiatric rehospitalizations.

224.    Similar to the SAMHSA guidelines, the National Alliance on Mental Illness (NAMI), a non-profit that serves people with mental health disabilities and their families, has concluded that "[w]hile law enforcement may still play a role in in some mental health crises, the primary response should come from mental health crisis response professionals."[92]

---

[91] SAMHSA, *National Guidelines*, *supra* note 6, at 18.
[92] NATIONAL ALLIANCE ON MENTAL ILLNESS, *supra* note 13.

225.    Systems following these guidelines for mental health crisis response exist in Oregon and have been implemented in jurisdictions of similar size to the County. These systems have been proven to be effective in reducing harm to individuals in crisis.

226.    For example, in Eugene, Oregon, Crisis Assistance Helping Out On The Street ("CAHOOTS"), a mobile intervention team, was established in 1989 to provide mental health first responders as an alternative to police response for non-violent crises. CAHOOTS teams operate out of vans that are dispatched in conjunction with but independent of other emergency services; each van includes two team members: a medic and an experienced crisis worker.[93] In 2021, CAHOOTS had some level of activity in 22,055 public-initiated calls for service and diverted between 3% to 8% of Eugene Police Department calls for service.[94]

227.    In Denver, Colorado, the Denver Department of Public Health & Environment and the Department of Safety collaborate to administer the Support Team Assisted Response ("STAR") Program. STAR deploys emergency response teams of two people—an emergency medical technician and a behavioral health clinician—to engage individuals experiencing distress related to mental health issues, poverty, homelessness, and substance abuse. STAR is dispatched through the 911 operating system and responds to calls where individuals are not in imminent risk.

228.    A recent Stanford study found that the STAR program reduced reports of targeted, less serious crimes (e.g., trespassing, public disorder, and resisting arrest) by 34% during its first

---

[93] WHITE BIRD CLINIC, *Crisis Assistance Helping Out on the Streets*, https://perma.cc/W622-4MMU, (last accessed Jan. 25, 2024).

[94] EUGENE POLICE DEPARTMENT CRIME ANALYSIS UNIT, *CAHOOTS Program Analysis 2021 Update* (May 17, 2022), https://eugene-or.gov/DocumentCenter/View/66051/CAHOOTS-program-analysis-2021-update.

six months of operation.[95] A multi-disciplinary assessment of STAR, including contributions from the Denver Police, Mental Health Center of Denver and Denver 911, found that none of the 748 calls that STAR responded to during its initial six months required police arrests. Mental health was cited as the most common primary concern of individuals encountered in the STAR program.

229.    In San Francisco, California, the Street Crisis Response Team ("SCRT") is a collaboration between the San Francisco Department of Public Health, Fire Department, and Department of Emergency Management to provide clinical interventions and care coordination for people who experience behavioral health crises in public spaces. SCRT is an alternative response to dispatching law enforcement that employs "a behavioral health approach that deescalates situations and addresses a person's immediate needs for care, treatment, and shelter." During its first year, SCRT—with teams of a paramedic, a behavioral health clinician, and a behavioral health peer specialist—diverted more than "one-third of all 911 calls (38%) for 'mentally disturbed persons' from law enforcement."[96]

230.    Unlike these other jurisdictions, Defendants continue to deploy law enforcement officers as the default first responder for non-violent mental health emergencies in violation of the ADA and the Rehabilitation Act.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Discrimination on the Basis of Disability in Violation of
Title II of the Americans with Disabilities Act 42 U.S.C. §§ 12131.**
*(On behalf of Plaintiff Wesley and Plaintiff DRO against Defendant Washington County and
Defendant Washington County Consolidated Communications Agency)*

---

[95] Thomas Dee & Jaymes Pyne, *A community response approach to mental health and substance abuse crises reduced crime*, 8 SCIENCE ADVANCES 6 (Jun. 8, 2022) https://www.science.org/doi/10.1126/sciadv.abm2106.

[96] SAN FRANCISCO OFFICE OF THE MAYOR, *San Francisco Celebrates One-Year Anniversary of Street Crisis Response Team* (Nov. 30, 2021), https://perma.cc/H9N6-3ZBQ.

231.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

232.    Title II of the Americans with Disabilities Act (ADA) prohibits state and local government entities from denying qualified individuals with disabilities or those regarded as having disabilities an equal opportunity to benefit from the entity's services, programs, or activities. 42 U.S.C. § 12132. The ADA's protections extend to all aspects of a public entity's activities, including the provision of emergency response services.

233.    Plaintiff Joshua Wesley has depression and PTSD, both of which substantially limit one or more of his major life activities, such as thinking, communicating, and interacting with others. Plaintiff Wesley is a qualified individual with a disability protected by the ADA, *see* 42 U.S.C. §§ 12102, 12131(2).

234.    Plaintiff DRO's clients and constituents, including Jane Doe, John Doe, and Mary Roe, have or are regarded as having mental health disabilities that substantially limit one or more of their major life activities such as thinking, communicating, and interacting with others. Plaintiff DRO's clients and constituents are qualified individuals with disabilities protected by the ADA, s*ee* 42 U.S.C. §§ 12102, 12131(2).

235.    The Agency and Washington County are each, respectively, a public entity as defined by Title II of the ADA. 42 U.S.C. § 12131(1).

236.    The Defendants' unified emergency response services, including 911 service and other systems that receive information about potential emergency situations and that dispatch or facilitate the dispatch of personnel such as police, fire, mobile crisis teams, and emergency medical service personnel to respond to those situations, is a service, program or activity within the meaning of Title II.

237.    The ADA, as authoritatively construed by its implementing regulations, provides that public entities may not provide aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, 28 C.F.R. § 35.130(b)(1); may not rely on "methods of administration that . . . defeat[] or substantially impair[] accomplishment" of the program's objectives, 28 C.F.R. § 35.130(b)(3); and may not "provide aids, benefits, or services in such a way that qualified individuals are not afforded "equal opportunity to obtain the same result . . . as that provided to others," or are "otherwise limit[ed] . . . in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service," 28 C.F.R. § 35.130(b)(1).

238.    When the Agency receives physical-health-related emergency calls for service in the County, the Agency makes determinations regarding call type and priority level, and then routes those calls to the County's ambulance service provider, AMR, which then dispatches paramedics and EMTs as first responders. The responding paramedics and EMTs are specifically trained to assess, stabilize, and treat the emergent health issue at the point of contact.

239.    When the Agency receives mental-health-related calls for service in the County, including those where there are no allegations of criminal activity and there is no legitimate threat of violence to others, the Agency makes determinations regarding call type and priority level, and then routes those calls to the Washington County Sheriff's Office (or other local law enforcement agencies, as needed), which then dispatches armed law enforcement officers as primary responders. The responding WCSO deputies are not qualified mental health professionals capable of providing on-site psychiatric assessment, stabilization, and treatment to individuals in crisis.

240.    As a result, people with mental health disabilities in the County, including Plaintiff Wesley and Plaintiff DRO's clients and constituents, such as Jane Doe, John Doe, and Mary Roe,

have been discriminated against by reason of their disability and deprived of the immediate medical care they need and unnecessarily exposed by Defendants to substantial risk of adverse outcomes, including but not limited to citation, arrest, involuntary hospitalization, and police uses of force.

241.     Additionally, the County has appropriate, non-police responses, such as the mobile crisis team, available to dispatch to mental health crises. Yet, before the Agency routes calls to any entity that may dispatch non-police responses to mental health emergencies, the Agency routes calls to the Washington County Sheriff's Office or other law enforcement agencies, which dispatches armed deputies as default primary responders. Responding deputies are not qualified mental health professionals capable of providing on-site psychiatric assessment, stabilization, and treatment to individuals in crisis. Their presence creates a substantial risk that they will exacerbate, rather than alleviate, the mental health crises they are intended to address.

242.     Therefore, Defendants administer their emergency response service in a way that substantially impairs the ability of that system to fulfill its essential purpose of providing adequate emergency response services for mental health emergencies.

243.     As a direct and proximate result of Defendants' discrimination, Plaintiff Wesley and Plaintiff DRO's clients and constituents, including Jane Doe, John Doe, and Mary Roe, have suffered and will continue to suffer harm in violation of their rights under the ADA. 42 U.S.C. § 12132.

## SECOND CAUSE OF ACTION

### Discrimination on the Basis of Disability in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794
*(On behalf of Plaintiff Wesley and Plaintiff DRO against Defendant Washington County and Defendant Washington County Consolidated Communications Agency)*

244.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

245.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against people with disabilities by any program or activity receiving federal financial assistance. Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program. 29 U.S.C. § 794(a). A program or activity includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

246.    Plaintiff Joshua Wesley has depression and PTSD, both of which substantially limit one or more his major life activities, such as thinking, communicating, working, and interacting with others. Plaintiff Wesley is a qualified individual with a disability protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j).

247.    Plaintiff DRO's clients and constituents, including Jane Doe, John Doe, and Mary Roe have or are regarded as having mental health disabilities that substantially limit one or more of their major life activities such as thinking, communicating, and interacting with others.  Plaintiff DRO's clients and constituents are qualified individuals with disabilities or perceived disabilities protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j).

248.    The Agency and County each, respectively, receive "Federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

249.    The Defendants' unified emergency response services, including 911 service and other systems that receive information about potential emergency situations and that dispatch or facilitate the dispatch of personnel such as police, fire, mobile crisis teams, and emergency medical

service personnel to respond to those situations, are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)–(B).

250.    Section 504 prohibits covered entities from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

251.    Further, Section 504 prohibits methods of administration that defeat or substantially impair accomplishment of the program's objectives.

252.    When the Agency receives physical-health-related emergency calls for service in the County, the Agency makes determinations regarding call type and priority level, and then routes those calls to the County's ambulance service provider, AMR, which then dispatches paramedics and EMTs as first responders. The responding paramedics and EMTs are specifically trained to assess, stabilize, and treat the emergent health issue at the point of contact.

253.    When the Agency receives mental-health-related calls for service in the County, including those where there are no allegations of criminal activity and there is no legitimate threat of violence to others, the Agency makes determinations regarding call type and priority level, and then routes those calls to the Washington County Sheriff's Office (or other local law enforcement agencies, as needed), which then dispatches armed law enforcement officers as primary responders. The responding WCSO deputies are not qualified mental health professionals capable of providing on-site psychiatric assessment, stabilization, and treatment to individuals in crisis.

254.    As a result, people with mental health disabilities in the County, including Plaintiff Wesley and Plaintiff DRO's clients and constituents, such as Jane Doe, John Doe, and Mary Roe,

have been discriminated against by reason of their disability and deprived of the immediate medical care they need and unnecessarily exposed by Defendants to substantial risk of adverse outcomes, including but not limited to citation, arrest, involuntary hospitalization, and police uses of force.

255. Additionally, the County has appropriate, non-police responses, such as the mobile crisis team, available to dispatch to mental health crises. Yet, before the Agency routes calls to any entity that may dispatch non-police responses to mental health emergencies, the Agency routes calls to the Washington County Sheriff's Office or other law enforcement agencies, which dispatches armed deputies as default primary responders. Responding deputies are not qualified mental health professionals capable of providing on-site psychiatric assessment, stabilization, and treatment to individuals in crisis and their presence creates a substantial risk that they will exacerbate, rather than alleviate, the mental health crises they are intended to address.

256. Therefore, Defendants administer their emergency response service in a way that substantially impairs the ability of that system to fulfill its essential purpose of providing adequate emergency response services for mental health emergencies.

257. As a direct and proximate result of Defendants' discrimination, Plaintiff Wesley and Plaintiff DRO's clients and constituents, including Jane Doe, John Doe, and Mary Roe, have suffered and will continue to suffer harm in violation of their rights under the Rehabilitation Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request this Court:

A. Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the Defendants' emergency response programs and services violate Title II of the Americans with Disabilities Act of 1990,

42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794;

B.  Grant Plaintiffs' permanent injunctive relief requiring, at a minimum and within a limited and reasonable period of time, that Defendants, their agents, employees, and those persons acting in concert with them implement and operate emergency response programs and services that provide comparable responses to physical health emergencies and mental health emergencies, and that ensure that mental health professionals are the default first responders for typical mental health emergencies;

C.  Order Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, inter alia, 42 U.S.C. § 12205, 42 U.S.C. § 1988, and other applicable laws; and

D.  Order such other relief as the Court may deem just and proper, including such orders as may be necessary to effectuate and implement the foregoing.

Dated: February 5, 2024                    Respectfully submitted,

                                           */s/* David Boyer

                                           David Boyer, OSB # 235450
                                           Meghan E. Apshaga, OSB #232137
                                           Disability Rights Oregon
                                           511 SW 10th Ave., Suite 200
                                           Portland, OR 97205-2748
                                           dboyer@droregon.org
                                           mapshaga@droregon.org
                                           (503) 243-2081 ext. 301

                                           Kelly Simon, OSB #154213
                                           American Civil Liberties Union
                                           Foundation of Oregon, Inc.
                                           PO Box 40585
                                           Portland, OR 97240-0585
                                           ksimon@aclu-or.org
                                           (503) 227-3186

                                           Julian Clark*
                                           Jenn Rolnick Borchetta*
                                           American Civil Liberties Union
                                           Foundation, Inc.
                                           125 Broad Street, 17th Floor
                                           New York, NY 10004-2400
                                           jclark@aclu.org
                                           jborchetta@aclu.org
                                           (929) 969-4365

                                           Brian Dimmick*
                                           Westley Resendes*
                                           American Civil Liberties Union
                                           Foundation, Inc.
                                           915 15th Street NW
                                           Washington, DC 20005-2302
                                           bdimmick@aclu.org
                                           wresendes@aclu.org
                                           (202) 638-2210

                                           Wilson Baker*
                                           American Civil Liberties Union
                                           Foundation, Inc.
                                           425 California Street
                                           San Francisco, CA 94104-2102
                                           wbaker@aclu.org

(415) 570-8011

Daniel L. Brown*
Laura L. Chapman*
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112-0015
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
dbrown@sheppardmullin.com
lchapman@sheppardmullin.com
NY Telephone: (212) 634-3095
SF Telephone: (415) 434-9100

Attorneys for Plaintiffs

*pro hac vice pending