Julian Clark
Jenn Rolnick Borchetta
American Civil Liberties Union
Foundation, Inc.
125 Broad Street, 17th Floor
New York, NY 10004-2400
jclark@aclu.org
jborchetta@aclu.org
(929) 969-4365

David Boyer, OSB # 235450
Meghan E. Apshaga, OSB #232137
Disability Rights Oregon
511 SW 10th Ave., Suite 200
Portland, OR 97205-2748
dboyer@droregon.org
mapshaga@droregon.org
(503) 243-2081 ext. 301

Brian Dimmick
Westley Resendes
American Civil Liberties Union
Foundation, Inc.
915 15th Street NW
Washington, DC 20005-2302
bdimmick@aclu.org
wresendes@aclu.org
(202) 638-2210

Wilson Baker
American Civil Liberties Union
Foundation, Inc.
425 California Street
San Francisco, CA 94104-2102
wbaker@aclu.org
(415) 570-8011

Kelly Simon, OSB #154213
American Civil Liberties Union
Foundation of Oregon, Inc.
PO Box 40585
Portland, OR 97240-0585
ksimon@aclu-or.org
(503) 227-3186

Daniel L. Brown*
Laura L. Chapman
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112-0015
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
dbrown@sheppardmullin.com
lchapman@sheppardmullin.com
NY Telephone: (212) 634-3095
SF Telephone: (415) 434-9100

Attorneys for Plaintiffs

*pro hac vice application pending

UNITED STATES DISTRICT

COURT DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |
|---|---|
| DISABILITY RIGHTS OREGON, on behalf of its clients and constituents, and JOSHUA WESLEY, | Case No. 3:24-cv-00235-SB |
| Plaintiffs, | PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS |
| v. | **ORAL ARGUMENT REQUESTED** |
| WASHINGTON COUNTY, a political subdivision of the State of Oregon; and the WASHINGTON COUNTY CONSOLIDATED COMMUNICATIONS AGENCY, an intergovernmental entity in the State of Oregon, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD............................................................................................. 3

STATEMENT OF FACTS ..................................................................................... 4

ARGUMENT ......................................................................................................... 7

I.    Plaintiffs Plausibly Allege Actionable Claims of Disability Discrimination Under the
ADA and Rehabilitation Act ............................................................................... 7

   A.    Plaintiffs Plausibly Allege that the Service at Issue is Defendants' Unified Emergency
   Response System.............................................................................................. 9

   B.    Plaintiffs Plausibly Allege Defendants' Unified Emergency Response System
   Discriminates Against People with Mental Health Disabilities ........................... 16

      1.    *Plaintiffs Plausibly Allege That Defendants Do Not Afford People with Mental
      Health Disabilities Equal Opportunity to Access the Benefits of Defendants' Emergency
      Response System* ....................................................................................... 17

      2.    *Plaintiffs Plausibly Allege that Defendants Administer Their Emergency Response
      System by Methods that Substantially Impair Its Objectives with Respect to People with
      Mental Health Disabilities* .......................................................................... 22

      3.    *Plaintiffs Seek Neither a Higher Standard of Care nor a New Service* ................... 23

   C.    Plaintiffs Plausibly Allege Defendants' Emergency Response System Discriminates by
   Reason of Disability ....................................................................................... 28

II.    Plaintiff Disability Rights Oregon Exhausted All Required Administrative Remedies Prior
to Filing This Lawsuit ...................................................................................... 33

III.    Defendant County's Alternative Motions to Strike and For a More Definite Statement
Should Be Denied............................................................................................. 37

   A.    Plaintiffs' Allegations Are Not Immaterial, Impertinent, or Scandalous .................... 37

   B.    Plaintiffs' Complaint Is Sufficiently Clear and Specific Such That Defendant County
   Could Reasonably Prepare a Response ................................................................ 38

CONCLUSION..................................................................................................... 39

CERTIFICATE OF SERVICE .............................................................................. 41

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Advocacy Ctr. v. Stalder*,
  128 F. Supp. 2d 358 (M.D. La. 1999) ...................................................................... 36

*Albino v. Baca*,
  747 F.3d 1162 (9th Cir. 2014) ............................................................................... 27

*Alexander v. Choate*,
  469 U.S. 287 (1985) ...................................................................................... 10, 15, 29

*Am. Council of the Blind v. Paulson*,
  525 F.3d 1256 (D.C. Cir. 2008) ............................................................................. 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 3

*Barden v. City of Sacramento*,
  292 F.3d 1073 (9th Cir. 2002) ................................................................................. 7

*Barnes v. Olive*,
  No. 2:15-cv-00520, 2015 WL 5813193 (D. Or. Sept. 30, 2015) ............................. 38

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 4

*Brooklyn Ctr. for Indep. of Disabled vs. Bloomberg*,
  980 F. Supp. 2d 588 (S.D.N.Y. 2013) .................................................................... 10

*Buchanan v. Maine*,
  469 F.3d 158 (1st Cir. 2006) .................................................................................. 27

*Byers v. Wal-Mart Stores, Inc.*,
  No. 3:17-cv-00579, 2017 WL 9049874 (D. Or. Oct. 2, 2017) ................................ 37

*C.B. v. Sonora Sch. Dist.*,
  691 F. Supp. 2d 1170 (E.D. Cal. 2010) .................................................................. 39

*Cantu v. City of Portland*,
  No. 3:19-CV-01606, 2020 WL 2952972 (D. Or. June 3, 2020) ........................ 37, 39

*Cmtys. Actively Living Indep. & Free v. City of LA*,
  2011 WL 4595993 (C.D. Cal. Feb 10, 2011) ..................................................... 10, 29

*Cohen v. City of Culver City*,
  754 F.3d 690 (9th Cir. 2014) ............................................................................ 19, 20

*Complete Distrib. Servs., Inc. v. All States Transp.*, LLC,
  No. 3:13–cv–00800, 2015 WL 1393281 (D. Or. Mar. 25, 2015) ........................... 37

*Crowder v. Kitagawa,*
    81 F.3d 1480 (9th Cir. 1996).......................................................................... 27, 29

*Daubert v. Lindsay Unified Sch. Dist.,*
    760 F.3d 982 (9th Cir. 2014)............................................................................... 20

*Disability Rights N.J., Inc. v. Comm'r, Dep't of Human Servs.,*
    796 F.3d 293 (3d Cir. 2015)........................................................................... 25, 28

*Doe v. Pfrommer,*
    148 F.3d 73 (2d Cir. 1998)................................................................................... 28

*Does 1–5 v. Chandler,*
    83 F.3d 1150 (9th Cir. 1996)........................................................................... 14, 15

*Dunn v. Dunn,*
    219 F. Supp. 3d 1163 (M.D. Ala. 2016)............................................................... 36

*Gonzalez v. Martinez,*
    756 F. Supp. 1533 (S.D. Fla. 1991)..................................................................... 35

*Gunzenhauser v. Garland,*
    No. 22-CV-03406, 2023 WL 2167387 (N.D. Cal. Feb. 21, 2023)........................... 9

*Henrietta D. v. Bloomberg,*
    331 F.3d 261 (2d Cir. 2003)................................................................................. 29

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist,*
    725 F.3d 1088 (9th Cir. 2013)...................................................................... 8, 9, 27

*King v. Holder,*
    950 F. Supp. 2d 164 (D. D.C. 2013) .................................................................... 38

*Kirola v. City & Cnty. of San Francisco,*
    860 F.3d 1164 (9th Cir. 2017)........................................................................ 19, 20

*L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.,*
    55 F.4th 1296 (11th Cir. 2022)............................................................................ 10

*Lentini v. Cal. Cntr. for the Arts, Escondido,*
    370 F.3d 937 (9th Cir. 2004)............................................................................... 27

*Lovell v. Chandler,*
    303 F.3d 1039 (9th Cir. 2002)............................................................................... 8

*Martin v. City of Portland,*
    No. 3:19-CV-1647, 2020 WL 363391 (D. Or. Jan. 21, 2020) ............................... 38

*Martin v. PGA Tour, Inc.,* 204 F.3d 994 (9th Cir. 2000), *aff'd,* 532 U.S. 661 (2001)................. 16

*McGary v. City of Portland*,
    386 F.3d 1259 (9th Cir. 2004)........................................................................ 4, 8, 15, 27, 29

*Mich. Prot. & Advocacy Serv., Inc., v. Flint Cmty. Schs.*,
    146 F. Supp. 3d 897 (E.D. Mich. Nov. 23, 2015) ...................................................... 35

*Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon*,
    254 F.3d 846 (9th Cir. 2001)........................................................................................ 16

*Murray v. Mayo Clinic*,
    934 F.3d 1101 (9th Cir. 2019)........................................................................................ 8

*Nat'l Fed'n of Blind, Inc. v. Lamone*,
    813 F.3d 494 (4th Cir. 2016)......................................................................................... 10

*New Mexico State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011)......................................................................................... 4

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) ................................................................................................ 12, 27

*Olson v. Allen*,
    No. 3:18-cv-001209, 2019 WL 1232834 (D. Or. Mar. 15, 2019)............................... 27

*OSU Student All. v. Ray*,
    699 F.3d 1053 (9th Cir. 2012)......................................................................................... 4

*Pareto v. FDIC*,
    139 F.3d 696, (9th Cir. 1998)......................................................................................... 4

*Payan v. Los Angeles Cmty. Coll. Dist.*,
    2019 WL 9047062 (C.D. Cal. Apr. 23, 2019).............................................................. 20

*Reyes v. United States*,
    No. 7:22-CV-00181, 2023 WL 2338059 (E.D. N.C. Feb. 2, 2023)..................... 34, 35

*Rodde v. Bonta*,
    357 F.3d 988 (9th Cir. 2004)............................................................... 12, 19, 20, 29

*Rodriguez v. City of N.Y.*,
    197 F.3d 611 (2d Cir. 1999)......................................................................................... 27

*Sanders v. Arneson Prods., Inc.*,
    91 F.3d 1351 (9th Cir. 1996)........................................................................................ 32

*Simmons v. Navajo Cnty.*,
    609 F.3d 1011 (9th Cir. 2010)...................................................................................... 25

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011 ......................................................................................... 4

*Tcherepnin v. Knight,*
   389 U.S. 332 (1967) ................................................................................. 15

*Townsend v. Quasim,*
   328 F.3d 511 (9th Cir. 2003) .................................................................... 27

*Tugg v. Towey,*
   864 F. Supp. 1201 (S.D. Fla. 1994) ......................................................... 26

*Updike v. Multnomah Cnty.,*
   870 F.3d 939 (9th Cir. 2017) .................................................................... 16

*Van Velzor v. City of Burleson,*
   43 F. Supp. 3d 746 (N.D. Tex. 2014) ....................................................... 26

*WFG Nat'l Title Ins. Co. v. Bay,*
   No. 3:22-cv-01010, 2023 WL 6595846 (D. Or. Aug. 30, 2023) ............... 38

*Where Do We Go Berkeley v. Cal. Dep't of Transp.,*
   32 F.4th 852 (9th Cir. 2022) ..................................................................... 10

*Zimmerman v. Or. Dep't of Justice,*
   170 F.3d. 1169 (9th Cir. 1999) ................................................................. 34

*Zukle v. Regents of the University of California,*
   166 F.3d 1041 (9th Cir. 1999) .................................................................... 8

**Statutes**

29 U.S.C § 794(a) ............................................................................................. 14

42 U.S.C § 12201(a) ......................................................................................... 29

42 U.S.C. § 10805(a)(1) ................................................................................... 39

42 U.S.C. § 10807(a) ........................................................................... 39, 40, 41

42 U.S.C. § 12101(b)(1) ................................................................................... 12

42 U.S.C. § 12102 (3)(A) .................................................................................. 38

42 U.S.C. §§ 12102(1)(A)–(C) ............................................................. 36, 37, 38

42 U.S.C. §§ 12131–65 ............................................................................. 12, 14

**Other Authorities**

H.R. Rep. No. 102-319, H.R. Rep. No. 319, 102nd Cong., 1st Sess., *reprinted in* 1991
   U.S.C.C.A.N. 777 ................................................................................... 41

S. Rep. No. 109, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 1371 ........................... 40

Statement of Interest of the United States of America, Bread v. District of Columbia, No. 1:23-cv-01945 (D.D.C. Feb. 22, 2024) ECF No. 50, https://perma.cc/C8GA-97R .......... 7, 17, 25, 26

U.S. Dep't of Just. and Dep't of Health & Human Servs., *Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities* (2023) ...................... 17, 26

U.S. Dep't of Just., *Investigation of the City of Mpls. and Mpls. Police Dep't* (June 2023) 17, 26

U.S. Dep't of Just., *Investigation of the Louisville Metro Police Dep't & Louisville Metro Gov't* (Mar. 2023) ............................................................................................................. 17, 26

**Rules**

Fed. R. Civ. P. 12(e)–(f) ............................................................................................................ 42

Fed. R. Civ. P. 8(a)(2) ................................................................................................................. 8

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 8

**Regulations**

28 C.F.R. §§ 35.130(b)(1)(ii)–(iii) .......................................................................................... 22

28 C.F.R. § 35.130(b)(3) ...................................................................................................... 22, 27

28 C.F.R. § 35.130(b)(7)(i) ...................................................................................................... 32

28 C.F.R. § 35.130 (b)(8) .......................................................................................................... 22

28 C.F.R. § 35.150(a) .......................................................................................................... 25, 32

28 C.F.R § 35.162 ...................................................................................................................... 15

28 C.F.R. § 41.51(b)(1)(ii) ........................................................................................................ 29

28 C.F.R. § 45.51(b)(3) ...................................................................................................... 27, 29

28 C.F.R. § Pt. 35, App. B (2011) ............................................................................................ 12

## INTRODUCTION

The Complaint demands that health emergencies associated with people with mental health disabilities receive an effective health response—not an ineffective law enforcement response—because like physical health emergencies, they are health emergencies.

Defendant Washington County ("Defendant County") and Defendant Washington County Consolidated Communications Agency ("Defendant Agency") (collectively, "Defendants") do not provide people in Washington County with mental health disabilities equal opportunity to access the benefit of Defendants' jointly-operated unified emergency response system ("Service"). This case challenges that failure. Defendants move to dismiss this case under Rule 12(b)(6) on the basis that Plaintiffs failed to adequately allege that Defendants denied them equal opportunity to benefit from Defendants' Service, or otherwise discriminated against them by reason of disability. Defendants' Motions to Dismiss should be denied in their entirety.

When a person in the County experiences a physical health emergency, such as a heart attack, a call placed to Defendants' Service prompts a response from qualified health professionals who assess and stabilize the individual and, if needed, connect them with follow-up services. In stark contrast, when a person in the County experiences a mental health emergency, such as acute psychosis, a call placed to the same Service prompts a response from law enforcement officers, who are trained to investigate criminal activity and to forcibly subdue and detain suspects rather than to assess and stabilize a health emergency.  A heart attack and acute psychosis are both health emergencies, but—as evidenced by Defendants' different responses to them—Defendants only treat the former as such.[1]

_____

[1]  Qualified health professionals specialize in the assessment, stabilization, and treatment of patients with emergent health needs; law enforcement officers specialize in the investigation, apprehension, and detention of individuals suspected of criminal offenses. Qualified

This inequality is discriminatory, and Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") (collectively "the Acts") prohibit it. The Acts require government entities to ensure that their programs, services, and activities (terms used interchangeably through this brief) provide people with disabilities the same opportunity to benefit from them as people without disabilities.  Government entities also may not administer their programs in a way that substantially impairs or defeats the service's ability to meet its objectives with respect to people with disabilities. Defendants' Service violates this mandate too, as its reliance on law enforcement officers as first responders to mental health emergencies impairs its purpose of providing appropriate responses health emergencies of all types.

Plaintiffs plausibly allege that Defendants' Service is one unified, jointly-operated emergency response system that provides an emergency response to all people in the County, for all types of health emergencies. This definition of Defendants' Service is not only plausible, but probable because it is consistent with the definition provided by the Department of Justice, which is charged "with implementing Title II of the ADA by promulgating regulations, issuing technical assistance, and bringing suits in federal court to enforce the statute." Statement of Interest of the United States of America at 3, Bread v. District of Columbia, No. 1:23-cv-01945 (D.D.C. Feb. 22, 2024) ECF No. 50, https://perma.cc/C8GA-97R ("DOJ Statement of Interest").

 Defendants' arguments for dismissal are unavailing, because, at their core, they rely on the erroneous premise that the Service represents not one unified service but two (or more)

---

health professionals carry medical equipment and supplies to dress and treat wounds; law enforcement officers carry handcuffs and weapons to restrain and incapacitate people. Qualified health professionals are trained to treat traumatic injuries and administer basic life support; law enforcement officers are trained to use firearms and command compliance.

services.   The distinctions Defendants attempt to draw characterizing the responses to mental health emergencies as a separate service from other emergency responses are artificial: they are grounded in biases and misconceptions about mental health disabilities rather than law or fact. As Plaintiffs allege, Defendants' responses to health emergencies associated with people with mental health disabilities are not a separate service, distinct from their responses to all other health emergencies. A health emergency is a health emergency—whether physical or mental, or both. And no matter the accompanying personnel, *all* responses that Defendants send to address a health emergency are part of one service.

With a proper understanding of Defendants' emergency response system as a single unified service, Defendants' other arguments are unpersuasive. Defendants argue that Plaintiffs: (1) are not denied meaningful access to their Service; (2) do not allege discrimination on the basis of disability; (3) challenge the adequacy of a service rather than the denial of a service provided to non-disabled individuals; and (4) seek a new service altogether. But each of these arguments rest on Defendants' faulty and fragmented definition of the service that they provide. Additionally, Defendant Agency's argument that Plaintiff Disability Rights Oregon ("DRO") has not exhausted all administrative remedies is unfounded, both because no administrative exhaustion requirement applies in this situation and, even if one did, DRO has satisfied it. Finally, Defendant County's Motion for a More Definite Statement and Motion to Strike are meritless and should be denied.

## <u>LEGAL STANDARD</u>

A complaint survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). In determining whether a pleading has met the plausibility standard, a court must accept as true all well-pleaded

allegations in the complaint, as well as all reasonable inferences to be drawn from them. *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012); *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must also be read in the light most favorable to the nonmoving party. *See New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011).

The standard for pleading an ADA discrimination claim is not demanding. To state a claim for relief under the Acts, it must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and "give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Rule 8(a) 'does not impose a probability requirement at the pleading stage*; it* simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence to support the allegations." *Starr v. Baca,* 652 F.3d 1202, 1217 (9th Cir. 2011) (quoting *Twombly,* 550 U.S. at 556) (emphasis in *Starr*). Even a "claim [that] does not fall within the four corners of... prior case law does not justify dismissal under Rule 12(b)(6)." *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004).

## STATEMENT OF FACTS

Defendants' Service "provides countywide 911 service" for all "emergency and non-emergency calls for service," including health emergencies arising from both physical and mental conditions. *See* ECF No. 1 ("Compl.") ¶¶ 40, 83, 236.

Defendants' Service, which integrates multiple public entities and agencies, has two primary and interconnected components: (1) receiving information from emergency requests for service, and (2) dispatching emergency responders to those calls, based on the emergency described. The "emergency telecommunications facility, or 911 dispatch center," controlled and

operated by Defendant Agency and contracted for by Defendant County, receives information from 911 calls and provides it to the emergency dispatching agencies that send responders to emergencies based on the type of emergency reported. *Id.* ¶¶ 83, 40, 15, 87, 236, 238-39, 252. One such dispatching agency is the Washington County Sheriff's Office ("WCSO"), which Defendant County controls and operates. *Id.* ¶¶ 15, 87, 134, 239. For 911 calls involving health emergencies, Defendant Agency decides which County agency to route a call to, and this decision is critical in determining which personnel respond. *Id.* ¶¶ 87, 238–39, 252.

For all types of health emergencies, including *both* physical and mental health emergencies, the Service performs the same functions to achieve the same objectives. *Id.* ¶¶ 236, 238, 239. Officials assess the caller's needs, with Defendant Agency call takers "gather[ing] information" and "determin[ing] the nature and severity" of the emergency, and which responders (if any) to deploy. *Id.* ¶ 86. Then, agents of Defendants' Service are tasked with attempting to "assess and stabilize" the person in crisis at the scene or via phone. *Id.* ¶ 88; *see also id.* ¶¶ 99, 129. Finally, dispatched responders decide whether additional medical services are needed and, if so, connect the person to follow-up services, which could include transporting them to a medical facility. *Id.* ¶¶ 88, 99.

Despite its consistent use of the same emergency response processes, Defendants' Service responds to health emergencies associated with people with mental health disabilities in a starkly different manner than it does for other health emergencies For general health emergencies, the Agency routes 911 calls to the ambulance service provider, which dispatches highly trained paramedics and EMTs. *Id.* ¶¶ 87, 100–02, 238. Accordingly, over a one-year period, the Agency dispatched ambulances and trained health professionals to 100% of 911 calls for abdominal pain.

*Id.* ¶ 106. Thus, as intended, Defendants' Service provides timely and effective emergency health care to people who need urgent attention for general health emergencies. *See id.* ¶ 99.

By contrast, the Agency routes 911 calls for health emergencies associated with people with mental health disabilities to a law enforcement agency, which then dispatches armed law enforcement officers as primary responders. *Id.* ¶¶ 87, 114, 252–53. For example, over a one-year period, Agency call takers coded 100% of the 1,319 calls that involved a person "reported to be mentally unstable," as "BHI – **Behavioral Health Incident," and Defendants' Service dispatched law enforcement officers as primary responders. *Id.* ¶¶ 113, 119. Defendants' Service relied on law enforcement officers for these calls even though Defendant County operates, but rarely uses, a non-law enforcement response comprised exclusively of mental health clinicians. *Id.* ¶¶ 13, 87, 114, 252–53. Instead, the law enforcement officers that Defendants deploy to mental health emergencies have no training on stabilizing or treating mental health emergencies. At most, the officers have "Crisis Intervention Training" ("CIT") that is only designed to reduce the risk of serious injury or death during interactions between law enforcement officers and people with mental health disorders. *Id.* ¶¶ 61–62. CIT, however, does not prepare law enforcement personnel to provide medical treatment.

WCSO deputies respond ineffectively to mental health emergencies not only because of the health training that they lack, *see id.* ¶¶ 59, 64, 97, 107, but also because of the law enforcement training that they receive. The overwhelming majority of deputies' training and fieldwork teaches them to use command-and-control tactics that focus on treating the individual needing help as a threat, *id.* ¶ 63; demand compliance by adopting an authoritative presence that emphasizes that they are in charge, *id.*; and resort to the use of restraints or force when patients are non-compliant.

*Id.* ¶¶ 66–74. These tactics are antithetical to effective emergency care and can dramatically escalate a mental health emergency. *Id.* ¶¶ 65, 68, 73; *see also infra* Part I.B.1.

Compounding this problem, WCSO deputies routinely transport people to mental health facilities involuntarily. *Id.* ¶¶ 71–72. Such transports can be traumatizing experiences, and mental health professionals recommend initiating them rarely. *Id.* ¶¶ 73–74. WCSO, however, considers involuntary transports to be a "means of resolving crisis calls." *Id.* ¶ 77. The consequence is that when law enforcement officers, such as WCSO deputies, respond to mental health emergencies, they use aggressive tactics. These tactics fail to deescalate that, far from deescalating the crisis— let alone treat it—and "are more likely to exacerbate, rather than resolve, the mental health crisis they were sent to address." *Id.* ¶ 2; *see also id.* ¶¶ 24, 65, 68, 74, 82, 109, 134, 136, 168, 185, 241, 255.

## ARGUMENT

I. **Plaintiffs Plausibly Allege Actionable Claims of Disability Discrimination Under the ADA and Rehabilitation Act**

As the Complaint alleges, Defendants use of law enforcement officers as default responders to health emergencies associated with people with mental health disabilities violates both the Rehabilitation Act and the ADA. Congress enacted the Americans with Disabilities Act in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA prohibits discrimination against individuals with disabilities by state and local governments. *Id.* §§ 12131– 65. Individuals with disabilities may not be "excluded from participation in or be denied the benefits of the services, programs, or activities" that public entities offer. *Id.* § 12132. These broad prohibitions against discrimination apply to "anything a public entity does." 28 C.F.R. § Pt. 35, App. B (2011); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076-77 (9th Cir. 2002) (discussing

the ADA's broad application).  "There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of the University of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999). The only difference is that the Rehabilitation Act also requires a plaintiff to allege that the relevant service, program, or activity receives federal funding. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).[2]

As required to state a claim of disability discrimination under Title II of the ADA, Plaintiffs plausibly allege: (1) that they are "an individual[s] with a disability;" (2) that they are "otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;" (3) that they were "either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or [were] otherwise discriminated against by the public entity;" and (4) "such exclusion, denial of benefits, or discrimination was by reason of [their] disability." *McGary,* 386 F.3d at 1265  (holding that neutral programs that unduly burden people with disabilities discriminate by "reason of []disability"). Contrary to Defendants' contention, ECF 21, Defendant Washington County's Motion to Dismiss at 17 ("County MTD"), ECF 25, Defendant WCCCA's Motion to Dismiss at 23 ("Agency MTD"), Plaintiffs have alleged causation sufficiently, and notably, Plaintiffs are only required to show disability was a motivating factor, not the "but-for" cause of discrimination. *See K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013).[3]

---

[2] Title II of the ADA is expressly modeled after § 504 of the Rehabilitation Act of 1973 and adopts its substantive standards. Because Title II and § 504 have the same standards and courts apply the same analysis to claims brought under both statutes, Plaintiffs discuss and analyze these statutes together.

[3] Defendants misstate the holding of *Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019) to support their contention that Title II of the ADA requires disability to be the "but-for" cause of discrimination. *See* County MTD at 17; Agency MTD at 23. To the contrary, the Ninth Circuit has long held that "Title II's prohibition of discrimination or denial of benefits by reason of disability establishes a motivating factor causal standard for liability when there are two or more possible

Defendants do not contest in their motions that Plaintiffs meet the first two elements: that Plaintiff Wesley and Plaintiff DRO's clients are "qualified individuals with disabilities" or that they are "otherwise qualified to participate in and receive the benefit of Defendants' Service.[4] *See generally* County MTD (arguing for dismissal on elements three and four of a Title II claim); Agency MTD. Defendants also do not contest that they are public entities as defined under Title II of the ADA, *see* 42 U.S.C. § 12132, or that they receive federal financial assistance as defined under Section 504. *See* 29 U.S.C § 794(a). Instead, Defendants only dispute whether Plaintiffs' factual allegations satisfy elements three and four—that Plaintiffs were excluded from or denied benefits, or otherwise discriminated against, by reason of disability. *See* County MTD at 25, 20; Agency MTD at 21–22. As shown below, Plaintiffs meet this standard because they allege that Defendants provide an emergency response service that addresses all health emergencies but denies people experiencing a mental health emergency equal opportunity to benefit from that service because those people have—or are perceived to have—mental health disabilities.

### A. Plaintiffs Plausibly Allege that the Service at Issue is Defendants' Unified Emergency Response System

---

reasons for the challenged decision and at least one of them may be legitimate." *K.M. ex rel. Bright,* 725 F.3d at 1099 (internal citations and quotation marks omitted). The *Murray* Court's holding was explicitly cabined to Title I of the ADA, which applies to employment contexts. *See Murray* 934 F.3d at 1107 ("holding that ADA discrimination claims under *Title I* must be evaluated under a but-for causation standard") (emphasis added). Nonetheless, even if the Ninth Circuit had extended its holding in *Murray* to Title II, Plaintiffs' allegations would still be sufficient because at least one court analyzing Title I claims has held that a plaintiff's allegations are sufficient to meet the 'but-for' standard at pleading stage where, as is the case here, "the plaintiff stated the allegedly discriminatory action was 'because of his psychiatric disability' and alleged that he specifically informed the defendant about his disability." *Gunzenhauser v. Garland*, No. 22-CV-03406, 2023 WL 2167387, at *6 (N.D. Cal. Feb. 21, 2023).

[4] The Complaint alleges that *all* people who experience a health emergency that Defendants associate with psychiatric disabilities, and who receive an unequal emergency response from Defendants, are qualified disabled individuals under the Acts. *See* Compl. at ¶¶ 3, 87, 109, 112, 123, 234, 247; *see also* 42 U.S.C. § 12102 (1)(A)–(C); *see also infra* Part I.C.

As a threshold matter, analyzing Plaintiffs' claims of disability discrimination under the Acts requires the scope and function of the service at issue to be accurately defined. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 861–862 (9th Cir. 2022). Where, as here, a service is not defined by a regulation, *see* 28 C.F.R § 35.162 (defining "telephone emergency services"), or a statutory entitlement, *see Alexander v. Choate*, 469 U.S. 287, 302–03 (1985) (relying on a statute that explicitly defined the scope of Tennessee's inpatient Medicaid coverage), the service is defined by its benefit, its purpose, and the functions that it takes to achieve that purpose. Because these are generally questions of fact, which are defined by the Complaint at the motion to dismiss stage, the Court must accept as true Plaintiffs' factual allegations. *See, e.g.*, *Where Do We Go Berkeley,* 32 F.4th at 860 (stating the district court "accepted Plaintiffs' definition" of the scope at issue but revisited that question on appeal to assess whether based on the factual record developed in the case the modification sought constituted a fundamental alteration); *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1303–04 (11th Cir. 2022) (holding that the district court erred in "redefining the scope of the program" from what "the record clearly" showed the plaintiffs were seeking); *Cmtys. Actively Living Indep. & Free v. City of LA*, 2011 WL 4595993, at *2 (C.D. Cal. Feb 10, 2011) (defining scope of city's emergency preparedness program and its benefits based on record evidence); *Brooklyn Ctr. for Indep. of Disabled vs. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013) (same); *Nat'l Fed'n of Blind, Inc. v. Lamone,* 813 F.3d 494 (4th Cir. 2016) (defining the scope of the absentee voting program at issue and concluding, based on the record, that defendants' proposed scope would undermine the purpose of the ADA).

Here, Plaintiffs allege Defendants' Service is one unified emergency response system that is defined by the common purpose of receiving information about emergencies and delivering the

benefit of emergency medical intervention to patients facing *any* type of health emergency. Compl. at ¶¶ 3, 108. Specifically, the Complaint alleges that the purpose of the Service is to "receive information about potential emergency situations and…dispatch or facilitate the dispatch of personnel…to respond to those situations" *Id.* ¶ 236. The Complaint further alleges that the function of this Service is to allow individuals experiencing a health emergency to "call Defendants for emergency help," "request and receive emergency response services," *Id.* ¶¶ 2, 104, , that provide the benefit of emergency medical intervention—"assessment, stabilization, and treatment" of an "emergent health issue at the point of contact." *Id.* ¶¶ 2, 238–39. When determining how to appropriately respond to an emergency, irrespective of the type, Defendants use the same processes, follow the same procedures, and take the same actions.  Individuals who call Defendants for emergency assistance (for themselves or others) will speak to the same call takers. *Id.*  ¶¶ 83, 86. Those call takers follow the same "rules, regulations, policies, and procedures" when assigning call type and "determin[ing] how to respond…" *Id.* ¶¶ 84, 112. Defendants' dispatchers then route all calls "to an appropriate public or private safety agency that may then dispatch responding personnel to the scene." *Id.* ¶ 84.

The Department of Justice ("DOJ") bolsters Plaintiffs' characterization of Defendants' emergency response system as a unified whole that provides a single service. In its Statement of Interest recently filed in a case alleging similar claims as Plaintiffs do here, the DOJ clarified that an "emergency response system…is properly defined as a single service, program, or activity." *See* DOJ Statement of Interest at 12. The DOJ explained that a "rigid separation of each type of emergency is inconsistent with the interconnected nature of the [government entity's] system" and "by cabining the analysis of emergencies by people with mental health disabilities…the [government entity's] framework would successfully hide many inequalities from view." *Id*. at 14.

Likewise, the DOJ and the Department of Health and Human Services ("HHS"), reached the same conclusion. *See* U.S. DEP'T OF JUST. AND DEP'T OF HEALTH & HUMAN SERVS., *Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities* 3–4 (2023) ("DOJ–HHS Guidance") ("The ADA also applies to public entities' emergency response…systems."); *see also* U.S. DEP'T OF JUST., *Investigation of the Louisville Metro Police Dep't & Louisville Metro Gov't* 59 (Mar. 2023) (framing the "city's systems for responding to 911 calls" as one service, program, or activity for purposes of ADA liability) ("DOJ Louisville Report"); U.S. DEP'T OF JUST., *Investigation of the City of Mpls. and Mpls. Police Dep't* 57 (June 2023) (same). The DOJ's interpretation that a public entity's "emergency response system…is properly defined as a single service, program, or activity," DOJ Statement of Interest, at 12, should be considered persuasive authority.

Furthermore, Plaintiffs' characterization of the service here is similar to the one adopted in *Olmstead* and *Rodde*. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999); *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004). In *Olmstead*, the U.S. Supreme Court explained that the integration mandate proscribed the discrimination plaintiffs alleged because people with mental disabilities received "medical services" in institutions while people without such disabilities received them in the community. 527 U.S. at 583. In *Rodde*, the Ninth Circuit held that the service provided by a hospital system was "specialized medical expertise", which encompassed a range of distinct specialties. 357 F.3d at 995 & n.10. These cases show that the provision of health care—even health care spanning different procedures and addressing different ailments—constitutes a discrete service and the recipients of that service are sufficiently similarly situated to permit a meaningful comparison.

Although Defendants admit they operate an emergency response system, *see* Agency MTD at 14 ("Defendants' Integrated 911 Emergency Response System"); County MTD at 9 (same), they nevertheless insist that the Service is not one unified service but "two distinct" services—one for physical health emergencies, and another for mental health related emergencies. County MTD at 21–22; Agency MTD at 34. By treating the Service's different emergency responses as different services, Defendants erroneously suggest that "Plaintiffs challenge emergency services dispatched in response to mental health related 911 calls only." County MTD at 9 n. 1; Agency's MTD at 14 n.3. This reading is unsupported by the law and is inconsistent with the facts Plaintiffs allege. To be sure, Defendants' argument ignores Plaintiffs' allegations demonstrating that Defendants' Service is one unified emergency response system that provides a variety of *responses*—not *services*—to people facing physical and mental health emergencies, Compl. ¶¶ 3, 108. When the Service is characterized commonsensically as one unified emergency response system that is defined by its common purpose, functions, and benefit, it is clear the variety of *responses* Defendants dispatch to health emergencies are part of one service—not separate *services*, as Defendants argue.

Where, as here, a public service is supplied by public entities in one unified effort to achieve one common purpose, the service does not become multiple services simply because the entities may take different actions or make different determinations throughout the *same* processes that deliver the service. Defendants' approach to characterizing the Service in this way would allow for myriad other possible, albeit implausible, constructions of the Service. For example, under Defendants' flawed logic, all responses to call types designated as Priority 1, the highest priority level for emergency calls, could constitute a separate service from all responses to call types designated as Priority 2, simply because Defendants determined calls designated as Priority

1 need to be responded to faster than others. Likewise, under Defendants' implausible view, their emergency response system could lawfully respond with health professionals to every health emergency except for ones involving an adverse insulin reaction—a practice that plainly discriminates against people with diabetes. Indeed, by attempting to define Defendants' Service as addressing every type of health emergency except those associated with people with mental health disabilities, Defendants underscore the illegality of their emergency response system.

The main authority Defendants rely on to support their argument that their unified, single Service is actually two distinct services is *Does 1–5 v. Chandler*, 83 F.3d 1150, 1151–52 (9th Cir. 1996). But this case, in fact, confirms Plaintiffs' position. In *Does 1–5*, the Ninth Circuit analyzed whether Hawaii's General Assistance Program violated the ADA by placing a twelve-month maximum limit on benefits for recipients who were eligible based on disability, without placing similar restrictions on benefits for recipients eligible because they had dependent children. *See id.* at 1152–55. The Court found that the General Assistance program was not a unified program serving a single needy population. Rather, it was two programs under the umbrella heading of General Assistance, with distinct eligibility requirements for each program. *Id.* at 1155. The Court then concluded that neither program discriminated against disabled individuals. Accepting plaintiffs' articulation of the program's single essential purpose as "providing income support for the needy," the Court explained that:

> [t]he …program does not provide benefits to all needy residents who cannot receive federal aid—only those who are disabled or who have dependent children. Non-disabled needy without dependent children are not entitled to receive any funds. This restriction cuts against viewing the program as having the unified purpose of providing for the needy as opposed to viewing it, functionally if not formally, as two discrete forms of benefit providing for two discrete subgroups of the needy population. …The Hawaii GA program is, functionally, made up of a program of support for needy families and a separate program of support for the needy disabled. *Id.*

Contrary to Defendants' arguments, *Does 1–5* supports Plaintiffs' characterization in this case of the Service as a unified whole. Unlike the service in *Does 1-5*, the purpose of Defendants' Service here—a service provided to *all* people in Washington County—is to receive information about *all* potential emergency situations, respond to those situations with appropriate personnel, and provide the benefit of emergency medical intervention to *all*. Compl. ¶¶ 236, 238, 239. Although Plaintiffs allege that Defendants' Service is not equally accessible to people with mental health disabilities, there is no dispute that they, along with anyone in Washington County, are eligible for the Service. Indeed, based on the Court's reasoning in *Does 1–5*, Defendants' Service should properly be construed as a "single, unified program with [a] single essential purpose." *Does 1–5*, 83 F.3d at 1155.

Defendants' attempts to define their Service in the narrowest sense also run afoul of the fundamental principle articulated in the U.S. Supreme Court's *Alexander* opinion: the scope of the service or benefit at issue "cannot be defined in a way that effectively denies otherwise qualified [disabled] individuals the meaningful access to which they are entitled." *Alexander*, 469 U.S. at 301; *see also Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967) (it is a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes."); *McGary,* 386 F.3d at 1268 ("[i]t is axiomatic that the ADA must be construed broadly in order to effectively implement the ADA's fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities"). This Court must, therefore, reject Defendants' fragmented definition of their Service, because it would do precisely what *Alexander* proscribes. After all, "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit." *Alexander*, 469 U.S. at 301, n. 21; *see also Martin v. PGA Tour, Inc*., 204

F.3d 994, 1001 (9th Cir. 2000), *aff'd*, 532 U.S. 661 (2001) (suggesting that if a covered entity has the ability to define what the fundamental nature of the service at issue is, it will "define itself out of reach of the ADA").

### B. Plaintiffs Plausibly Allege Defendants' Unified Emergency Response System Discriminates Against People with Mental Health Disabilities

Defendants contend that Plaintiffs claims challenge the "adequacy and effectiveness of mental health treatment," but as the Complaint clearly shows, Plaintiffs actually challenge the lack of *equal access to* emergency medical intervention—the benefit of the Service—not the adequacy of medical treatment itself. Defendants also misrepresent the degree of culpability that Plaintiffs need to show. Contrary to Defendants' arguments,[5] Plaintiffs do not need to allege or prove intent or deliberate indifference to succeed on claims under the ADA and Section 504 that seek only injunctive and declaratory relief. *See Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 851 (9th Cir. 2001) ("We have never held that a plaintiff must prove an intentional violation of the ADA in order to obtain an injunction mandating compliance with its provisions").

In providing any aid, benefit, or service, Defendants may not (1) "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others"; or (2) "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. §§ 35.130(b)(1)(ii)–(iii). Public entities also may not adopt "criteria

---

[5] Defendants cite *Updike v. Multnomah Cnty.*, 870 F.3d 939 (9th Cir. 2017) for the proposition that "a public entity may be liable under the Acts only 'if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons.'" But this standard applies to cases only where *compensatory damages* are sought and therefore, is clearly inapplicable here, where the relief sought is *injunctive and declaratory relief*.

or methods of administration" that have the effect of subjecting people with disabilities to discrimination, or that "defeat[] or substantially impair[] accomplishment of the public entity's program with respect to individuals with disabilities"; nor may they impose or apply "eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the services and programs public entities provide. *Id.* §§ 35.130(b)(3), (b)(8).

As explained below, the Complaint plausibly alleges that Defendants violate these mandates in two ways: (1) by failing to provide people with mental health disabilities equal access to the benefit that the Service affords people without such disabilities; and (2) by administering the emergency response service by methods that substantially impair the Service's objectives with respect to people with mental health disabilities.

> 1.  *Plaintiffs Plausibly Allege That Defendants Do Not Afford People with Mental Health Disabilities Equal Opportunity to Access the Benefits of Defendants' Emergency Response System*

The Complaint sufficiently alleges that Defendants do not provide people with mental health disabilities the same opportunity to benefit from the Service as it affords others. *See* Compl. ¶ 19. Defendants' Service—which is available to *all* people in the County for *all* health emergencies—provides a health-led emergency response from EMTs and paramedics to all health emergencies except for those uniquely associated with mental health disabilities. *See id.* ¶ ¶ 236, 238–39. For that subset of health emergencies, Defendants' Service discriminatorily provides a police-led response that is fundamentally different and less effective than the health-led responses for other health emergencies. *See id.* ¶ ¶ 2, 11, 20, 21, 59, 70, 74, 77, 79. The different personnel that Defendants dispatch to each category of health emergency reflects this discrimination. Qualified health professional and law enforcement officer are two different occupations that

require vastly different training and skills to achieve entirely different objectives, and only the former can provide patients urgent out-of-hospital stabilization and medical treatment

Plaintiffs plausibly allege that paramedics and EMTs, who lead Defendants' response to physical health emergencies, are trained to administer out-of-hospital "specialized medical care that cannot be provided by a police officer…." *Id.* ¶ 103. Indeed, "[i]n order to be licensed as an EMT in Oregon, an individual must complete an EMT educational course, and pass… examinations." *Id.* ¶ 101. Similarly, "[p]aramedics must receive an associate's degree or higher from an accredited institution of higher learning, be previously certified as EMTs, complete an additional paramedic educational program that usually ranges from 1,200 to 1,800 hours, and pass a paramedic certification examination." *Id.* ¶ 102. In essence, EMTs and paramedics bring key elements of the emergency room to patients experiencing physical health emergencies by providing advanced life support skills to stabilize patients both on the scene and enroute to a hospital.

In stark contrast, Plaintiffs plausibly allege that the law enforcement officers who lead Defendants' response to health emergencies uniquely associated with mental health disabilities, are "wholly unqualified to make critical treatment determinations, let alone administer stabilizing treatment themselves." *Id.* ¶ 107. "WCSO deputies receive limited training on interacting with individuals during mental health crises but significant training on engaging individuals as suspects." *Id.* ¶ 60. This "frequently leads deputies to employ law enforcement strategies to address mental health emergencies," *id.*, which "are more likely to exacerbate, rather than resolve, the mental health crisis they were sent to address." *Id.* ¶ 2. As a result of officers' reliance on "command-and-control tactics" while interacting with people experiencing a mental health emergency, patients with mental health disabilities are "especially vulnerable to police use of

force," and face "a variety of collateral risks, such as criminal or civil arrests, that are wholly absent from non-police interventions." *Id.* ¶¶ 65–66, 68.

The statistics in the Complaint demonstrate the risk of adverse collateral consequences to police-led responses to mental health emergencies. Plaintiffs allege that "of the 12,159 mental-health-related calls that the WCSO responded to from January 1, 2020 to November 30, 2022, 1,226 incidents, or 10%, had a recorded disposition of arrest." *Id.* ¶ 70. Another 10% of those responses "had a recorded disposition of 'hold' or involuntary detention." *Id.* ¶ 77. Collectively, these allegations establish that law enforcement officers do not provide patients with mental health disabilities the benefit of on-site "assessment and treatment," *id.* ¶ 59, that people with physical health emergencies receive. By not providing a health response to mental health emergencies, Defendants' Service thus denies people with mental health disabilities equal access to the benefit the Service affords people without such disabilities. *See id.* ¶ 19.

Defendants err is arguing that their emergency response system isn't discriminatory because certain aspects of it are available to people with mental health disabilities. *See Rodde,* 357 F.3d at 998. They incorrectly claim that Title II "requires a court to consider whether, when viewed in its entirety, the program at issue is accessible" and therefore, "meaningful access is not denied simply because individual aspects or elements of a program are not accessible to disabled individuals." County MTD at 26; Agency MTD at 32. But Defendants incorrectly apply the cases on which they base their assertion: *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1185 (9th Cir. 2017). *Kirola* relies on the standard articulated in *Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014). But, both *Cohen* and *Kirola* involved inability to access curb ramps, and considered the concept of access "in its entirety" in the context of a claim brought under 28 C.F.R. § 35.150(a). That regulation is specific to physical barriers to program access, rather than

deficiencies in the public entity's programs or services. *See Cohen*, 754 F.3d at 697–701. Because this case does not involve physical barriers, the "in its entirety" standard does not apply. *See* 28 C.F.R. § 35.150(a); *Payan v. Los Angeles Cmty. Coll. Dist.,* 2019 WL 9047062, at *1 (C.D. Cal. Apr. 23, 2019) ("28 C.F.R. § 35.150(a) and its 'in its entirety' standard does not apply to… deficiencies in the public entity's programs or services themselves"). Therefore, *Kirola* is inapposite. *See Kirola*, 860 F.3d at 1185 (holding plaintiff failed to establish that city's public right-of-way and recreational park programs, when viewed in their entirety, were inaccessible to individuals with disabilities); *see also Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982 (9th Cir. 2014) (considering whether Title II requires a public entity to structurally alter public seating at a high school football field).

Defendants also erroneously argue that Plaintiffs' claims fail because "they do not allege that mentally disabled individuals are treated differently than others who receive mental health emergency services." County MTD at 21; Agency MTD at 34.  To support this argument, Defendants wrongly contend that an equal opportunity claim requires only that people with and without mental health disabilities receive the same response within the "same group-type of emergency." County MTD at 12; *see* Agency MTD at 31–32; *contra Rodde*, 357 F.3d at 998 (enjoining a hospital closure that would have deprived people with disabilities an equal opportunity to benefit from the county's specialized medical services by effectively eliminating services uniquely associated with their needs, while leaving the specialized services relied on by the general public untouched). Just as Defendants' narrow framing of the Service attempts to "exclude the allegations about the general population's experience from the court's analysis, thereby preventing a meaningful comparison," DOJ Statement of Interest at 15, so too does their mischaracterization of the comparison required by the Acts in this context. As the Complaint alleges, the discrepancy

between Defendants' responses to mental and physical health emergencies constitutes "a denial of benefits or other discrimination in violation of the ADA and Section 504." *Id.* at 16. The DOJ and HHS explained this point in recent guidance on ADA-compliant emergency responses to people with behavioral health disabilities:

> [e]qual opportunity requires that people with behavioral health disabilities receive a health response in circumstances where others would receive a health response—for example, if call centers would dispatch an ambulance or a medic rather than law enforcement to respond to a person experiencing a heart attack or a diabetic crisis, equal opportunity would entail dispatching a health response in similar circumstances involving a person with a behavioral health disability.
> DOJ–HHS Guidance at 3–4.

This is why DOJ found, in its investigations of the Louisville Metro and Minneapolis Police Departments, that there was "reasonable cause to believe" that both cities were in violation of the ADA based, in part, on their failure to provide people with behavioral health disabilities the same kind of emergency health response as those without disabilities receive. *See* DOJ Louisville Investigation at 1, 59–60 ("Louisville Metro's often harmful emergency response to behavioral health crises stands in stark contrast to its response to people who are experiencing physical health crises…. Louisville Metro and LMPD have subjected many individuals to an unnecessary or overly aggressive LMPD response during a behavioral health episode, violating the ADA."); DOJ Minneapolis Investigation at 57 ("Our investigation showed that the City and MPD violate the Americans with Disabilities Act (ADA) by discriminating against people with behavioral health disabilities when providing emergency response services."). The allegations of inequality here parallel those the DOJ published in its reports. *See* DOJ Louisville Investigation at 59–66; DOJ Minneapolis Investigation at 57–66. And here, as there, this inequality "deprives people with behavioral health disabilities an equal opportunity to benefit from the City's emergency response services," DOJ Minneapolis Investigation at 57, and violates the ADA and the Rehabilitation Act.

> 2. *Plaintiffs Plausibly Allege that Defendants Administer Their Emergency Response System by Methods that Substantially Impair its Objectives with Respect to People with Mental Health Disabilities*

In addition to alleging that Defendants do not afford equal opportunity to access the Service's benefits, as shown above, Plaintiffs also sufficiently allege that Defendants administer the emergency response service by methods that substantially impair the Service's objectives as to people with mental health disabilities. An entity must not use "methods of administration: . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii) (ADA); *id.* § 45.51(b)(3) (Rehabilitation Act). This mandate provides an independent basis for establishing liability, measuring the services offered to people with a disability not against those offered to people without a disability but rather against the program's objectives. Defendants did not challenge this basis of liability in their Motions. Regardless, as explained below, Plaintiffs plausibly allege "Defendants administer their emergency response service in a way that substantially impairs the ability of that system to fulfill its essential [objectives]." Compl. ¶ 242.

Defendants' Service includes a mobile crisis team ("MCT"), which is comprised "of qualified behavioral health professionals" intended to "provide timely, developmentally appropriate and trauma-informed interventions, screening, assessment, de-escalation and other services necessary to stabilize an individual experiencing a behavioral health crisis." *Id.* ¶ 129. Yet, as the Complaint alleges, Defendants virtually never use MCTs, even though MCTs would support the Service's objectives for people with disabilities. Instead, Plaintiffs allege, Defendants: (1) "do[] not dispatch the MCT in response to 911 calls for mental health crises. . . . in part because [it] is not integrated into the Agency's dispatch system," *id.* ¶ 93, and (2) send armed deputies as

default primary responders to mental health emergencies before, or in lieu of, sending the MCT—the County's only non-police response. *See id.* ¶ 134.

Because "deputies are not qualified mental health professionals capable of providing on-site psychiatric assessment, stabilization, and treatment to individuals in crisis," *id.*; *see also* discussion *supra* Part I.A.1.b., Defendants deprive people with mental health disabilities "of the immediate medical care they need and [are] unnecessarily exposed by Defendants to substantial risk of adverse outcomes." Compl. ¶ 240. These adverse outcomes are in direct opposition to the stated objectives of this emergency response and therefore, Defendants not only substantially impair accomplishment of these objectives but in doing so also violate the Acts.

### 3. *Plaintiffs Seek Neither a Higher Standard of Care nor a New Service*

Defendants also mischaracterize Plaintiffs' well-pled allegations by arguing that Plaintiffs: (1) seek a higher standard of care, and (2) seek a new service, program, or activity. Neither argument for dismissal is persuasive and should be summarily rejected.[6]

At their core, Plaintiffs' claims allege the disparate *type of response* that Defendants' Service assigns to health emergencies associated with mental health disabilities deprives them of an equal opportunity to benefit from the Service. Plaintiffs do not allege Defendants discriminate against them because of the unequal *outcomes* that result from Defendants' responses to their health emergencies, or the *inadequate treatment* the personnel assigned to those responses provide.

---

[6] Again, Defendants' arguments largely depend on a narrow and erroneous characterization of the service at issue, asserting that "Plaintiffs challenge the emergency services dispatched in response to mental health related 911 calls only." County MTD at 9 n.1; Agency's MTD at 14 n.3. When the service at issue is properly analyzed as one unified service, it is clear Plaintiffs do not challenge "the adequacy and effectiveness of mental health treatment provided at the scene of a mental health related emergency," but the disparity in responses to physical and mental health emergencies." Agency MTD at 36; County MTD at 24.

And although the pleadings certainly include the common outcomes of Defendants' response to mental health emergencies, those outcomes solely serve to illustrate how Defendants deny people with mental health disabilities equal opportunity to access to the Services' benefits that others receive. *See* Compl. ¶ 215 ("instead of benefiting from Defendants' emergency response services—like people experiencing a physical health emergency in the County routinely do—Mary Roe suffered an array of harms."); *see also id.* ¶¶ 158, 175, 192 (describing the steps police responders did not take to afford Plaintiffs an opportunity to benefit from Defendants' Service).

Indeed, Plaintiffs' equal opportunity claim compares the "benefits" Defendants' Service affords people with mental health disabilities against those it affords others. Similarly, Plaintiffs' method-of-administration claim assesses Defendants' Service not against a "standard of care" but against the purpose that Defendants, themselves, established the Service to achieve. These are exactly the types of benchmarks contemplated in the DOJ Implementing Regulations that Congress incorporated directly into the ADA. *See* 28 C.F.R. § 41.51(b)(1)(ii) (equal opportunity); *id.* § 45.51(b)(3) (methods of administration); *see also* 42 U.S.C § 12201(a) (requiring courts to construe the ADA to provide at least as much protection as that provided by DOJ regulations implementing the Rehabilitation Act).

Moreover, Plaintiffs note that implicit in Defendants' argument that Plaintiffs challenge "the adequacy and effectiveness of mental health treatment," Agency MTD at 36; County MTD at 24, is that there is currently some level of mental health treatment "provided at the scene of a mental health related emergency." *Id.* This might be the case if Plaintiffs were alleging the wrong type of mental health professionals are sent to respond to mental health emergencies, or about the treatment decisions these professionals were making. But that is not this case. Deploying officers "who are wholly unqualified to make critical medical treatment determinations, let alone

administer stabilizing treatment themselves," Compl. ¶ 107, to the scene of a mental health emergency does not constitute mental health treatment. Indeed, it defies credulity to suggest that a police response that is "more likely to exacerbate, rather than alleviate" mental health emergencies equates to mental health treatment. Nevertheless, Defendants' argument is inapposite because Plaintiffs seek not a particular kind or level of medical treatment but *access to* emergency medical intervention that the Service provides to others—the benefit of the Service.

All the cases cited by Defendants clearly concern the adequacy of medical treatment or are otherwise inapposite. For instance, in *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1021 (9th Cir. 2010), the family of a prisoner who died by suicide while in jail asserted that the County failed to accommodate the prisoner's disability by, *inter alia,* not placing him in certain "programs or activities to lessen his depression." *Id.* at 1022. The court held that this was a claim for "inadequate treatment for disability," not "discrimination because of disability." *Id.* Plaintiffs' claims are entirely different. Unlike *Simmons*, here, Plaintiffs do not seek special or unique access to a medical treatment program that would improve their mental health, nor a *different* treatment program that is not offered to others. Instead, Plaintiffs seek equal access to the benefits of a service that is provided to others.

The other cases cited by Defendants are no more relevant, as they squarely concern challenges to adequate medical treatment or involve claims for benefits that did not previously exist. *See Disability Rights N.J., Inc. v. Comm'r, Dep't of Human Servs.*, 796 F.3d 293, 304 (3d Cir. 2015) (rejecting claim that the ADA required a hearing for psychiatric patients before they were medicated involuntarily because such hearings did "not exist in New Jersey for nondisabled people").

Relatedly, Plaintiffs do not seek "new services," as Defendants contend. Plaintiffs are not asking for Defendants' unified emergency response system to provide anything beyond what it currently offers. The changes to Defendants' Service that Plaintiffs seek here do not require Defendants to create a new service. As the Complaint alleges, Defendants' Service routinely responds to mental health emergencies, *see* Compl. ¶ 2, and it deploys qualified mental health professionals to a (very small) portion of them. *Id.* ¶ 96. Thus, Defendants' assertion that Plaintiffs seek an entirely new service is simply incompatible with Plaintiffs' factual allegations. Plaintiffs plausibly allege that Defendants do not have procedures in place to ensure that the Agency dispatches the Mobile Crisis Team when needed and have not sufficiently funded or adequately staffed these teams—so that they are available to provide adequate emergency response. *See id.* ¶¶ 14, 19, 93–98.

Expanding access to this existing component of an existing service is one possible way to address Plaintiffs' claims and seeking such relief does not constitute a request for a new service. *See e.g.*, *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 759 (N.D. Tex. 2014) (holding plaintiff stated ADA claim by alleging that city relied on less effective personnel to enforce disability-related traffic laws than it used to enforce other laws); *Tugg v. Towey*, 864 F. Supp. 1201, 1208 (S.D. Fla. 1994) (holding that affording Deaf people equal access to counseling program required hiring counselors with different qualifications than the ones previously employed); *see also Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259-60 (D.C. Cir. 2008) (requiring significant modification of U.S. currency to ensure meaningful access for people with visual impairments).

Nor does expanding access to this existing component of the Service constitute a demand for a "fundamental alteration" to the existing program, as Defendants suggest. *See* County MTD

at 19; Agency MTD at 25. Because Plaintiffs are not requesting a reasonable modification, but rather equal opportunity to access the benefit the Service affords others, the "fundamental alteration" defense is not available to Defendants. That affirmative defense is available only in cases requesting access to existing physical structures, *see* 28 C.F.R. § 35.150(a)(3), and requests for reasonable modifications, *see id.* § 35.130(b)(7)(i). Moreover, even if the "fundamental alteration" defense were available, it would not be appropriate for this Court to consider now, because Defendants bear the burden of proving this affirmative defense, *see id.*, and whether a modification would constitute a fundamental alteration is "an intensively fact-based" inquiry, it is not appropriate to litigate at the motion to dismiss stage. *Lentini v. Cal. Cntr. for the Arts, Escondido*, 370 F.3d 937, 845 (9th Cir. 2004); *accord K.M. ex rel. Bright,* 725 F.3d at 1096; *cf. Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (holding that affirmative defenses must be pled and proved, and are usually not properly raised at the motion to dismiss stage).[7]

Defendants cite a series of out-of-circuit cases repeating the proposition that the Acts do not require public entities to provide new or better services,[8] *see* County MTD at 27; Agency MTD at 40–41, but fail to cite even a single case to support their contention that what Plaintiffs seek here—changes to the administration and operation of an existing service—could be deemed a new service. *See Rodriguez v. City of N.Y.*, 197 F.3d 611, 614, 618 (2d Cir. 1999) (rejecting plaintiff's claim seeking safety-monitoring services, which New York's Medicaid program "provide[d] to no one"); *Buchanan v. Maine*, 469 F.3d 158, 173, 175 (1st Cir. 2006) (stating the principle that

---

[7] The Ninth Circuit has repeatedly held that a determination on such defenses must come after discovery, and be based on findings of fact. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1485-86 (9th Cir. 1996); *McGary*, 386 F.3d at 1270; *Townsend v. Quasim*, 328 F.3d 511, 520 (9th Cir. 2003).

[8] *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999) ("States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide."); *Townsend* 328 F.3d at 518 (same); *Buchanan*, 469 F.3d at 173 (same); *Olson v. Allen*, No. 3:18-cv-001209, 2019 WL 1232834, at *4 (D. Or. Mar. 15, 2019) (same).

demands for new services are not cognizable under the ADA but not applying it and rejecting the plaintiff's claim on grounds that the services the plaintiff sought were either offered or ones that he didn't need); *Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir. 1998) (holding that the plaintiff impermissibly challenged "the substance of the services provided to him" by claiming that a job training program for people with disabilities discriminated against him by denying him a job coach and other services).[9] Indeed, these cases are distinguishable because, when properly construed, the Complaint does not demand a new type of emergency response, let alone a new service.

### C. Plaintiffs Plausibly Allege Defendants' Emergency Response System Discriminates by Reason of Disability

Mental health emergencies are uniquely and closely connected to mental health disabilities, and the systemic failure to provide equally effective responses to these emergencies discriminates based on these disabilities.  The Complaint alleges that Defendants provide a supposedly facially neutral Service that furnishes a health response to all health emergencies except for those uniquely associated with mental health disabilities, *see* Compl. ¶ 236. The Complaint further alleges that the Service burdens people with mental health disabilities in a manner different from and greater than others, *see id.*  ¶¶ 65, 66, 68.  Finally, the Complaint alleges that as a result of this, Defendants' Service denies people with mental health disabilities the same opportunities to benefit it makes available to others. *See id.* ¶¶ 2, 19. No more is needed to establish discrimination by reason of

---

[9] *Pfrommer* and *Disability Rights New Jersey* recognized that the services the plaintiffs sought might be available to other people with disabilities but deemed this possibility irrelevant on the ground that federal disability law does not proscribe discrimination among people within the same protected class. *See Pfrommer*, 148 F.3d at 84; *Disability Rights N.J.*, 796 F.3d at 304. Thus, the courts essentially viewed the "new services" inquiry as assessing whether the plaintiff sought services not currently provided to people without disabilities. In any event, the viability of intra-disability discrimination claims is not at issue here, as Plaintiffs contend that Defendants' emergency response system unlawfully treats people with mental health disabilities differently from the public at large, not people with other disabilities. *See* discussion *supra* Part I.A.1 & *infra* Part I.B.

disability. *McGary,* 386 F.3d at 1265–66 (holding that neutral programs that unduly burden people with disabilities discriminate by "reason of disability"); *Crowder*, 81 F.3d at 1484 (same) (citing *Alexander,* 469 U.S. at 295).

The touchstone for establishing disability discrimination under the Acts is to show that a person has been denied equal access to state-provided services on the basis of a disability. *Id.* at 1484. Implicit in this standard is a showing that disabled individuals face an impediment to access that is not faced by non-disabled individuals. Put differently, disability discrimination occurs when plaintiffs "face conditions that are more onerous for them [than non-disabled individuals] because of their particular disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003).

The Ninth Circuit has repeatedly affirmed that, "in the wake of *Alexander*, state action that disproportionately burdens the disabled because of their unique needs remains actionable under the ADA." *Rodde,* 357 F.3d at 998; *see Crowder*, 81 F.3d at 1483 (holding that, in enacting the ADA, Congress intended to address "forms of discrimination which deny disabled persons public services disproportionately due to their disability"). Where, as here, a public entity's action "would deny certain disabled individuals meaningful access to government-provided services because of their unique needs, while others retain access to the same class of services," actionable discrimination has occurred. *Rodde*, 357 F.3d at 998; *see also Living Indep. & Free,* 2011 WL 4593993, at *13–15 (holding that "the City disproportionately burdens [people with disabilities] through its facially neutral practice of administering its [emergency planning] program in a manner that fails to address [their] needs").

Defendants seek dismissal of Plaintiffs' claims based on a fundamental misunderstanding of these claims. Defendants contend that "Plaintiffs do not, because they cannot, assert that the reason distinct categories of emergencies receive different [responses] is *because of* a perceived

qualifying mental health disability." County MTD at 21; *see also* Agency MTD at 33. Yet, that is exactly what Plaintiffs allege. *See, e.g.*, Compl. ¶ 27, 110, 112.

Specifically, Plaintiffs allege that "anyone who appears to be experiencing a mental health crisis, or who is otherwise categorized as having a behavioral health incident, is treated automatically as a threat [that] require[es] [a] law enforcement response," not as a person who needs emergency health care; *see also id.* ¶ 113–14 ("when the Agency receives an emergency call for service that involves a person '*reported to be mentally unstable*' the Agency's manual advises call takers to code the call as 'BHI – Behavioral Health Incident' . . . *all* calls coded as behavioral health incidents in the County automatically receive an armed law enforcement response") (emphasis added); *id.* ¶ 59 n.18 (Washington County Sheriff's Office's Policy #1310-R03 is titled "Responding to *Persons with Mental Health Issues*" and "applies when deputies encounter a person who is known to be mentally ill as well as one who exhibits symptoms of mental health issues") (emphasis added).

The Complaint provides numerous allegations that Defendants treat people with mental health disabilities uniformly as a threat based on "common myths and misconceptions about people with mental health disabilities incorrectly characterize them as violent and dangerous." *Id.* ¶ 115. One example of this is that Defendant Agency's Call Taking Manual directs call takers to assign behavioral health calls as "an immediate threat to people or property" regardless of a call's individual circumstances. *Id.* ¶ 113–14. Defendant Agency's materials further advise dispatchers to err in favor of sending law enforcement to calls involving mental health emergencies, warning that "[a] 93yo woman with dementia can be as strong and dangerous as a 23yo male," and responders might "need the 'manpower'" to contain a person in crisis. *Id.* ¶ 118.

Indeed, the Complaint alleges with particularity the step-by-step process by which Defendants' Service discriminates against people with mental health disabilities on the basis of their disability. These plausible allegations include: (1) how information about mental-health-related calls is gathered, *id.* ¶¶ 86, 148 ("Mr. Wesley communicated to the call taker that he had cut himself recently, that he had knives in the house but did not have any on his person, and that he was suicidal"); (2) how that information determines the nature and severity of the incident being reported, *id.* ¶¶ 86, 151 ("the Agency call taker knew or reasonably should have known that Mr. Wesley had a mental health condition")[10] (3) how that information is used to code the call, *id.* ¶¶ 86, 150 ("[the call taker] changed the call type to "SUA-Suicide Attempt – FD" after receiving more information about the crisis"); (4) how the call code informs which response is dispatched, *id.* ¶¶ 86, 120 (per its training materials, the Agency directs call takers to advise dispatchers to send *only* law enforcement officers . . . to respond to . . . Suicide Threat (SUT)"); and (5) how that all culminates in Defendants' Service providing people with mental health disabilities an emergency response that fails to meet their needs and doesn't benefit them, *id.* ¶¶ 86, 27 ("Individual Plaintiff Joshua Wesley . . . received an unequal, Agency-dispatched, County-operated police response because of his mental health disabilities.").

Defendants erroneously contend these allegations establish only that emergency type, not disability, determines which response is dispatched, *see* County MTD at 24, Agency MTD at 36, and that because both disabled and non-disabled individuals experience mental health emergencies

---

[10] The Agency argues that Plaintiffs did not allege discrimination on the basis of disability because "[t]he Complaint does not include any facts showing that the Agency call takers actually know that the callers are individuals with disabilities or that the subject(s) of the calls have a disability," Agency MTD at 25, but this argument is unavailing because actual knowledge of an individual's disability is not necessary to establish an individual is discriminated against on the basis of disability under the Acts. *See* 42 U.S.C. § 12102(1)(C).

and the Service provides the same emergency response to both, "Plaintiffs do not allege unequal treatment or any difference in services provided to mentally disabled individuals as compared to non-disabled individuals." County MTD at 6; *see* Agency MTD at 18.

Significantly, and fatally, this argument relies on the mistaken belief that "individuals experiencing mental health crises are not an exclusive group of qualified disabled individuals under the Acts." *See* County MTD at 21 n.8.[11] Indeed, Plaintiffs allege the opposite—*all* people who experience a health emergency that Defendants associate with mental health disabilities, and who receive an unequal emergency response from Defendants, are qualified disabled individuals under the Acts. *See* Compl. ¶¶ 3, 87, 109, 112, 123, 234, 247; *see also* 42 U.S.C. §§ 12102(1)(A)–(C). As Plaintiffs plausibly allege, "[m]ost mental health emergencies arise from mental health disabilities,"[12] Compl. ¶ 51, and thus, all people who experience a mental health emergency in the County are covered individuals with disabilities either because they have an actual "mental impairment that substantially limits one or more major life activities of such individual" 42 U.S.C. § 12102 (1)(A), *see* Compl. ¶ 137, 151, 188, 234, 247, or because they are "regarded as" disabled by Defendants, *see* Compl. ¶ 88, 112, 158, 173, 175, 192, 203, 234, 247, who make dispatch decisions based on a perception that all callers experiencing mental health crisis are people with mental health disabilities. *See* 42 U.S.C. § 12102 (1)(C).

---

[11] The only case Defendants cite in support of this argument, *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996), is inapposite for two reasons. First, Plaintiffs do not argue people who experience a mental health crisis are disabled because they have a temporary psychological impairment that qualifies as a disability under the ADA. Second, this case was decided before 2008 amendments to the ADA that broadened the construction of who has a disability and clarified the standards for determining when an individual is "regarded as having such an impairment" under the Acts.

[12] But for their mental health disabilities, the vast majority of these individuals would not experience mental health emergencies and would not need to contact Defendants' emergency response system.

An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. *Id.* § 12102 (3)(A).

Accordingly, even if a small subset of individuals who are subjected to Defendants' police-led response to a mental health emergency do not have "a physical or mental impairment that substantially limits one or more major life activities," *id.* § 12102 (1)(A), that individual nonetheless is "regarded as" disabled by Defendants because they have been subjected to the discriminatory provision of the Service. *See* § 12102 (1)(C). As the Complaint alleges, and as Defendants admit, *all* people who have a mental health emergency in the County uniformly receive the same police-led emergency response, s*ee* Compl. ¶¶ 70 n.24, 95, 119, 121–23; *see also* County MTD at 21–22; Agency MTD at 34. Because "[r]esponding deputies are not qualified mental health professionals capable of providing on-site psychiatric assessment, stabilization, and treatment to individuals in crisis," Compl. ¶ 241, all people who experience a mental health crisis and receive a police-led response are denied meaningful access to the Services' benefits that others receive. *See id.* ¶¶ 2, 19. Therefore, all or virtually all individuals who experience a mental health emergency are covered as disabled individuals under the Acts.

Defendants' arguments for why Plaintiffs have failed to plausibly allege that they were discriminated against "by reason of disability" fail. Plaintiffs' plausible allegations plead facts that are more than sufficient to survive Defendants' motions to dismiss.

## II.  **Plaintiff Disability Rights Oregon Exhausted All Required Administrative Remedies Prior to Filing This Lawsuit**

Defendant Agency's argument that DRO's claims should be dismissed because it failed to exhaust administrative remedies prior to filing this lawsuit fails for three reasons: (1) the statutory requirement to exhaust administrative remedies applies only when, unlike here, a protection and

advocacy network litigates an action on behalf of an individual, *see* 42 U.S.C. § 10807(a); (2) even if DRO was required to exhaust administrative remedies prior to filing, DRO satisfied that requirement; and, (3) as a Protection and Advocacy System ("P&A")  DRO is exempt from the exhaustion requirement and may file immediately, when, as here, the lawsuit seeks to "prevent or eliminate imminent serious harm to a mentally ill individual." *Id.* § 10807(b).

The PAIMI Act authorizes DRO to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." *Id.* § 10805(a)(1). DRO often exercises its federal authority by representing individual clients, but DRO also needs to be able to litigate in a more systemic manner as a representative of its clients. If Defendant Agency's interpretation of PAIMI's requirements was accurate, DRO would be hamstrung in a way that would defeat its ability to effectively advocate for its disabled constituents, largely defeating the purpose of P&As. While unclear from Defendant Agency's motion, it does not appear that Defendant is alleging that DRO failed to exhaust administrative remedies under the ADA or the Rehabilitation Act. Nor could such a claim succeed because neither of the Acts requires any sort of exhaustion. *See Zimmerman v. Or. Dep't of Justice*, 170 F.3d. 1169 (9th Cir. 1999).

Consequently, *Reyes v. United States*, which Defendant Agency cites, is inapposite.  *See Reyes v. United States*, No. 7:22-CV-00181, 2023 WL 2338059, at *1 (E.D. N.C. Feb. 2, 2023). In *Reyes*, an individual plaintiff brought several claims under a variety of federal provisions. Some of the causes of action required exhaustion and were dismissed for that reason, while the rest were dismissed for other procedural reasons.  Pertinent to this case, the court summarily dismissed two P&A statute claims in a footnote, one under the Protection and Advocacy of Individual Rights

(PAIR) statute and the other under PAIMI statute.  These two claims were not discussed in the body of the decision because they were not "actionable statutes."  *Id.* at 1 n.1.

Defendant Agency's exhaustion argument appears to rely solely on the exhaustion requirement under PAIMI, which only applies when a P&A litigates an action on behalf of an individual. *See* 42 U.S.C. § 10807(a)*; see also Mich. Prot. & Advocacy Serv., Inc., v. Flint Cmty. Schs.*, 146 F. Supp. 3d 897, 905 (E.D. Mich. Nov. 23, 2015). That requirement is not triggered by a case like this one, in which DRO litigates on behalf of its constituents, rather than one individual plaintiff. Here, while DRO is a named co-plaintiff in this matter, DRO is participating in its own capacity as a plaintiff that enjoys representational standing and § 10807(a) does not apply.

Even if the PAIMI exhaustion requirement applied here, DRO satisfied it. PAIMI's exhaustion requirement is not a strict one, *Gonzalez v. Martinez*, 756 F. Supp. 1533 (S.D. Fla. 1991), imposing only a "limited obligation on a [P&A] to make some efforts to pursue administrative remedies before filing suit." *See Mich. Prot. & Advocacy*, 146 F. Supp. 3d at 905. Accordingly, the legislative history cited by Defendant Agency ends with the passage:

> It is not the intention of the Committee that the administrative remedies must be pursued for an unreasonable duration, but rather that whenever possible there should be timely and reasonable attempts made to mediate and negotiate appropriate administrative remedies. If the pursuit of administrative remedies has not solved any matter within a reasonable time, the eligible system may pursue alternative remedies, including the initiation of a legal action. . . . the committee recommends that a 3-day notification be given to appropriate parties prior to filing any such action.

S. Rep. No. 109, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 1371.

What Defendant Agency's argument does not include is that the PAIMI statute was amended in 1991, and Congress clarified the exhaustion requirement. The Congressional intent remains that protection and advocacy systems should engage in non-adversarial methods of resolving conflicts when possible, but Congress also emphasized that systems "shall be held to the

same standard of exhaustion of remedies provided under State and Federal laws and that the Act places no additional burden of exhaustion on the systems." H.R. Rep. No. 102-319, H.R. Rep. No. 319, 102nd Cong., 1st Sess., *reprinted in* 1991 U.S.C.C.A.N. 777.

Courts have uniformly found that this limited exhaustion requirement can be met simply by attempting to request relief that will be sought in litigation. *See e.g., Advocacy Ctr. v. Stalder*, 128 F. Supp. 2d 358, 365 (M.D. La. 1999). For instance, in a case analogous to the facts here, the Alabama P&A sent a letter to the Alabama Department of Corrections that summarized the findings of an investigation and communicated a willingness to enter discussions to resolve the issues identified in the report. *See Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1175 (M.D. Ala. 2016). The Alabama P&A stated that they filed the lawsuit because there was not "a meeting of the minds about how both sides might work together to achieve a resolution." *Id*. The court found this was sufficient to fulfill the exhaustion requirement because there was an attempt to resolve the issues informally, but the P&A determined that the issues would not be resolved "within a reasonable time." 42 U.S.C. § 10807(a). Likewise, here, the parties engaged in pre-litigation discussions that would satisfy any exhaustion requirement, if one applied. *See* Exhibit A, "Declaration of David Boyer, Managing Attorney, Disability Rights Oregon."

Finally, due to the serious implications of the Defendants' practices, and the dire outcomes faced by people in mental health crises in the County, DRO is exempt from any exhaustion requirement per 42 U.S.C. § 10807(b). That provision allows a P&A to file immediately, without exhaustion, "any legal action instituted to prevent or eliminate imminent serious harm to a mentally ill individual." *Id.*

For these reasons, Defendant Agency's arguments seeking dismissal for failure to exhaust should be rejected.

III.   **Defendant County's Alternative Motions to Strike and For a More Definite Statement Should Be Denied**

Motions to strike are "disfavored and infrequently granted," and "[m]otions for a more definite statement are disfavored and are proper only where the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted." *Cantu v. City of Portland*, No. 3:19-CV-01606, 2020 WL 2952972, at *2–3 (D. Or. June 3, 2020). Here, Defendant County's Alternative Motions must be dismissed because Plaintiffs' allegations are neither (1) "immaterial, impertinent, or scandalous," Fed. R. Civ. P. 12(f), nor (2) "so vague and ambiguous" that Defendant County "cannot reasonably prepare a response." *Id.* at 12(e).

### A.  Plaintiffs' Allegations Are Not Immaterial, Impertinent, or Scandalous

Nothing in the Complaint is "immaterial, impertinent, or scandalous." *Id.* at 12(f). Defendant County argues that the Complaint includes immaterial "inflammatory descriptions,"[13] "public policy arguments,"[14] and "commentary"[15] that "distract"[16] and "do not pertain to the discrimination claims."[17] County MTD at 28-29. But an ""[i]mmaterial' matter in a pleading is content that has no essential or important relationship to the claim for relief or the defenses being pleaded, while 'impertinent' matter is that which does not pertain, and is not necessary, to the issues in question." *Byers v. Wal-Mart Stores, Inc.*, No. 3:17-cv-00579, 2017 WL 9049874, at *1 (D. Or. Oct. 2, 2017) (citing *Complete Distrib. Servs., Inc. v. All States Transp.*, LLC, No. 3:13–cv–00800, 2015 WL 1393281, at *2 (D. Or. Mar. 25, 2015) (cleaned up). Here, the paragraphs are material because the describe Mr. Wesley's personal experience with the County's emergency

---

[13] Defendant County argued this in regard to Compl. ¶ 10.
[14] Defendant County argued this in regard to Compl. ¶¶ 22-24.
[15] Defendant County argued this in regard to Compl. ¶¶ 42-59, 65-68, 72-73, 75-76.
[16] Defendant County argued this in regard to Compl. ¶ 10.
[17] Defendant County argued this in regard to Compl. ¶¶ 42-59, 65-68, 72-73, 75-76.

response system, relate to the effectiveness of dispatching law enforcement officers to mental health crises, and generally allege that experts agree that qualified mental health professionals should respond to mental health emergencies. Defendant's argument that "[t]he allegations that qualified mental health professionals are better trained than law enforcement to treat people with mental health disabilities is not an issue in this case," County MTD at 29, is puzzling if not frivolous as it goes to the heart of Plaintiffs' allegations.

Defendant County also argues that these paragraphs should be stricken because they "rely on unauthenticated hearsay." *Id.* However, even if Plaintiffs' allegations are hearsay, "an evidentiary burden of proof is imposed at summary judgment or at trial, not at the motion-to-dismiss stage, in which the plaintiff's allegations are accepted as true." *WFG Nat'l Title Ins. Co. v. Bay*, No. 3:22-cv-01010, 2023 WL 6595846, at *7 (D. Or. Aug. 30, 2023); *see, e.g., King v. Holder*, 950 F. Supp. 2d 164, 171 (D. D.C. 2013) (stating, on motion to dismiss, that complaints can rely on hearsay). For the reasons above, Defendant County's Motion to Strike should be denied.

### B. Plaintiffs' Complaint Is Sufficiently Clear and Specific Such That Defendant County Could Reasonably Prepare a Response

Defendant's arguments that "Vague Allegations Should be Clarified" and the Complaint are "unclear because [certain paragraphs] do not specify the defendant that is the subject of the allegation,"[18] County MTD at 30-31, should be denied. "Rule 12(e) is designed to strike at unintelligibility, rather than want of detail." *Martin v. City of Portland,* No. 3:19-CV-1647, 2020 WL 363391, at *2 (D. Or. Jan. 21, 2020) (citing *Barnes v. Olive*, No. 2:15-cv-00520, 2015 WL 5813193, at *2 (D. Or. Sept. 30, 2015)). "The Court must deny the motion if the complaint is

---

[18] Defendant County argued this in regard to ¶¶ 82(a), 98, 107, and 107(b).

specific enough to notify defendant of the substance of the claim being asserted." *Cantu*, 2020 WL 2952972, at *3 (citing *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1170, 1191 (E.D. Cal. 2010)).

First, Defendant does not claim that the Complaint fails to provide enough detail to notify Defendant of the substance of the claims being asserted. Second, there is nothing unintelligible where the Plaintiffs allege that the Agency and the County are jointly liable. *See, e.g.*, Compl. ¶ 83 ("The Washington County Consolidated Communications Agency operates an emergency telecommunications facility, or 911 dispatch center, for the County"). For the reasons above, Defendant County's Motion for a More Definite Statement should be denied.

## **CONCLUSION**

For the foregoing reasons, Defendants' motions should be denied. Although dismissal is not warranted, Plaintiffs reserve the right to seek leave to replead in the event the Court grants Defendants' Motions in whole or in part.

Dated: May 17, 2024                                   Respectfully submitted,

/s/ Julian Clark
Julian Clark
Jenn Rolnick Borchetta
American Civil Liberties Union
Foundation, Inc.
125 Broad Street, 17th Floor
New York, NY 10004-2400
jclark@aclu.org
jborchetta@aclu.org
(929) 969-4365

Kelly Simon, OSB #154213
American Civil Liberties Union
Foundation of Oregon, Inc.
PO Box 40585
Portland, OR 97240-0585
ksimon@aclu-or.org
(503) 227-3186

David Boyer, OSB # 235450
Meghan E. Apshaga, OSB #232137
Disability Rights Oregon
511 SW 10th Ave., Suite 200
Portland, OR 97205-2748
dboyer@droregon.org
mapshaga@droregon.org
(503) 243-2081 ext. 301

Brian Dimmick
Westley Resendes
American Civil Liberties Union
Foundation, Inc.
915 15th Street NW
Washington, DC 20005-2302
bdimmick@aclu.org
wresendes@aclu.org
(202) 638-2210

Wilson Baker*
American Civil Liberties Union
Foundation, Inc.
425 California Street
San Francisco, CA 94104-2102
wbaker@aclu.org
(415) 570-8011

Daniel L. Brown*
Laura L. Chapman
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112-0015
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
dbrown@sheppardmullin.com
lchapman@sheppardmullin.com
NY Telephone: (212) 634-3095
SF Telephone: (415) 434-9100

Attorneys for Plaintiffs

*pro hac vice application pending

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of May, 2024, I served the foregoing Plaintiffs' Consolidated Response in Opposition to Defendants' Motions to Dismiss on the parties below by electronic means through the Court's Case Management/Electronic Case File System.

Heather Van Meter
Liani Reeves
Ivan Resendiz
Miller Nash LLP
500 E Broadway Ste 400
Vancouver, WA 98660
    *Attorneys for Co-Defendant WCCCA*

Karen O'Kasey
Ruth A. Casby
Zachariah H. Allen
Hart Wagner LLP
1000 SW Broadway, 20th Floor
Portland, OR 97205
    *Attorneys for Co-Defendant Washington County*

/s/ Julian Clark
Julian Clark