**Karen O'Kasey,** OSB No. 870696
E-mail:  kok@hartwagner.com
**Ruth A. Casby**, OSB No. 944225
E-mail:  rac@hartwgner.com
**Zachariah H. Allen**, OSB No. 122729
E-mail:  zah@hartwagner.com
**HART WAGNER LLP**
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
Telephone: (503) 222-4499
Facsimile: (503) 222-2301

<u>Of Attorneys for Defendant Washington County</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, on behalf of its clients and constituents, and JOSHUA WESLEY, | No. 3:24-cv-00235-SB |
| Plaintiffs, | **DEFENDANT WASHINGTON COUNTY'S MEMORANDUM OF SUPPLEMENTAL AUTHORITIES** |
| v. | |
| WASHINGTON COUNTY, a political subdivision of the State of Oregon; and the WASHINGTON COUNTY CONSOLIDATED COMMUNICATIONS AGENCY, an intergovernmental entity in the State of Oregon, | |
| Defendants. | |

Pursuant to the court's request, attached is the memorandum decision in *Greene v. City of New York*, 2024 WL 1308434, from the United States District Court of the Southern District of New York.

**Page 1 - DEFENDANT WASHINGTON COUNTY'S MEMORANDUM OF SUPPLEMENTAL AUTHORITIES**

**HART WAGNER LLP**
**1000 S.W. Broadway,**
**Twentieth Floor**
**Portland, Oregon 97205**
**Telephone: (503) 222-4499**
**Facsimile: (503) 222-2301**

DATED this 29th day of August, 2024.

HART WAGNER LLP

By:    */s/ Karen O'Kasey*
        Karen O'Kasey, OSB No. 870696
        Ruth A. Casby, OSB No. 944225
        Zachariah H. Allen, OSB No. 122729
        Of Attorneys for Defendant Washington County

**HART WAGNER LLP**
**1000 S.W. Broadway,**
**Twentieth Floor**
**Portland, Oregon 97205**
**Telephone: (503) 222-4499**
**Facsimile: (503) 222-2301**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of August, 2024, I served the foregoing **DEFENDANT WASHINGTON COUNTY'S MEMORANDUM OF SUPPLEMENTAL AUTHORITIES** on the following parties at the following addresses:

Dave Boyer
Meghan E. Apshaga
Disability Rights Oregon
511 SW 10th Ave., Suite 200
Portland, OR 97205-2748

Kelly Simon
American Civil Liberties Union
Foundation of Oregon, Inc.
PO Box 40585
Portland, OR 97240-585

Daniel L. Brown
Laura L. Chapman
Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112-0015
   *Attorneys for Plaintiff*

Heather Van Meter
Ivan Resendiz
Miller Nash LLP
500 E Broadway Ste 400
Vancouver WA  98660
   *Attorneys for Co-Defendant*

by electronic means through the Court's Case Management/Electronic Case File system.


  */s/ Karen O'Kasey*
   Karen O'Kasey

Page 1 – CERTIFICATE OF SERVICE

**HART WAGNER LLP**
**1000 S.W. Broadway,**
**Twentieth Floor**
**Portland, Oregon 97205**
**Telephone: (503) 222-4499**
**Facsimile: (503) 222-2301**

2024 WL 1308434
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Steven GREENE, Giovanna Sanchez-Esquivel; Sarah
Arvio; Lisa Collins; Oritseweyimi Omoanukhe Ayu; and
Neil Amitabh, individually and on behalf of all others
similarly situated, and Community Access, Inc.; National
Alliance on Mental Illness of New York City, Inc.;
Correct Crisis Intervention Today – NYC; and Voices of
Community Activists and Leaders New York, Plaintiffs,
v.
CITY OF NEW YORK; Eric Adams; Bill de Blasio;
Keechant L. Sewell; Dermot F. Shea; NYPD Police
Officer Martin Haber; NYPD Police Sergeant Gbain,
NYPD Police Officer Vikram Prasad; NYPD Police
Officer Andre Dawkins; NYPD Police Officer Tyrone
Fisher; NYPD Police Officer Deviendra Ramayya;
NYPD Police Officer Julian Torres; NYPD Officer
Sanchez; NYPD Officer Marrone; and NYPD
Officers John and Jane Does # 1-40, Defendants.

21-CV-05762 (PAC)
|
Signed March 26, 2024

**Synopsis**
**Background:** Individuals who were involuntarily
hospitalized by city police department while in mental
health crisis or perceived mental health crisis and non-
profit organizations focused on mental health advocacy
brought putative class action against city, mayor, former
mayor, police commissioner, former police commissioner,
and police officers, asserting § 1983 claims for unlawful
seizure, warrantless entry, excessive force, and municipal
liability, claims for disability discrimination in violation of the
Americans with Disabilities Act (ADA), the Rehabilitation
Act, and the New York City Human Rights Law (NYCHRL),
and claims for violations of the New York State Constitution
and New York common law based on city's practice
of using police officers as first responders to mental
health crises, seeking compensatory and punitive damages
for alleged injuries caused by the policies, as well as
permanent injunction mandating implementation of a new,
non-police mental health crisis response program operating
independently of police department. Defendants moved to
dismiss for failure to state a claim.

**Holdings:** The District Court, Loretta A. Preska, J., held that:

[1] individuals sufficiently alleged that police officers lacked
probable cause for mental health arrest, and thus stated § 1983
false arrest claim;

[2] individuals who encountered police in public failed to
state § 1983 claim for unlawful warrantless entry;

[3] uncorroborated 911 call did not provide probable cause,
and thus individual sufficiently stated § 1983 claim for
unlawful warrantless entry;

[4] individuals sufficiently stated § 1983 claims for excessive
force;

[5] officers were not entitled to qualified immunity from
individuals' § 1983 claims for false arrest, unlawful
warrantless entry, and excessive force;

[6] city did not violate ADA and the Rehabilitation Act by
failing to respond to mental health calls with mental health
practitioners; and

[7] individuals failed to state claim for § 1983 municipal
liability.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (62)

**[1]    Civil Rights** 👉 Nature and elements of civil
actions
To assert a cognizable § 1983 claim, the plaintiff
must allege (1) the challenged conduct was
attributable at least in part to a person who
was acting under color of state law and (2)
the conduct deprived the plaintiff of a right
guaranteed under the Constitution of the United
States. 🔖 42 U.S.C.A. § 1983.

**[2]**    **Civil Rights** 🔑 Arrest and detention

To state a § 1983 false arrest claim, a plaintiff must allege that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. U.S. Const. Amend. 4; 🚩 42 U.S.C.A. § 1983.

**[3]**    **Civil Rights** 🔑 Arrest and detention

Probable cause to arrest constitutes justification and is a complete defense to § 1983 action for false arrest. U.S. Const. Amend. 4; 🚩 42 U.S.C.A. § 1983.

**[4]**    **Search, Seizure, and Arrest** 🔑 Arrests

Probable cause to arrest may be determined as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers. U.S. Const. Amend. 4.

**[5]**    **Mental Health** 🔑 Apprehension and custody pending determination

In the context of a mental health arrest, police officers must consider whether probable cause exists to believe the individual is a danger to herself or others, that is, whether there is a substantial risk of serious physical harm to herself or others. U.S. Const. Amend. 4.

**[6]**    **Mental Health** 🔑 Apprehension and custody pending determination

A showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior. U.S. Const. Amend. 4.

**[7]**    **Mental Health** 🔑 Apprehension and custody pending determination

Likelihood of serious harm to self or others, for purposes of probable cause for mental health arrest, can be evidenced by overt acts, attempts or threats of harm, or by other conduct such as neglect or refusal to care for oneself. U.S. Const. Amend. 4.

**[8]**    **Mental Health** 🔑 Apprehension and custody pending determination

Refusal to accept medical treatment does not, by itself, establish that a person is dangerous to himself, for purposes of probable cause for mental health arrest. U.S. Const. Amend. 4.

**[9]**    **Mental Health** 🔑 Apprehension and custody pending determination

A report of a suicide threat may establish probable cause for mental health arrest and naturally calls for reliance on the informant; however, police officers may not rely on an anonymous and uncorroborated 911 call to justify a belief that plaintiff presented a threat of physical harm to himself or others. U.S. Const. Amend. 4.

**[10]**    **Mental Health** 🔑 Apprehension and custody pending determination

A 911 call reporting a threat of suicide is generally not sufficient, standing alone, to establish probable cause for mental health arrest, for purposes of § 1983 false arrest claim; defendants must identify additional circumstances which reasonably suggest that plaintiffs presented a danger to themselves or others. U.S. Const. Amend. 4; 🚩 42 U.S.C.A. § 1983.

**[11]**    **Mental Health** 🔑 Apprehension and custody pending determination

Individuals who had been involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis sufficiently alleged that police officers

lacked probable cause for mental health arrest pursuant to New York Mental Hygiene law and city policies, and thus stated § 1983 false arrest claim, where individuals alleged that police received 911 call indicating threat of harm, that, when police arrived, individuals calmly denied any intention to harm himself or herself or others, that no other facts at scene suggested that individuals posed a danger to themselves or others, and that each was arrested on basis of 911 call alone. U.S. Const. Amend. 4; 🚩42 U.S.C.A. § 1983; 🚩N.Y. Mental Hygiene Law § 9.41.

[12]    **Mental Health** 🔑 Apprehension and custody pending determination

Individual experiencing homelessness sufficiently alleged that police lacked probable cause for mental health arrest pursuant to New York Mental Hygiene law and city policies, and thus stated § 1983 false arrest claim, where individual alleged that officers had no reason to believe he was experiencing "mental illness" or was conducting himself in manner which was likely to result in serious harm to individual or others based only on his status as person experiencing homelessness and report from individual's former building manager that individual was "off his medication." U.S. Const. Amend. 4; 🚩42 U.S.C.A. § 1983; 🚩N.Y. Mental Hygiene Law § 9.41.

[13]    **Civil Rights** 🔑 Arrest and detention

Individual diagnosed with bi-polar and schizoaffective disorders who had been involuntarily hospitalized by city police department while in mental health crisis pursuant to New York Mental Hygiene Law and city policies sufficiently stated § 1983 false arrest claim based on his mental health arrest for banging on door of psychiatrist's office after being locked out of office while waiting to be seen by psychiatrist, where there were no allegations that police were called, that police were aware of individual's behavior, or that individual exhibited signs of distress or danger

once police arrived. U.S. Const. Amend. 4; 🚩42 U.S.C.A. § 1983; 🚩N.Y. Mental Hygiene Law § 9.41.

[14]    **Civil Rights** 🔑 Arrest and detention

Individual diagnosed with bi-polar and schizoaffective disorder who had been involuntarily hospitalized by city police department while in mental health crisis pursuant to New York Mental Hygiene Law and city policies failed to state § 1983 false arrest claim based on mental health arrest following physical confrontation with police when he was turned away from receiving psychiatric care, where individual's demand for psychiatric care, coupled with his resistant behavior, gave police probable cause to believe that he was both suffering from "mental illness" and that he posed a threat to himself or others. U.S. Const. Amend. 4; 🚩42 U.S.C.A. § 1983; 🚩N.Y. Mental Hygiene Law § 9.41.

[15]    **Civil Rights** 🔑 Arrest and detention

Individual diagnosed with bi-polar and schizoaffective disorder who had been involuntarily hospitalized by city police department while in mental health crisis pursuant to New York Mental Hygiene Law and city policies failed to sufficiently allege that mental health arrest in lobby of mental health clinic was not supported by probable cause, and thus failed to state § 1983 false arrest claim, where police received report that individual had threatened someone on the phone, police then encountered individual in lobby while he was being "emotional and loud," and there was no indication that individual denied making the threat or that he denied that he was in distress. U.S. Const. Amend. 4; 🚩42 U.S.C.A. § 1983; 🚩N.Y. Mental Hygiene Law § 9.41.

[16]    **Search, Seizure, and Arrest** 🔑 Validity; reasonableness

It is basic principle of Fourth Amendment law that searches and seizures inside home without warrant are presumptively unreasonable. U.S. Const. Amend. 4.

**[17]    Search, Seizure, and Arrest** 👉 Public places and property

Individuals who were involuntarily hospitalized by city police department while in mental health crisis pursuant to New York Mental Hygiene law and city policies failed to state § 1983 claim for unlawful warrantless entry, where individuals were in public when they encountered police, and thus did not have constitutionally protected reasonable expectation of privacy. U.S. Const. Amend. 4; 🚩42 U.S.C.A. § 1983; 🚩N.Y. Mental Hygiene Law § 9.41.

**[18]    Search, Seizure, and Arrest** 👉 Reasonableness; reasonable expectation of privacy

Plaintiff must possess reasonable expectation of privacy in places or items being entered or searched in order to invoke Fourth Amendment. U.S. Const. Amend. 4.

**[19]    Search, Seizure, and Arrest** 👉 Providing medical aid

**Search, Seizure, and Arrest** 👉 Preventing Injury or Harm

Under "emergency aid doctrine," exigent circumstances exist permitting entry if law enforcement has probable cause to believe that person is seriously injured or threatened with such injury. U.S. Const. Amend. 4.

**[20]    Search, Seizure, and Arrest** 👉 Emergencies and exigent circumstances

Police bear heavy burden in justifying warrantless entry on basis of exigent circumstances. U.S. Const. Amend. 4.

**[21]    Search, Seizure, and Arrest** 👉 What constitutes exigent circumstances or emergency in general

Core question in determining whether exigent circumstances justified warrantless entry is whether facts, as they appeared at moment of entry, would lead reasonable, experienced officer, to believe that there was urgent need to render aid or take action. U.S. Const. Amend. 4.

**[22]    Search, Seizure, and Arrest** 👉 Providing medical aid

An uncorroborated 911 call reporting that a "mentally ill" person was in distress is insufficient support for probable cause to believe there is a medical exigency justifying warrantless entry. U.S. Const. Amend. 4.

**[23]    Search, Seizure, and Arrest** 👉 Providing medical aid

Uncorroborated 911 call did not provide probable cause for entry into individual's home pursuant to exigent circumstances exception to warrant requirement, and thus individual, who was involuntarily hospitalized by city police department pursuant to New York Mental Hygiene law and city policies, sufficiently stated § 1983 claim for unlawful warrantless entry. U.S. Const. Amend. 4; 🚩42 U.S.C.A. § 1983; 🚩N.Y. Mental Hygiene Law § 9.41.

**[24]    Search, Seizure, and Arrest** 👉 Providing medical aid

Individual who was involuntarily hospitalized by city police department pursuant to New York Mental Hygiene law and city policies sufficiently stated § 1983 claim for unlawful warrantless entry, where individual challenged authenticity of alleged call from his social worker to police asking police to "check in on him," once police arrived, individual and his fiancé stated that individual was not suicidal, did not threaten suicide, and did not have any medical

problems, fact that police prolonged entry to have conversation with individual suggested there was no emergency, and, at point officers entered individual's apartment, it should have been clear that he was neither seriously injured nor threatened with such injury. U.S. Const. Amend. 4; 🚩 42 U.S.C.A. § 1983; 🚩 N.Y. Mental Hygiene Law § 9.41.

**[25]    Search, Seizure, and Arrest** 🔗 Preventing Injury or Harm

Individual who was involuntarily hospitalized by city police department pursuant to New York Mental Hygiene law and city policies after individual's boyfriend called 911 to report that she was having a "manic episode" sufficiently stated § 1983 claim for unlawful warrantless entry, where there was never any indication that individual was dangerous, and boyfriend specified when placing 911 call that she was not violent and had no weapons. U.S. Const. Amend. 4; 🚩 42 U.S.C.A. § 1983; 🚩 N.Y. Mental Hygiene Law § 9.41.

**[26]    Search, Seizure, and Arrest** 🔗 Application of Fourth Amendment and state equivalents

Fourth Amendment prohibits the use of excessive force in police-citizen interactions. U.S. Const. Amend. 4.

**[27]    Search, Seizure, and Arrest** 🔗 Reasonableness in general; objective or subjective test

Determining whether force was reasonable requires careful balancing of nature and quality of intrusion on individual's Fourth Amendment interests against countervailing governmental interests at stake. U.S. Const. Amend. 4.

**[28]    Search, Seizure, and Arrest** 🔗 Reasonableness in general; objective or subjective test

Courts considering Fourth Amendment excessive force claim must pay careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. U.S. Const. Amend. 4.

**[29]    Search, Seizure, and Arrest** 🔗 Application of Fourth Amendment and state equivalents

A successful excessive force claim under the Fourth Amendment requires sufficient evidence to establish that the alleged use of force was serious or harmful enough to be actionable. U.S. Const. Amend. 4.

**[30]    Search, Seizure, and Arrest** 🔗 Application of Fourth Amendment and state equivalents

A de minimis use of force will rarely suffice to state a constitutional claim under the Fourth Amendment and de minimis injury can serve as conclusive evidence that de minimis force was used. U.S. Const. Amend. 4.

**[31]    Search, Seizure, and Arrest** 🔗 Application of Fourth Amendment and state equivalents

Pushes or shoves that cause no injury cannot support an excessive force claim under the Fourth Amendment. U.S. Const. Amend. 4.

**[32]    Search, Seizure, and Arrest** 🔗 Particular cases in general

Individuals who were involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis pursuant to New York Mental Hygiene law and city policies sufficiently stated § 1983 claims for excessive force, where individuals denied that they posed any threat and alleged that they conducted themselves in a calm manner but that, despite calm demeanor and compliance with officers' commands, individuals were subjected to substantial force and sustained injuries. U.S.

Const. Amend. 4; ⚐42 U.S.C.A. § 1983;
⚐N.Y. Mental Hygiene Law § 9.41.

**[33]    Civil Rights** ⚷ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**[34]    Civil Rights** ⚷ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To be "clearly established," for purposes of qualified immunity, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

**[35]    Federal Civil Procedure** ⚷ Immunity

As a general rule, the defense of qualified immunity cannot support the grant of a motion to dismiss for failure to state a claim; not only must the facts supporting qualified immunity defense appear on the face of the complaint, but, as with all motions to dismiss for failure to state a claim, motion may be granted on qualified immunity grounds only where it appears that the alleged facts, if true, plausibly state a claim that would entitle defendant to relief. Fed. R. Civ. P. 12(b)(6).

**[36]    Federal Civil Procedure** ⚷ Immunity

Qualified immunity defense presented on motion to dismiss for failure to state claim faces formidable hurdle and is usually not successful. Fed. R. Civ. P. 12(b)(6).

**[37]    Civil Rights** ⚷ Sheriffs, police, and other peace officers

It was clearly established, at time that individuals were involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis pursuant to New York Mental Hygiene law and city policies, that reliance on a 911 call alone was insufficient to establish probable cause for seizures and exigent circumstances, and that officers could not use force beyond what was necessary during arrest, and thus officers were not entitled to qualified immunity from individuals' § 1983 claims for false arrest, unlawful warrantless entry, and excessive force. U.S. Const. Amend. 4; ⚐42 U.S.C.A. § 1983; ⚐N.Y. Mental Hygiene Law § 9.41.

**[38]    Civil Rights** ⚷ Existence of other remedies; exclusivity

No private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution. ⚐42 U.S.C.A. § 1983.

**[39]    Civil Rights** ⚷ Persons Protected, Persons Liable, and Parties

There is respondeat superior remedy under New York State Constitution that is significantly broader than that under § 1983. ⚐42 U.S.C.A. § 1983.

**[40]    Associations** ⚷ Injury or interest in general

**Associations** ⚷ Suits on Behalf of Members; Associational or Representational Standing

An organization may have standing in one of two ways: by establishing so-called associational or representational standing to sue on behalf of its members, or by establishing that it was directly injured as an organization direct standing.

**[41]** **Associations** 🖐 Injury or interest in general

**Associations** 🖐 Causation and redressability in general

To succeed on a theory of direct standing, organizational plaintiffs have the burden of showing: (1) an imminent injury in fact to itself as an organization, rather than to its members, that is distinct and palpable; (2) that its injury is fairly traceable to enforcement of the ordinance; and (3) that a favorable decision would redress its injuries.

**[42]** **Federal Civil Procedure** 🖐 In general; injury or interest

**Federal Courts** 🖐 Case or Controversy Requirement

Where multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. U.S. Const. art. 3, § 2, cl. 1.

**[43]** **Associations** 🖐 Injury or interest in general

Only perceptible impairment of organization's activities is necessary for there to be injury-in-fact for purposes of standing.

**[44]** **Associations** 🖐 Injury or interest in general

One way organization may demonstrate perceptible impairment for purposes of injury-in-fact requirement for standing is by alleging that it needed to divert resources from other activities to address harm caused by defendant's conduct.

**[45]** **Associations** 🖐 Injury or interest in general

When defendant's conduct leads organization to devote more than anticipated resources to address one or more of its goals or activities and organization pleads that it has devoted fewer resources to other goals, organization has adequately pleaded injury for purposes of standing.

**[46]** **Civil Rights** 🖐 Property and housing

**Civil Rights** 🖐 Persons Protected, Persons Liable, and Parties

Non-profit organization that provided supportive housing for people living with mental health conditions sufficiently alleged injury-in-fact, and thus had direct organizational standing to bring claims against city for violations of the ADA and the Rehabilitation Act, § 1983 municipal liability, and violation of the New York City Human Rights Law (NYCHRL), in action challenging city's practice of using police officers as first responders to mental health crises, where organization alleged that it had to divert resources from its housing program to provide additional training to staff to enable them to respond to a significant portion of mental health crises themselves because staff were hesitant to call 911, and to investigate and respond to incidents of police misconduct. 🚩42 U.S.C.A. § 1983; Americans with Disabilities Act of 1990 § 101, 🚩42 U.S.C.A. § 12111 et seq.; Social Security Act § 304, 42 U.S.C.A. § 504; New York City Administrative Code § 8-101 et seq.

**[47]** **Civil Rights** 🖐 Discrimination by reason of handicap, disability, or illness

To plead a violation of Title II of the ADA, a plaintiff must allege (1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability. Americans with Disabilities Act of 1990 § 202, 🚩42 U.S.C.A. § 12132.

**[48]** **Civil Rights** 🖐 Handicap, Disability, or Illness

Purpose of ADA and Rehabilitation Act is to eliminate discrimination on basis of disability and to ensure evenhanded treatment between

disabled and able-bodied. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990 § 202, 🚩42 U.S.C.A. § 12132.

**[49]    Civil Rights** 🔑 Arrest and detention

City did not violate ADA and the Rehabilitation Act by failing to respond to mental health calls with mental health practitioners, in action challenging city policies regarding mental health arrests implemented pursuant to New York Mental Hygiene Law, which allowed police to involuntarily detain individuals who appeared to be "mentally ill" and displayed an inability to meet basic living needs, even when no recent dangerous act had been observed, where individuals detained under policies could not claim they were denied participation in a public entity's services, because program implemented under policies provided service, namely, transport to a hospital for mental health care, exclusively to individuals with mental health conditions. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990 § 202, 🚩42 U.S.C.A. § 12132; 🚩N.Y. Mental Hygiene Law § 9.41.

**[50]    Civil Rights** 🔑 Discrimination by reason of handicap, disability, or illness

A program which provides services exclusively to the "mentally disabled" cannot discriminate against the "mentally disabled" within the meaning of the ADA and Rehabilitation Act. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990 § 202, 🚩42 U.S.C.A. § 12132.

**[51]    Civil Rights** 🔑 Arrest and detention

Individuals who were involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis pursuant to New York Mental Hygiene Law and city policies implementing Law sufficiently

alleged that city failed to provide reasonable accommodations during their mental health crises, and thus stated claim for violation of the ADA and Rehabilitation Act, where individuals alleged that they were excluded from equal access to police services because of police department's failure to accommodate their disabilities during mental health arrests. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990 § 202, 🚩42 U.S.C.A. § 12132.

**[52]    Municipal Corporations** 🔑 Conformity to constitutional and statutory provisions in general

When the state specifically permits conduct prohibited at the local level, state law governs.

**[53]    Civil Rights** 🔑 Arrest and detention

Individuals who were involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis pursuant to New York Mental Hygiene Law and city policies implementing Mental Hygiene Law failed to state claim for disability discrimination in violation of the New York City Human Rights Law (NYCHRL) based on city's failure to respond to mental health calls with mental health practitioners, rather than police officers, where Mental Hygiene Law expressly permitted use of police in responding to mental health crises, and city policies merely implemented state law. 🚩N.Y. Mental Hygiene Law § 9.41; New York City Administrative Code § 8-101 et seq.

**[54]    Civil Rights** 🔑 Liability of Municipalities and Other Governmental Bodies
**Civil Rights** 🔑 Acts of officers and employees in general;  vicarious liability and respondeat superior in general

Under 🚩*Monell*, a municipality is not liable under § 1983 for the unlawful actions of an employee under a theory of respondeat superior;

municipalities are, however, liable for their own illegal acts. ⚑ 42 U.S.C.A. § 1983.

**[55]    Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

Under two-pronged test for § 1983 claims brought against a municipality, plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer; second, the plaintiff must establish a causal connection between the policy and the deprivation of his constitutional rights. ⚑ 42 U.S.C.A. § 1983.

**[56]    Civil Rights** 🔑 Complaint in general

A plaintiff need not allege every facet of a prima facie case of municipal liability under § 1983 at the pleadings stage; instead, he must simply allege facts that allow the court to draw the inference that the constitutional violation was the result of a municipal policy of inaction, as opposed to isolated misconduct by a single actor. ⚑ 42 U.S.C.A. § 1983.

**[57]    Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

**Civil Rights** 🔑 Lack of Control, Training, or Supervision; Knowledge and Inaction

Plaintiff may allege official policy or custom, as element of § 1983 municipal liability claim, by showing one of the following: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to

deliberate indifference to the rights of those who come into contact with the municipal employees. ⚑ 42 U.S.C.A. § 1983.

**[58]    Civil Rights** 🔑 Criminal law enforcement; prisons

Individuals who were involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis pursuant to New York Mental Hygiene Law and city policies implementing Mental Hygiene Law failed to state claim for § 1983 municipal liability based on policies, where policies tracked same requirements as constitutional Mental Hygiene Law, which permitted police to detain those who were both "mentally ill" and reasonably believed to be a danger to themselves or others. ⚑ 42 U.S.C.A. § 1983, ⚑ N.Y. Mental Hygiene Law § 9.41.

**[59]    Civil Rights** 🔑 Criminal law enforcement; prisons

Individuals who were involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis pursuant to New York Mental Hygiene Law and city policies implementing Mental Hygiene Law failed to state claim for § 1983 municipal liability based on de facto policy of using excessive force against persons in mental health crisis, where reports documenting deficiencies in city's response to mental health calls and to various incidents where police department used lethal force against individuals in mental health crisis were outdated and included scant incidents of brute and excessive force, and 24 instances where officers used lethal force against individuals in mental health crisis over some 40 years were too few to establish de facto policy. U.S. Const. Amend. 4, ⚑ 42 U.S.C.A. § 1983; ⚑ N.Y. Mental Hygiene Law § 9.41.

**[60]**    **Civil Rights**    🔑    Governmental Ordinance, Policy, Practice, or Custom

To plead de facto policy, for purposes of establishing municipal liability under § 1983, plaintiff must establish longstanding practice or custom which constitutes standard operating procedure; relevant practice must be so widespread as to have force of law. 🚩 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[61]**    **Civil Rights**    🔑    Criminal law enforcement; prisons

Individuals who were involuntarily hospitalized by city police department while in mental health crisis or perceived mental health crisis pursuant to New York Mental Hygiene Law and city policies failed to state claim for § 1983 municipal liability based on deliberate indifference to rights of persons with mental health conditions, where 24 instances where officers used lethal force against individuals in mental health crisis over period of 40 years, none of which resulted in liability, was insufficient to put city on notice that its policies caused constitutional violations. U.S. Const. Amend. 4; 🚩 42 U.S.C.A. § 1983; 🚩 N.Y. Mental Hygiene Law § 9.41.

**[62]**    **Civil Rights**    🔑    Lack of Control, Training, or Supervision; Knowledge and Inaction

To demonstrate deliberate indifference adequately, for purposes of § 1983 municipal liability, plaintiff must plead that city had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction. 🚩 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Jeffrey F. Kinkle, Dunnington Bartholow & Miller LLP, New York, NY, Luna Droubi, Deema Azizi, Jody Lynn Yetter, Jonathan C. Moore, Beldock Levine & Hoffman LLP, New York, NY, Richard Franklin Schwed, Dennis Danai Kitt, Shearman & Sterling LLP, New York, NY, Ruth Lowenkron, Marinda Van Dalen, New York Lawyers for the Public Interest, Inc., New York City, NY, Poupa Jenny Marashi, Law Office of P. Jenny Marashi/Marashi Legal, Bronx, NY, Samuel Polsky Vitello, Akerman LLP, New York, NY, Zhaohua Huang, Scarsdale, NY, for Plaintiffs Steven Greene, Giovanna Sanchez-Esquivel, Community Access, Inc., National Alliance on Mental Illness of New York City, Inc., Correct Crisis Intervention Today - NYC.

Jeffrey F. Kinkle, Dunnington Bartholow & Miller LLP, New York, NY, Luna Droubi, Deema Azizi, Jody Lynn Yetter, Jonathan C. Moore, Beldock Levine & Hoffman LLP, New York, NY, Richard Franklin Schwed, Dennis Danai Kitt, Shearman & Sterling LLP, New York, NY, Ruth Lowenkron, New York Lawyers for the Public Interest, Inc., New York, NY, Poupa Jenny Marashi, Law Office of P. Jenny Marashi/Marashi Legal, Bronx, NY, Samuel Polsky Vitello, Akerman LLP, New York, NY, Zhaohua Huang, Scarsdale, NY, for Plaintiff Sarah Arvio.

Jeffrey F. Kinkle, Dunnington Bartholow & Miller LLP, New York, NY, Jody Lynn Yetter, Beldock Levine & Hoffman LLP, New York, NY, Poupa Jenny Marashi, Law Office of P. Jenny Marashi/Marashi Legal, Bronx, NY, for Plaintiffs Neil Amitabh, Voices of Community Activists and Leaders New York, Lisa Collins, Oritseweyimi Omoanukhe Ayu.

Alan Howard Scheiner, Jeffrey Fredrick Frank, New York City Law Department, Special Federal Litigation Division, New York, NY, Peter William Brocker, United States Department of Justice, Washington, DC, Soo-Young Shin, United States Attorney's Office, Los Angeles, CA, for Defendant City of New York.

Soo-Young Shin, United States Attorney's Office, Los Angeles, CA, Alan Howard Scheiner, Jeffrey Fredrick Frank, New York City Law Department, Special Federal Litigation Division, New York, NY, for Defendants Bill de Blasio, Dermot F. Shea.

Alan Howard Scheiner, Jeffrey Fredrick Frank, New York City Law Department, Special Federal Litigation Division, New York, NY, for Defendants NYPD Police Officer Martin

Haber, NYPD Sergeant Gbain, NYPD Police Officer Vikram Prasad, NYPD Police Officer Andre Dawkins, NYPD Police Officer Tyrone Fisher, NYPD Police Officer Deviendra Ramayya, NYPD Police Officer Julian Torres, NYPD Police Officer Sanchez, Eric Adams, Keechant L. Sewell, NYPD Officer Marrone.

Adam Nicholas Shoop, The Bronx Defenders, Bronx, NY, for Amicus The Bronx Defenders.

## OPINION & ORDER

LORETTA A. PRESKA, United States District Judge

**\*1** Plaintiffs bring this putative class action against Defendants New York City ("the City") and numerous City employees to challenge the City's practice of using "police officers as first responders to mental health crises." [1] Second Am. Compl. ("SAC") ¶ 2, ECF No. 155. Specifically, Plaintiffs allege that the City's policies unlawfully require the police forcibly to seize individuals with perceived mental disabilities even when they pose no threat to themselves or others, stripping the mentally disabled of their constitutional rights to be free from unwarranted seizures, detentions, and excessive force. *Id.* ¶¶ 12–17. Plaintiffs seek compensatory and punitive damages for alleged injuries caused by the policies, as well as a permanent injunction "mandating implementation of a new, non-police mental health crisis response program operating independently of the NYPD." *Id.* ¶ 21.

Plaintiffs bring seven causes of action. Individual Plaintiffs assert claims for: unlawful seizure, warrantless entry, and excessive force pursuant to 42 U.S.C. § 1983 (Counts III and IV); and for violations of the New York State Constitution and New York common law (Count VI). Individual and Organizational Plaintiffs collectively bring causes of action for: discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, § 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the new York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (Counts I, II, and VII); and for municipal liability under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Count V). Presently before the Court is Defendants' Partial Motion to Dismiss Plaintiffs' SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). Defs.'

Mot. Dismiss, ECF No. 174. Defendants move to dismiss all claims in the SAC save for the claims of one Individual Plaintiff. [2]

**\*2** For the reasons that follow, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** Defendants' motion to dismiss Plaintiffs' municipal liability claim brought pursuant to *Monell* (Count V) and Plaintiffs' disability discrimination claims (Counts I, II, and VII), save for Greene, Sanchez-Esquivel, and Ayu's claims for reasonable accommodation under the ADA and Rehabilitation Act. The Court further **GRANTS** dismissal of Ayu's claims for false arrest arising from his April and May 2022 arrests, and Collins, Ayu, and Amitabh's warrantless entry claims, as well as their corresponding state law claims (Counts III and VI). The motion is **DENIED** as to all other claims.

## BACKGROUND

The Court begins by reviewing the factual and procedural background leading to the instant motion to dismiss. The following facts are taken from the SAC and documents incorporated therein and are assumed to be true for the purposes of deciding the motion. *See Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007).

### I. Policies Regarding Persons in Mental Health Crisis

Plaintiffs contend that the City has systemically failed "to provide safe, appropriate, and immediate responses to New Yorkers experiencing mental health crises." SAC ¶ 1. Plaintiffs' chief complaint regards two policies: the NYPD's Emotionally Disturbed Person Policy and the City's Involuntary Removal Policy (collectively, the "Policies"). *Id.* ¶¶ 12, 17. In this section, the Court will provide an overview of the Policies and their alleged shortcomings.

Each year, NYPD responds to approximately 200,000 calls regarding Emotionally Disturbed Persons ("EDP"). *Id.* ¶ 398. Pursuant to the New York Mental Hygiene Law, in responding to such calls, the police "may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41. Once in protective custody, § 9.41 directs the police to

transport the person to "any [approved] hospital ... or any comprehensive psychiatric emergency program" so that he or she may receive mental health treatment. *Id.*

The City gives NYPD guidance on how to execute mental health arrests pursuant to 🚩 § 9.41 through the NYPD's Emotionally Disturbed Person Policy ("EDP Policy"), located in the NYPD Patrol Guide § 221-13. *See* EDP Policy, ECF No. 21-1. The purpose of the EDP Policy is to "safeguard a mentally ill or emotionally disturbed person who does not voluntarily seek medical assistance." EDP Policy 1. It defines EDP as a "person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others." *Id.* The EDP Policy requires the NYPD to take an EDP into protective custody when an officer "reasonably believes that a person who is apparently mentally ill or emotionally disturbed ... is conducting himself in a manner likely to result in a serious injury to himself or others." *Id.* at 2. The Policy then provides detailed instructions on how to effectuate such arrests. *See id.* at 2–7.

In addition to the EDP Policy, in November 2022, Mayor Adams announced a new "Involuntary Removal Policy," SAC ¶ 131, which "clarif[ies] roles and responsibilities in involuntary removals under 🚩 Mental Hygiene Law sections 9.41 and 🚩 9.58." *Id.* ¶ 134 (brackets omitted). The Involuntary Removal Policy specifies that "both 🚩 sections 9.41 and 🚩 9.58 authorize the removal of a person who appears to be mentally ill and displays an inability to meet basic living needs, even when no recent dangerous act has been observed." *Id.* ¶ 135. Pursuant to the Policy, the NYPD "may involuntarily detain" such individuals. *Id.* ¶ 136.

**\*3** Plaintiffs object to these Policies on two grounds. First, they claim that the Policies require the police to detain mentally disabled individuals "regardless of whether the 'EDP' appears to present a danger to themselves [sic] or anyone else." *Id.* ¶ 77. In support, Plaintiffs rely on the experience of the six Individual Plaintiffs (discussed *infra*) and on the language of the Policies themselves. Regarding the EDP Policy, they note that it requires the NYPD to take an individual into custody even if the "the EDP is unarmed, not violent, and willing to leave voluntarily." *Id.* ¶ 75 (quoting EDP Policy 4). Regarding the Involuntary Removal Policy, Plaintiffs take issue with the fact that the NYPD may execute a

mental health arrest "without any indication that [an EDP] had committed or will commit a dangerous act." *Id.* ¶ 17. Taken together, they argue that the Policies allow the police "to seize individuals with perceived mental disabilities simply for existing." Pls.' Mem. Law Opp'n Defs.' Partial Mot. Dismiss ("Pls.' Opp.") 28, ECF No. 181.

Second, Plaintiffs claim that in effectuating mental health arrests, the police mistreat EDPs, causing "traumatization, serious injuries, deaths, arrests, imprisonments, and forced hospitalizations." *Id.* ¶ 85. In support, Plaintiffs detail 24 incidents since 1984 in which mentally disabled individuals were killed by police responding to EDP calls. SAC ¶ 82. Plaintiffs further rely on two reports documenting the NYPD's inadequate treatment of those with mental disabilities. *Id.* ¶¶ 88–130. For example, in 2002, an Urban Justice Center report [3] concluded that the "NYPD's training programs and protocols for dealing with individuals in emotional or psychiatric crisis are not only bad policy, they may also violate federal and state law." *Id.* ¶ 90 (quoting Urban Justice Center Report at 15). More recently, in 2017, the New York City Department of Investigation, Office of the Inspector General for the NYPD, promulgated a report [4] ("OIG Report") which "identified long-standing deficiencies in the NYPD's handling of responses to individuals with mental disabilities." *Id.* ¶ 99.

Finally, Plaintiffs document what they characterize as a long history of failed efforts to reform the NYPD's handling of mental health calls. For example, in 2014, the City committed to offering crisis intervention training ("CIT Training") to all NYPD officers, yet four years later, less than one-third of the force had been trained. *Id.* ¶¶ 96–97. More recently, in 2018, former Mayor de Blasio launched a pilot program, the Behavioral Health Emergency Assistance Response Division ("B-HEARD"), which aimed to have mental health professionals respond to "low acuity mental health 911 calls." *Id.* ¶ 107. B-HEARD originally sought to have mental health workers respond to 70% of calls in covered areas, but Plaintiffs aver that the NYPD "continue[s] to respond to nearly all mental health 911 calls." *Id.* ¶ 111. Due to this and a number of other deficiencies, Plaintiffs characterize B-HEARD as "only the latest in a series of failed efforts" to craft an appropriate response to those in mental health crisis. *Id.* ¶ 128. They conclude that the City's consistent failure to divest the NYPD of its obligation to respond to mental health calls "has led to the criminalization of individuals deemed by the NYPD to be 'EDPs,' the

traumatization of these individuals, extensive injuries to these individuals, and far, far too many deaths." *Id.* ¶ 130.

## II. Individual Plaintiffs

Individual Plaintiffs in this action are people with actual or perceived mental disabilities who Plaintiffs claim have been "unlawfully seized and forced into unconstitutional confinement." *Id.* ¶ 3. Plaintiffs claim at the time of each seizure, the individuals "were committing no crime," "presented no risk to themselves or anyone else," yet were "forcibly detained, and injured physically and/or emotionally, while being involuntarily transported to a hospital against their will." *Id.* ¶ 4. The following section details the allegations of each Individual Plaintiff.

### A. Steven Greene

**\*4** Plaintiff Steven Greene is a 26-year-old male diagnosed with post-traumatic stress disorder ("PTSD"), attention deficit disorder ("ADD"), and an injured hip. SAC ¶ 146. On May 6, 2020, at approximately 12:30 a.m., NYPD officers and EMS personnel arrived at Greene's apartment in response to an "EDP with gun" call to 911. *Id.* ¶ 147. One responding officer stated that Greene's social worker called and asked the police to "check in on him." *Id.* ¶ 148. Plaintiffs aver that Greene's ex-girlfriend placed the call "to harass him." *Id.*

When the police arrived, Greene informed the officers that "he was not suicidal, did not tell anyone he was suicidal, and did not have any medical problems." *Id.* ¶ 151. He "did not conduct himself in a manner that could be considered likely to result in serious harm to himself or others," and at no point was Greene "in possession of a gun nor was there ever a gun present in his apartment." *Id.* At the time of the encounter, Greene was on the phone with his fiancé. *Id.* ¶ 153. An officer took Greene's phone and spoke with Greene's fiancé who confirmed that Greene was not suicidal. *Id.* ¶ 154.

Nevertheless, an EMS employee informed Greene that because of the 911 call, they had to take him to the hospital. *Id.* ¶ 152. Greene explained that he did not want to go and walked back inside his apartment. *Id.* ¶ 155. The officers followed Greene and "began grabbing him." *Id.* ¶ 156. Greene grew "increasingly anxious" and asked the officers to stop touching him, telling them he suffered from PTSD, ADD, and an injured hip. *Id.* ¶¶ 156–57. Instead, the officers handcuffed him, forced him out of the apartment, dragged him down the

stairs, and strapped him to a gurney to be taken to the hospital. *Id.* ¶¶ 158–60. Greene repeatedly said that the stretcher straps and the handcuffs were too tight and that his arms felt numb. *Id.* ¶ 161. He also stated that his social worker could not have called 911 because she did not work after 5 p.m. and therefore "could not have learned he was suicidal in the middle of the night." *Id.* ¶ 162. Greene was brought to North Central Bronx Hospital, where he remained for a few hours before being released. *Id.* ¶ 164. Because of the incident, Greene suffered "bruising and abrasions to his chest, arms, and head," as well as emotional trauma. *Id.* ¶¶ 164–65.

### B. Giovanna Sanchez-Esquivel

Plaintiff Giovanna Sanchez-Esquivel is a 27-year-old student at Columbia University who suffers from PTSD, autism, anxiety, depression, and bipolar disorder. *Id.* ¶ 172. On November 7, 2020, at approximately 9:00 p.m., Sanchez-Esquivel was experiencing a manic episode. *Id.* ¶ 173. Her boyfriend called 311, and the operator informed him that there were no City services available for at least 24 to 48 hours and that he should call 911 instead. *Id.* He called 911 and stated that Sanchez-Esquivel had been having a "manic episode" for multiple days. *Id.* He further explained that she was not violent and had no weapons but said that she had mental disabilities including depression and bipolar disorder. *Id.*

Shortly after Sanchez-Esquivel's boyfriend placed the call, NYPD officers arrived at the apartment. [5] *Id.* ¶ 175. The officers spoke with Sanchez-Esquivel for approximately 25 minutes. Sanchez-Esquivel did not threaten to harm herself or others but instead "repeatedly and clearly" told the officers that she wanted them to leave. *Id.* ¶ 176. Sanchez-Esquivel explained to the officers that she had trauma from suffering multiple rapes. *Id.* ¶ 178. She also noted that she was a neuroscientist with an understanding of her own mental illnesses, adding "I have zero cognitive empathy, I'm autistic, I have PTSD, I'm not crazy, I'm rooted in reality." *Id.*

**\*5** After approximately 40 minutes, an officer stated that the police had to take Sanchez-Esquivel to the hospital "because she was not willing to go on her own." *Id.* ¶ 179. The officers handcuffed Sanchez-Esquivel as she cried and begged the officers to stop touching her because of her history of trauma. *Id.* ¶ 180. Instead, the officers "picked her up and carried her when she refused to leave." *Id.* ¶ 181. She was taken to Woodhull Hospital. *Id.* ¶ 182. She suffered severe bruises,

back and shoulder pain, as well as PTSD and emotional distress. *Id.* ¶ 184.

## C. Sarah Arvio

Plaintiff Sarah Arvio is a 67-year-old woman who suffers from polycythemia vera (a type of leukemia) and Budd-Chiari syndrome (a related liver condition). *Id.* ¶ 185. On March 13, 2020, at approximately 11 a.m., Arvio was on the phone with a staff member at Mount Sinai Institute for Liver Medicine, trying to get her hepatologist to complete a disability form. *Id.* ¶¶ 186–87. During the call, the staff member told Arvio that the hepatologist would not complete the form. *Id.* ¶ 188. In "an expression of frustration," Arvio told the staff member "I'm so frustrated with you all that I feel like jumping off a bridge." *Id.* ¶ 189.

Shortly thereafter, NYPD officers and an EMT arrived at Arvio's home in the Bronx. *Id.* ¶ 190. Arvio answered the door barefoot and in her bathrobe. *Id.* The officers entered the apartment and told Arvio they needed to take her to the hospital for psychiatric evaluation. *Id.* ¶ 191. Arvio responded in a "calm, rational, and cordial manner" that she was fine and that she had a busy day ahead. *Id.* ¶ 192. The officers said that because they received a call about suicide, they were "mandated" to take the subject of the call to the hospital. *Id.* ¶ 194. "Seeing no alternative," Arvio agreed to go and began walking back towards her bedroom to get dressed, but Defendant Officer Sanchez blocked her way. *Id.* ¶¶ 197–98. Sanchez said she would get Arvio's clothes, and Arvio "pleaded with [Sanchez] not to touch her things." *Id.* ¶ 199. Arvio then walked toward her desk to sit down, when she heard one of the officers say, "that's it!" *Id.* ¶ 200. The officers and the EMT then "swarmed" Arvio and "crushed their bodies around hers." *Id.* The officers "twisted Arvio's arms behind her back and handcuffed her." *Id.* ¶ 201. The handcuffs were too tight and squeezed Arvio's wrists. *Id.* Two of the officers kicked the back of Arvio's legs, and a third "held Arvio's head and pressed his thumb into her neck, causing her to pass out." *Id.* ¶ 202. When Arvio regained consciousness, she found herself wrapped tightly on a gurney in her hallway with her handcuffed wrists squeezed beneath her. *Id.* ¶ 203. Her leg was bleeding profusely. *Id.* ¶ 204. Despite informing the officers and the EMT, the wound was not treated. *Id.* ¶ 205.

Arvio was transported to Lincoln Medical Center. *Id.* ¶ 206. She remained in the hospital for approximately six hours. *Id.* ¶ 210. Other than receiving an x-ray of her leg and plain distilled water to pour into the wound, Arvio did not receive medical treatment for her leg. *Id.* The day after the incident, Arvio woke up with sore spots and bruises all over her body. *Id.* ¶ 213. Three days later she developed a fever due to an infection in her leg wound. *Id.* ¶ 214. On March 19, 2020, she went to the emergency room at Weil-Cornell where she was treated for her "traumatic leg injury." *Id.* Arvio continued to exhibit symptoms of infection for over two months and continues to suffer from "extreme emotional distress." *Id.* ¶¶ 215–16.

## D. Lisa Collins

**\*6** Plaintiff Lisa Collins is a 57-year-old woman who has never been diagnosed with a mental illness. *Id.* ¶ 217. On January 7, 2022, Collins checked in to the Four Seasons Hotel in lower Manhattan to enjoy a luxurious weekend that had been gifted to her. *Id.* ¶ 218. After checking in, she was escorted to her room by a young hotel attendant. *Id.* ¶ 220. The attendant followed Collins inside her room and engaged Collins in conversation, divulging personal details about various health struggles she was experiencing. *Id.* ¶¶ 220–21. Collins was confused by the personal nature of the encounter but nonetheless did her best to comfort the attendant during their half-hour long conversation. *Id.* ¶ 222. When the attendant left, Collins got on with her vacation: she ordered a cocktail, made dinner reservations with a friend, and headed to the pool for a swim. *Id.* ¶ 223.

While swimming, Collins was approached by a hotel employee who asked Collins to come to the lobby. *Id.* ¶ 224. When Collins arrived in the lobby, still wet from the pool, she was greeted by two NYPD officers and EMS workers. *Id.* ¶ 225. An EMS worker asked Collins "if she had any thoughts of harming herself or heard voices in her head." *Id.* ¶ 226. Incredulous, Collins replied "of course not. I'm swimming." *Id.* ¶ 227. She was then informed that the hotel manager had called the police to report a threat of suicide based on information provided by the hotel attendant who saw Collins to her room. *Id.* ¶ 228. Although Collins denied any suicidal ideation, the police explained that "once they received a report of an 'EDP,' they needed to bring that person to the hospital for an evaluation." *Id.* ¶¶ 229–32. Collins was subsequently escorted to her room by a female EMS employee. *Id.* ¶ 235. The EMS employee watched Collins change out of her bathing suit and then forced Collins into an ambulance to be taken to the hospital. *Id.* ¶¶ 235–36. At the hospital, Collins waited 90 minutes to be seen. *Id.* ¶ 240.

When a psychiatrist finally examined her, the psychiatrist expressed that Collins' detention "was ridiculous and was angry on Ms. Collins' behalf." *Id.* ¶ 241. She was released soon after. *Id.* ¶ 242.

### E. Oritseweyimi Omoanukhe Ayu

Plaintiff Oritseweyimi Omoanukhe Ayu is a 41-year-old man who has been diagnosed with bi-polar and schizoaffective disorder. *Id.* ¶ 245. He has been involuntarily detained by NYPD on several occasions. *Id.* ¶ 246. In March 2022, Ayu was living at the Renaissance Shelter in Crown Heights, where he was also receiving mental health treatment. *Id.* ¶ 247. One day, Ayu arrived for a 10 a.m. psychiatry appointment and was told he could not be seen until 1 p.m. *Id.* ¶ 248. At 1 p.m., he was told he would have to wait until 3 p.m. *Id.* When he asked if he could be seen sooner, the receptionist told him to ask someone outside the clinic. *Id.* When he stepped outside the clinic, the receptionist locked the door behind him. *Id.* ¶ 249. Upset at not being seen and for being tricked, Ayu began to bang on the door. *Id.* ¶ 250. Minutes later, seven NYPD officers arrived. *Id.* ¶ 251. Ayu said he would leave voluntarily, but the officers stated that Ayu was an EDP and that he must go with them. *Id.* ¶ 252. He was taken to Kings County Hospital and was quickly discharged without receiving treatment. *Id.* ¶¶ 254–57.

On April 26, 2022, Ayu was on the subway at 2 a.m. when he received a phone call informing him that his son had been murdered. *Id.* ¶ 258. Distraught, Ayu went to Kings County Hospital to admit himself. *Id.* ¶ 259. After being turned away by hospital staff, two NYPD officers asked him to leave, but he refused. *Id.* ¶¶ 260–62. Ayu began to film the officers and a scuffle ensued. *Id.* ¶ 263. He was ultimately restrained by multiple officers and transported to the psychiatric ward where he stayed for one week. *Id.* ¶¶ 264–65.

**\*7**  Weeks later, Ayu was in the lobby of the mental health clinic of Fortune Society in Queens. *Id.* ¶ 267. While in the lobby, he spoke loudly and emotionally about his son's recent murder. *Id.* ¶¶ 267–68. Minutes later, four NYPD officers surrounded Ayu and said they received a 911 report that he threatened someone over the phone. *Id.* ¶ 270. They explained they had to bring him to the hospital. *Id.* ¶ 271. When he refused, the "NYPD officers slammed Ayu to the ground and handcuffed him," injuring his head in the process. *Id.* ¶ 273. He was taken to Elmhurst Hospital Center in Queens and released after a psychiatric evaluation. *Id.* ¶ 276.

### F. Neil Amitabh

Plaintiff Neil Amitabh is a 39-year-old man who has never been diagnosed with a mental illness. *Id.* ¶ 280. In February 2023, Amitabh was homeless and had fallen asleep in a subway station together with his girlfriend. *Id.* ¶ 281. He awoke to his girlfriend's arguing with two NYPD officers. *Id.* ¶ 282. The police told the couple to leave the station. *Id.* ¶ 283. As he gathered his things to leave, an officer slammed Amitabh into the wall, injuring his hip. *Id.* ¶ 286. He was taken to Bellevue for psychiatric evaluation and released the following morning. *Id.* ¶¶ 291–93.

Previously, in March 2020, Amitabh was living in a homeless encampment under an overpass in the Bronx. *Id.* ¶ 297. One day he went to his former residence and hung his laundry to dry on a railing in front of the building. *Id.* ¶ 298. The building manager called the police and said that Amitabh was "off his medications" (he did not take medication), and soon after police and EMS arrived. *Id.* ¶¶ 299–300. Amitabh told the police he did not care, but he was taken against his will to St. Barnabas and injected with a drug that caused him to pass out. *Id.* ¶¶ 301–02. He was released two days later without medication. *Id.* ¶ 303. A few months later, Amitabh again encountered the police while at his encampment. *Id.* ¶ 304. He was told to vacate the area. *Id.* ¶ 305. While arguing with the police, he was asked to produce his identification, which he did not have. *Id.* ¶¶ 306–07. At this, he was handcuffed and transported to St. Barnabas, where he was soon discharged without a citation, charge, or medication. *Id.* ¶¶ 308–10.

### III. Organizational Plaintiffs

The Organizational Plaintiffs—Community Access, Inc. ("Community Access"), National Alliance on Mental Illness of New York City, Inc. ("NAMI-NYC"), Correct Crisis Intervention Today-NYC ("CCIT-NYC"), Voices of Community Activists and Leaders New York ("VOCAL-NY") (collectively, "Organizational Plaintiffs") —are organizations committed to supporting New Yorkers with mental disabilities. *Id.* ¶ 11. Community Access was founded in 1974 to provide supportive housing to New Yorkers with mental disabilities and is now a "leading advocate and provider of affordable housing, education, job training, and crisis support for New Yorkers with disabilities." *Id.* ¶ 33. NAMI-NYC "helps families and individuals affected by mental disabilities build better lives through

education, support, and advocacy." *Id.* ¶ 35. CCIT-NYC is a coalition of more than 80 civil rights and human service organizations who "work together with a mission to transform the City's response to mental health crises by providing peer-driven supports to individuals with mental disabilities." *Id.* ¶ 37. Finally, VOCAL-NY is a statewide organization that "advocates for low-income people affected by mental disabilities, HIV/AIDS, the war on drugs, mass incarceration, and homelessness." *Id.* ¶ 39. Collectively, the Organizational Plaintiffs allege that they have diverted substantial resources to oppose the City's police-based response to mental health calls. *Id.* ¶ 11.

### IV. Procedural History

**\*8** On July 5, 2021, Plaintiff Justin Baerga commenced this action, alleging numerous claims under 42 U.S.C. § 1983, state common law, and both the United States and New York constitutions.[6] *See* Compl., ECF No. 1. On December 29, 2021, Plaintiffs amended their Complaint, adding additional named Plaintiffs and seeking to certify the claims as a class action. *See* First Am. Compl. ("FAC"), ECF No. 21. On September 13, 2022, Defendants collectively moved to dismiss the FAC. ECF No. 101.

On November 29, 2022, while Defendants' motion to dismiss was pending, the City announced a new directive, the "Involuntary Removal Policy." SAC ¶ 17. On December 8, 2022, Plaintiffs filed an application to enjoin the new directive "pending the final determination of this action." Pl.'s Proposed Order Show Cause Emergency Relief 4, ECF No. 109. On January 30, 2023, this Court denied Plaintiffs' motion for lack of standing. *See Baerga v. City of New York*, No. 21 Civ. 5762 (PAC), 2023 WL 1107633 (S.D.N.Y. Jan. 30, 2023). In light of the Court's denial, Plaintiffs amended their Complaint a second time. The SAC adds facts and claims related to the Involuntary Removal Policy, adds individuals who have been detained after the policy's announcement, and adds new organizations that have allegedly been negatively impacted by the Policy. *See* Letter, ECF No. 147. On June 16, 2023, Defendants moved to dismiss.

### ANALYSIS

### I. Legal Standard

To defeat a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a plausible

claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, 129 S.Ct. 1937. While the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). For now, the task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011).

### II. Individual Claims

### A. Individual § 1983 Claims

**[1]** The Court first addresses claims brought by Individual Plaintiffs pursuant to 42 U.S.C. § 1983. To assert a cognizable § 1983 claim, the plaintiff must allege "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

### *1. False Arrest*

**[2]** **[3]** "To state a § 1983 false arrest claim, a plaintiff must allege 'that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.' " *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 647 (S.D.N.Y. 2021) (quoting *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)).[7] Probable cause to arrest "constitutes justification and is a complete defense to an action for false arrest." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)

(quotation omitted). Here, Defendants argue that each arrest was supported by probable cause.

**\*9** **[4]** **[5]** **[6]** **[7]** **[8]** Probable cause may be determined "as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Barkai v. Mendez*, 629 F. Supp. 3d 166, 191 (S.D.N.Y. 2022) (quotation omitted). In the context of "a mental health arrest, police officers must consider whether probable cause exists to believe the individual is a danger to herself or others, that is, whether there is a substantial risk of serious physical harm to herself or others." *Guan v. City of New York*, 37 F.4th 797, 807 (2d Cir. 2022). "[A] showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015), *aff'd*, 665 F. App'x 49 (2d Cir. 2016) (quotation omitted). "Likelihood of serious harm can be evidenced by overt acts, attempts or threats of harm, or by 'other conduct' such as neglect or refusal to care for oneself." 🚩*Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 505 (S.D.N.Y. 2015) (quoting 🚩*Boggs v. New York City Health & Hospitals Corp.*, 132 A.D.2d 340, 523 N.Y.S.2d 71, 89 (1987)). "However, refusal to accept medical treatment does not, by itself, establish that a person is dangerous to himself." 🚩*Id.*

**[9]** **[10]** The City takes purchase in the fact that several of the mental health arrests here were pursuant to 911 calls indicating threats of suicide. Indeed, "a report of a suicide threat does more to establish probable cause ... [and] naturally call[s] for more reliance on the informant." *Matthews v. City of New York*, No. 15 Civ. 2311, 2016 WL 5793414, at \*4 (S.D.N.Y. Sept. 30, 2016); *see also Bayne v. Provost*, No. 04 Civ. 44, 2005 WL 1871182, at \*7 (N.D.N.Y. Aug. 4, 2005) ("[A] police officer is justified in relying upon a citizen's warning that another person has threatened suicide even if it is later determined by mental health professionals that the person presents no such risk."). However, "police officers may not rely on an anonymous and uncorroborated 911 call to justify a ... belief that [plaintiff] presented a threat of physical harm to himself or others." 🚩*Kerman v. City of New York*, 261 F.3d 229, 238 (2d Cir. 2001); *see also Lurch v. City of New York*, No. 19 Civ. 11254, 2021 WL 842616, at \*4 (S.D.N.Y. Feb. 10, 2021), *report and recommendation adopted*, 19 Civ. 11254, 2021 WL 1172506 (S.D.N.Y. Mar. 29, 2021) ("Without knowing the contents of

the 911 call, it is insufficient to establish probable cause (or not) solely from that call."). As such, a 911 call reporting a threat of suicide is generally not sufficient, standing alone, to establish probable cause. Defendants must identify additional circumstances which reasonably suggest that the Plaintiffs presented a danger to themselves or others. Defendants have failed to meet this burden for all but Ayu's March and April 2022 arrests.

**[11]** Aviro, Greene, Collins, and Sanchez-Esquivel all present the same basic facts: (1) the police received a 911 call indicating a threat of harm; (2) when police arrived, each Plaintiff calmly denied any intention to harm himself or herself or others; (3) no other facts at the scene suggested that Plaintiffs posed a danger to themselves or others; (4) each was arrested on the basis of the 911 call alone.[8] These sparse facts are insufficient to establish probable cause on a motion to dismiss. *See 🚩Dunkelberger v. Dunkelberger*, No. 14 Civ. 3877, 2015 WL 5730605, at \*14 (S.D.N.Y. Sept. 30, 2015) (motion to dismiss denied where officers received a call from a relative but had reasons to doubt the veracity of the call when they showed up in person); *Amid v. Police Officer Thomas R. Lamb*, No. 14 Civ. 3151, 2016 WL 1070814, at \*3 (E.D.N.Y. Mar. 15, 2016) (denying motion to dismiss because it was disputed whether plaintiff posed a danger to herself even though plaintiff told suicide hotline she was contemplating suicide); 🚩*Kerman*, 261 F.3d at 240 ("We find it significant that the police failed to corroborate the gravamen of [the] 911 call.").

**\*10** **[12]** The Court cannot dismiss Amitabh's false arrest claim because, based on the pleadings, there is no indication that the police had reason to believe he was mentally ill. In order to arrest someone pursuant to 🚩§ 9.41, the police must have probable cause to believe both that the individual "appears to be mentally ill" and that he or she is conducting himself or herself "in a manner which is likely to result in serious harm to the person or others." 🚩N.Y. Mental Hyg. Law § 9.41. While the Defendants are correct that an "inability to meet ... essential needs for food, clothing or shelter," *Boggs*, 523 N.Y.S.2d at 85, may establish the second factor, it cannot, standing alone, establish the first. In two of the encounters, Amitabh alleges that he was detained simply for being homeless. SAC ¶¶ 297–310. In the other encounter, the building manager reported that he was "off his medication." *Id.* ¶ 299. However, there is no indication how the building manager would know such a detail, and no

facts are alleged from which the officers could conclude that Amitabh was in fact mentally ill. Accordingly, at this stage, the Court is "not yet in a position to conclude as a matter of law that there existed probable cause." *Barkai*, 629 F.Supp.3d at 197.

**[13]** The facts alleged likewise do not support a finding of probable cause for Ayu's March 2022 arrest. Plaintiff alleges that he was waiting to be seen by a psychiatrist, was subsequently locked out of the office, and that he then banged on the door. SAC ¶¶ 248–50. There are no allegations that the police were called, that they were aware of his behavior, or that he exhibited signs of distress or danger once they arrived. Indeed, the only allegation is that he offered to "leave the scene voluntarily." *Id.* ¶ 252. The Court cannot find as a matter of law that these facts amount to probable cause.

**[14]** The Court cannot reach the same conclusion regarding Ayu's April and May arrests. In April, Ayu had a physical confrontation with police when he was turned away from receiving psychiatric care. *Id.* ¶¶ 258–63. Typically, Ayu's lack of cooperation would do little to establish probable cause because "refusal to accept medical treatment does not, by itself, establish that a person is dangerous to himself." *Schoolcraft*, 103 F. Supp. 3d at 505. This, however, is not the typical case. Here, Ayu was not refusing psychiatric care, he was demanding it. *Id.* ¶ 262. Given his own representations, coupled with his resistant behavior, the police had probable cause to believe that he was both suffering from a mental illness and posed a threat to himself or others.

**[15]** The May 2022 arrest was also supported by probable cause. There, the allegations are that the police received a report that Ayu had threatened someone on the phone. *Id.* ¶ 270. The police then encountered Ayu in the lobby of a mental health clinic while he was being "emotional and loud." *Id.* ¶ 268. Unlike the other Plaintiffs, there is no indication that Ayu denied making the threat or that he denied that he was in distress. Here, the fact that the police had received a tip that he had made a threat, coupled with their firsthand observation of his escalated state and the fact that he was in a mental health clinic made it reasonable for the police to believe that he was suffering from a mental illness and presented a substantial risk of harm to himself or others. These facts are sufficient to find probable cause for the arrest.

In sum, the Court **DENIES** Defendants' motion to dismiss the false arrest claims as they relate to Aviro, Greene, Collins, Sanchez - Esquivel, Amitabh, and Ayu's March 2022 arrest.

The Court **GRANTS** the motion as to Ayu's April and May 2022 arrests.

### 2. Warrantless Entry

**[16]** The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. "The home has properly been regarded as among the most highly protected zones of privacy, and the sanctity of private dwellings is ordinarily afforded the most stringent Fourth Amendment protection." *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020) (citation omitted). It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (citation and quotation marks omitted).

**\*11** **[17]** **[18]** Defendants argue that warrantless entry claims of Collins, Ayu, and Amitabh must be dismissed because they were seized in public. *See* Defs.' Mem. Law Supp. Partial Mot. Dismiss ("Defs.' Mem.") 9 n.6, ECF No. 175. The Court agrees. "It is well-settled that a plaintiff must possess a reasonable expectation of privacy in the places or items being entered or searched in order to invoke the Fourth Amendment." *Gill v. Dawkins*, No. 16 Civ. 1398, 2020 WL 7042647, at *3 (E.D.N.Y. Nov. 30, 2020). Here, because all three were in public when they encountered the police, none had a "constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). Their claims for warrantless entry are dismissed.

**[19]** **[20]** **[21]** **[22]** Defendants argue that exigent circumstances justified their entry into the homes of Greene, Aviro, and Sanchez-Esquivel. "Under the emergency aid doctrine, exigent circumstances exist permitting entry if law enforcement has probable cause to believe that a person is 'seriously injured or threatened with such injury.' " *Chamberlain*, 960 F.3d at 105 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)). The "police bear a heavy burden," *Welsh*, 466 U.S. at 749, 104 S.Ct. 2091, in "justify[ing] a warrantless entry on the basis of exigent circumstances," *Chamberlain*, 960 F.3d at 106. The "core question is whether the facts, as they appeared at the moment of entry,

would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." 📁 *Id.* Important here, "an uncorroborated 911 call ... reporting that a mentally ill person was in distress is insufficient support for probable cause to believe there is a medical exigency." 📁 *Id.* at 111.

**[23]  [24]  [25]**  The Court finds that exigent circumstances did not justify the entry of Sanchez-Esquivel, Greene, and Aviro's homes. Regarding Aviro, it is unclear from the Complaint who called the police or the contents of the call. Absent any other information, the uncorroborated 911 call cannot support probable cause for exigent circumstances.

📁 *Chamberlain, 960 F.3d at 111.* Regarding Greene, Plaintiffs contest the authenticity of the call. SAC ¶ 148. Regardless, once the police arrived, Greene and his fiancé stated that Greene was not suicidal, did not threaten suicide, and did not have any medical problems. *Id.* ¶ 151. Indeed, the very fact that the police prolonged their entry to have this colloquy suggests there was no emergency. *Cf.* 📁 *Chamberlain, 960 F.3d at 106* ("A police officer, for reasons of safety at least, seems unlikely to want to prolong the process [of entering a dwelling]."). At the point they entered, it should have been clear that Greene was neither "seriously injured [n]or threatened with such injury."

📁 *Chamberlain, 960 F.3d at 105* (quotation omitted). Finally, as for Sanchez-Esquivel, there was never any indication that she was dangerous, only that she was having a "manic episode." SAC ¶ 173. Sanchez-Esquivel's boyfriend specified when placing the call that she was not violent nor had any weapons. 📁 *Id.* Accordingly, Defendants' motion is **DENIED** as to Sanchez-Esquivel, Greene, and Aviro's warrantless entry claims.

### *3. Excessive Force* [9]

**[26]  [27]  [28]**  "The Fourth Amendment prohibits the use of excessive force in police-citizen interactions."

📁 *Chamberlain, 960 F.3d at 113.* "Determining whether force was reasonable requires 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " 📁 *Id.* (quoting 📁 *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d

443 (1989)). Courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 📁 *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

**\*12  [29]  [30]  [31]**  "A successful excessive force claim requires sufficient evidence to establish that the alleged use of force was serious or harmful enough to be actionable." *Ferebee v. City of New York,* No. 15 Civ. 1868 (PAC), 2017 WL 2930587, at \*8 (S.D.N.Y. July 6, 2017). "A *de minimis* use of force will rarely suffice to state a constitutional claim and *de minimis* injury can serve as conclusive evidence that *de minimis* force was used." *Id.* (citation omitted). "Pushes or shoves that cause no injury cannot support an excessive force claim." *Id.*

**[32]**  The Court finds that all four Plaintiffs have plausibly alleged excessive force. Regarding Greene and Sanchez-Esquivel, the police spoke with both at length before effectuating an arrest. SAC ¶¶ 151, 179. During those conversations, Plaintiffs denied that they posed any threat and conducted themselves in a calm manner. *Id.* ¶¶ 151, 178. Despite their calm demeanor, both were allegedly subjected to substantial force. *Id.* ¶ 161 (describing that Greene "repeatedly said that the stretcher straps and handcuffs were too tight and that his arms felt numb"); *id.* ¶ 184 (describing that Sanchez-Esquivel sustained "severe bruises" and "back and shoulder pain caused by being handcuffed and dragged"). Regarding Amitabh, the SAC alleges that he was "slammed" into the wall injuring his hip despite complying with the officers' command to vacate the station. *Id.* ¶ 286. As to Ayu, the SAC alleges that he was "slammed" to the ground, potentially causing a concussion. *Id.* ¶ 273. In each instance, Plaintiffs allegedly sustained injuries sufficient to maintain their claims. 📁 *Sforza v. City of New York,* No. 07 Civ. 6122, 2009 WL 857496, at \*15 (S.D.N.Y. Mar. 31, 2009) ("A plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient."). Moreover, at this early stage, the Court cannot find that the force employed was objectively reasonable as a matter of law. Thus, Defendants' motion to dismiss the excessive force claims is **DENIED**.

### *4. Qualified Immunity*

**[33]** **[34]** **[35]** **[36]** "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.' " *Reichle v. Howards,* 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks and alterations omitted)). "[A]s a general rule, 'the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion.' " *Chamberlain,* 960 F.3d at 110 (quoting *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir. 1983)). "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears that the alleged facts, if true, plausibly state a claim that would entitle him to relief." *Id.* (quotation omitted). "Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion 'faces a formidable hurdle and is usually not successful.' " *Id.* at 111 (quoting *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 191–92 (2d Cir. 2006)).

**\*13** **[37]** Plaintiffs have met their burden to overcome Defendants' qualified immunity defense at this early stage. The law is clearly established that reliance on a 911 call alone is insufficient to establish probable cause for seizures, *see Kerman,* 261 F.3d at 235–36, and exigent circumstances, *see Chamberlain,* 960 F.3d at 111, and that officers may not use of force beyond what is necessary during arrest, *see id.* at 113. At this stage, drawing all inferences in Plaintiffs' favor, Plaintiffs have sufficiently pled that Defendants violated these rights by unlawfully entering Plaintiffs' homes and seizing Plaintiffs without probable cause and by using excessive force in the process.

### B. New York State Constitution

**[38]** **[39]** Individual Plaintiffs also sufficiently allege violations of the New York State Constitution under a theory of *respondeat superior.* Defendants are correct that "no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." Defs.' Mem. 32 (quoting *Oliver v. City of New York,* No. 19 Civ. 11219, 2022 WL 455851, at \*15 (S.D.N.Y. Feb. 15, 2022)). However, "there is a *respondeat superior* remedy under the New York State Constitution that is significantly broader than that under Section 1983." *Felix v. City of New York,* 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019) (citing *Brown v. State,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1141 (1996)). Because Plaintiffs allege *respondeat superior,* their claims survive.

### III. Organizational and Individual Plaintiffs' Claims

Having addressed the claims of the Individual Plaintiffs, the Court now turns to the claims brought by the Individual and the Organizational Plaintiffs collectively. These include claims under the ADA, the Rehabilitation Act, the NYCHRL, and municipal liability pursuant to *Monell.*

### A. Organizational Plaintiffs' Standing

**[40]** Before addressing Plaintiffs' claims on the merits, the Court first addresses Defendants argument that the Organizational Plaintiffs lack standing to bring this suit. *See* Defs.' Mem. 19–23. An organization "may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization ['direct standing']." *Connecticut Parents Union v. Russell-Tucker,* 8 F.4th 167, 172 (2d Cir. 2021). Here, Organizational Plaintiffs assert that they have both associational and direct standing to maintain their suit. Pls.' Opp. 23–24. The Court considers first whether Organizational Plaintiffs have demonstrated direct standing.

**[41]** **[42]** To succeed on a theory of direct standing, Organizational Plaintiffs have the "burden of showing: (i) an imminent 'injury in fact' to itself as an organization (rather than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to enforcement of the Ordinance;

and (iii) that a favorable decision would redress its injuries." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)). "It is well settled that where, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.' " *Id.* (quoting *Rumsfeld v. Forum of Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006)).

[43] [44] [45] The parties primarily dispute whether the organizations have alleged an injury-in-fact. In this Circuit, "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.' " *Nnebe*, 644 F.3d at 157 (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993)). One way an organization may demonstrate a "perceptible impairment" is by alleging that it "needed to divert resources from other activities to address the harm caused by a defendant's conduct." *Hous. Rts. Initiative v. Compass, Inc.*, No. 21 Civ. 2221, 2023 WL 1993696, at *7 (S.D.N.Y. Feb. 14, 2023). "[W]hen a defendant's conduct leads an organization to devote more-than-anticipated resources to address one or more of its goals or activities ... and the organization pleads that it has devoted fewer resources to other goals, the organization has adequately pleaded injury." *Id.* at *8; *see also Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 130 (2d Cir. 2020) ("[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." (citation omitted)).

**\*14** [46] Here, Organizational Plaintiff Community Access adequately alleges such an injury. Community Access is organized to "expand opportunities for people living with mental disabilities." SAC ¶ 317. As a "key part of its organization mission" Community Access offers 1,315 supportive housing units "where individuals with mental disabilities live side-by-side with individuals who do not have disabilities." *Id.* ¶ 320. Community Access pleads that this program has been impaired by the City's inadequate response to mental health calls. It alleges that its staff are "hesitant to call 911 ... for fear that members of the NYPD will escalate encounters or forcibly hospitalize, injure, and otherwise traumatize residents." *Id.* ¶ 323. As a result, they

allege that "Community Access must provide additional training to ... staff to enable them to respond to a significant portion of these crises themselves." *Id.* ¶ 324. Moreover, they allege that when NYPD has responded, it has resulted in "repeated instances of NYPD misconduct" requiring Community Access to expend "considerable resources and staff time to investigate" and respond to these incidents. *Id.* ¶ 328. This diversion of resources from Community Access's housing program is sufficient to confer direct organizational standing. These activities are more than a simple " 'setback to [Community Access's] abstract social interests'—they represent a real 'drain on the organization's resources' " that may otherwise be used to further other core activities like developing additional supportive housing. *Moya*, 975 F.3d at 129 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). The Court therefore finds that Community Access has alleged a perceptible impairment to its activities and has standing to bring this action. [10]

### B. ADA, Rehabilitation Act, and NYCHRL

Plaintiffs claim the City discriminates against those with mental disabilities through its use of the EDP and Involuntary Removal Policy, in violation of Title II of the ADA, § 504 of the Rehabilitation Act, and the NYCHRL. The Court considers the ADA and Rehabilitation Act claims together. *See Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016). The NYCHRL is evaluated separately under a more liberal standard. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

### 1. ADA and Rehabilitation Act

Plaintiffs' principal contention is that the City violates the disability discrimination statutes by failing to respond to mental health calls with mental health practitioners. Pls.' Opp. 21. They argue that the police "lack the necessary perspective and mental health expertise" to respond adequately to mental health crises and, as a result, the mentally disabled are discriminatorily subjected to "police killings and violence, injury, and other losses of liberty" simply for having a disability. SAC ¶ 13. To avoid these discriminatory results, Plaintiffs aver that the City must implement "a new, non-police mental health crisis response program operating

independently of the NYPD." *Id.* ¶ 21. Accordingly, the Court must decide whether the disability discrimination statutes require the City to provide a non-police mental health crisis response program.

 **[47]** Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To plead a violation of Title II of the ADA, a plaintiff must allege that 'she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability.' " *Felix v. City of New York*, 344 F. Supp. 3d 644, 663 (S.D.N.Y. 2018) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)).

 **[48]** The purpose of the disability discrimination statutes is "to eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). In keeping with this purpose, the Court of Appeals has repeatedly held that a plaintiff may not challenge the adequacy of services provided exclusively to the disabled under either the ADA or the Rehabilitation Act. For example, in *Doe v. Pfrommer*, the plaintiff alleged disability discrimination because he was denied specific accommodations regarding support services he received for his mental disability. 148 F.3d at 82. The court noted that "where the handicapping condition is related to the benefit provided, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory.' " *Id.* at 83 (quoting *United States v. Univ. Hosp.*, 729 F.2d 144, 157 (2d Cir. 1984)). As such, the Court held that there is no ADA violation where a plaintiff challenges "the substance of the services provided" rather than "illegal discrimination against the disabled." *Id.* at 84.

 **\*15** More recently, in *Tardif v. City of New York*, the Court of Appeals held that failure to provide custodial medical services does not, by itself, "constitute[ ] a failure to make a reasonable accommodation 'by reason of' an

individual's disability under the ADA." 991 F.3d 394, 404 (2d Cir. 2021). In *Tardif*, the police deprived a pre-arraignment detainee of her epilepsy medication which caused her to have a seizure. *Id.* at 399. In rejecting plaintiff's disability discrimination claim, the court found that "the fact that her disability was her motivation for seeking out such services does not suddenly transform her allegations regarding the inadequate medical treatment into a 'failure to accommodate' claim." *Id.* at 404. The court held that because "her claim relates solely to whether she received adequate medical treatment in police custody for her disability ... [it] is not cognizable under the ADA." *Id.*; *see also* *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability.").

 **[49]** **[50]** Plaintiffs claim is one that challenges the adequacy of services rather than the denial of services provided to non-disabled individuals. The program Plaintiffs challenge does not apply to the non-disabled at all. A program which provides services exclusively to the mentally disabled cannot discriminate against the mentally disabled within the meaning of the ADA and Rehabilitation Act. *See* *Disability Advocs., Inc. v. McMahon*, 124 F. App'x 674, 676 (2d Cir. 2005) ("[B]ecause New York's mental health pick-up program extends only to the disabled or those who would likely be regarded as disabled [plaintiff's] reasonable accommodation claim fails ...." (citation omitted)); *Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992) ("[T]he rehabilitation act does not create a cause of action based on a handicap that is directly related to providing the very services at issue."). In other words, Plaintiffs cannot claim they were denied a service, because the program they challenge provides a service—transport to a hospital for mental health care—exclusively to the mentally disabled. Plaintiffs' claim is squarely that the service the City provides—§ 9.41, as implemented by the EDP and Involuntary Removal Policy—is inadequate because it is carried out by police and not mental health workers. [11] But as in *Tardif*, this "claim relates solely to whether [Plaintiffs] received adequate medical treatment in police custody for [their] disability ... [which] is not cognizable under the ADA." 991 F.3d at 404; *see also* *Maccharulo v. New York State Dep't of Corr. Servs.*, No. 08 Civ. 301, 2010 WL 2899751, at *4 (S.D.N.Y. July 21, 2010) ("A challenge to the adequacy of services provided, as

opposed to a challenge alleging denial of services provided to non-disabled persons, is not a valid claim under the ADA or the Rehabilitation Act.").

Plaintiffs resist this characterization of their claim. Plaintiffs emphasize a report issued earlier this year by the Department of Justice ("DOJ Report") which investigated the practices of the Minneapolis Police Department ("MDP") in the wake of George Floyd's murder. [12] There, the DOJ found that the MDP violates the ADA in its response to people with behavioral health disabilities. DOJ Report 57. The DOJ found that "[m]any behavioral health-related calls for service do not require a police response, but MPD responds to the majority of those calls, and that response is often harmful and ineffective. This deprives people with behavioral health disabilities an equal opportunity to benefit from the City's emergency response services." The report goes on to explain that "[a] person in medical need receives a response from trained Emergency Medical Services," while a mentally disabled person gets "an armed police officer with often inaccurate and ineffective training in behavioral health." *Id.* at 58. Plaintiffs insist that they "make precisely these claims" and urge the Court to defer to DOJ's judgment on the matter. Pls.' Opp. 21.

**\*16** The Court is unmoved by DOJ's analysis. Plaintiffs' argument, as expressed by the DOJ, only works if pitched at a level of generality which treats mental and medical health calls as equivalent "emergency services." But this is not the law. The State of New York has determined that those with mental disabilities who pose a substantial risk of danger to themselves or others require a discrete emergency service, as expressed in 🔖 § 9.41 and the policies which implement it. This service applies exclusively to the mentally disabled in order to deliver them mental health care. *See* 🔖 N.Y. Mental Hyg. Law § 9.41 ("Such officer may direct the removal of such person or remove him or her to any [approved] hospital ... or any comprehensive psychiatric emergency program ...."). This program may be flawed, as Plaintiffs allege, but that does not render it discriminatory. If Plaintiffs claimed that they had a medical emergency, like a heart attack, but were denied an ambulance because of their mental disability, their claim would come closer to stating actionable discrimination under the ADA. But this is not their claim, which concerns only the adequacy of the services provided exclusively for the mentally disabled. Courts in this Circuit are clear that the ADA and Rehabilitation Act cognize no such claim. [13]

**[51]** However, to the extent Plaintiffs Greene, Sanchez-Esquivel, and Ayu allege that Defendants failed to provide reasonable accommodations during their mental health crises, these allegations are sufficient to state a claim on a motion to dismiss. [14] SAC ¶ 426. Although the Court of Appeals has not addressed whether Title II applies to arrests, five circuit courts along with courts in this District have held that it does. *See Reyes v. Town of Thomaston,* No. 18 Civ. 831, 2020 WL 5849529, at \*3 n.1 (D. Conn. Sept. 30, 2020) (collecting cases). In contrast to Plaintiffs' complaint that they were denied mental health first responders, which involves the adequacy of medical care provided pursuant to 🔖 § 9.41, here Plaintiffs claim is that they were excluded from equal access to police services because of NYPD's failure to accommodate their disabilities during mental health arrests. *See Butchino v. City of Plattsburg,* No. 20 Civ. 796, 2022 WL 137721, at \*12 (N.D.N.Y. Jan. 14, 2022) ("Whereas the failure to provide medical care is a generalized issue that applies beyond the ambit of disability law, the failure to provide reasonable accommodation to a service or benefit—a cooling off period for an individual with PTSD—is a quintessential failure to accommodate disability claim."). For much the same reasons that each Plaintiff adequately alleged violations of their constitutional rights during mental health arrests, they have adequately alleged a failure to accommodate their disabilities, so these individual claims survive. *See* 🔖 *Lloyd v. City of New York,* 246 F. Supp. 3d 704, 727 (S.D.N.Y. 2017) ("Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder.").

### 2. NYCHRL

**\*17** **[52]** Plaintiffs alternatively seek to reform the City's mental health crisis response program via the NYCHRL. *See* SAC ¶¶ 484–501. "Under NYCHRL, it is unlawful for any owner of a place or provider of public accommodation to deny an individual full and equal enjoyment, on equal terms and conditions, of accommodations or services based on an individual's disability." 🔖 *Lowell v. Lyft, Inc.,* 352 F. Supp. 3d 248, 262–63 (S.D.N.Y. 2018) (citing N.Y. City Admin Code § 8-107(4)). "Courts have repeatedly emphasized that the NYCHRL is to be construed as liberally as reasonably possible in favor of [plaintiffs] to the end that discrimination should not play a role in decisions." *Bravo v. De Blasio,* 75 Misc.3d 373, 167 N.Y.S.3d 708, 718 (N.Y.

Sup. Ct. 2022). Although broad, the NYCHRL is limited by the lawmaking authority of the City. "[W]hen the State specifically permits the conduct prohibited at the local level," the state law governs. Ctr. for Indep. of Disabled v. Metro. Transportation Auth., 184 A.D.3d 197, 125 N.Y.S.3d 697, 704 (2020).

[53]   Here, there is no violation of the NYCHRL because state law expressly permits the use of police in responding to mental health crises. As provided in the New York Mental Hygiene Law § 9.41, police are authorized to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." The challenged Policies merely implement this state law. For example, the EDP policy tracks the language of § 9.41 by allowing the NYPD to detain an "emotionally disturbed person," which it defines as someone "who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others." EDP Policy 2. The Involuntary Removal Policy authorizes "the removal of a person who appears to be mentally ill and displays an inability to meet basic living needs, even when no recent dangerous act has been observed." SAC ¶ 135. This policy comports with long-standing case law interpreting § 9.41. See Boggs, 523 N.Y.S.2d at 85 ("A threat of serious harm to a mentally ill person can result from a refusal or inability to meet her essential needs for food, clothing or shelter." (cleaned up));

see also Thomas v. Culberg, 741 F. Supp. 77, 81 n.1 (S.D.N.Y. 1990) ("New York Mental Hygiene Law does not require that the threat of substantial harm to oneself or others be evidenced by overt act, attempts or threats."). As the Policies are entirely coextensive with New York state law, they are therefore legal under city law.

In sum, save for Greene, Sanchez-Esquivel, and Ayu's claims for reasonable accommodation under the ADA and Rehabilitation Act, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' claims under the ADA, the Rehabilitation Act, and NYCHRL.

## C.   *Monell* Liability

[54]   Next, Plaintiffs allege a claim of municipal liability under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under Monell, a municipality is not liable for the unlawful actions of an employee under a theory of *respondeat superior*. Id. at 691, 98 S.Ct. 2018. "Municipalities are, however, liable for 'their *own* illegal acts.' " White v. City of New York, 206 F. Supp. 3d 920, 937 (S.D.N.Y. 2016) (quoting Connick v. Thompson, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)).

[55]   [56]   "The Second Circuit has established a two-pronged test for § 1983 claims brought against a municipality." Walker v. City of New York, No. 14 Civ. 808, 2015 WL 4254026, at *5 (S.D.N.Y. July 14, 2015). "The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985). "Second, the plaintiff must establish a causal connection ... between the policy and the deprivation of his constitutional rights." Id. A plaintiff need not allege every facet of a prima facie case at the pleadings stage, "[i]nstead, he must simply allege facts that allow the Court to draw the inference that the constitutional violation was the result of a municipal policy of inaction, as opposed to 'isolated misconduct by a single actor.' " Selvon v. The City of New York, No. 13 Civ. 6626, 2015 WL 4728144, at *3 (E.D.N.Y. Aug. 10, 2015) (quoting Amnesty Am. v. Town of Hartford, 361 F.3d 113, 130 (2d Cir. 2004)).

*18   [57]   A plaintiff may allege "an official policy or custom" by showing one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have

been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Staboleski v. City of New York*, No. 19 Civ. 8834, 2021 WL 796616, at *4 (S.D.N.Y. Mar. 1, 2021). Here, Plaintiffs allege that the City is liable on three theories: (1) a formal policy by way of the EDP and Involuntary Removal Policy; (2) a custom of using excessive force against those identified as EDPs; and (3) deliberate indifference to the rights of people with actual or perceived mental disabilities. SAC ¶¶ 17, 466–68. All three theories fail.

### 1. Formal Policy

**[58]**  First, the formal Policies do not violate the Constitution. Both Policies implement 🚩 New York Mental Hygiene Law § 9.41, which permits the police to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." It is well settled—and Plaintiffs do not challenge—that 🚩 § 9.41 is constitutional.

*See* 🚩 *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ("The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill."); 🚩 *In re K.L.*, 1 N.Y.3d 362, 370, 774 N.Y.S.2d 472, 806 N.E.2d 480 (N.Y. 2004) (same). As the challenged Policies merely implement a constitutional state law, they cannot form the basis of Plaintiffs' 🚩 *Monell* claim.

While Plaintiffs "do not challenge the MHL," they claim that the Policies run counter to 🚩 § 9.41 because they require the police to seize anyone with a mental disability, regardless of whether "they pose any risk to themselves or others." Pls.' Opp. 29. This is simply not true. The EDP policy applies, in its entirety, only to "EDPs," which it defines as "[a] person

who appears to be mentally ill or temporarily deranged *and* is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others." EDP Policy 2 (emphasis added). The EDP Policy therefore tracks the same requirements as the constitutional state law, which permits the police to detain those who are both mentally ill and reasonably believed to be a danger to themselves or others.

Regarding the Involuntary Removal Policy, Plaintiffs attempt to distinguish it from 🚩 § 9.41 by claiming that it "lowers the standard for involuntary detentions" by allowing the police to detain those who are "unable to meet their 'basic needs' ... without any indication that they had committed or will commit a dangerous act." SAC ¶ 132. As stated previously, 🚩 § 9.41 has long been interpreted to allow for mental health seizures absent "overt acts, attempts or threats," 🚩 *Thomas*, 741 F. Supp. at 81 n.1, and where a mentally disabled person is unable to meet his or her "essential needs for food, clothing or shelter," 🚩 *Boggs*, 523 N.Y.S.2d at 85. As such, the Involuntary Removal Policy does not "lower the standard" but merely implements 🚩 § 9.41 as it has been construed by New York courts for decades. Accordingly, Plaintiffs cannot rely on a formal policy to sustain their 🚩 *Monell* claim.

### 2. De Facto Policy

**\*19  [59]  [60]**  Plaintiffs alternatively allege that the use of "excessive force" against the mentally disabled is so widespread that it constitutes a *de facto* policy or practice. SAC ¶ 467. To plead a *de facto* policy "the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure." 🚩 *Gleeson v. Cnty. of Nassau*, No. 15 Civ. 648, 2019 WL 4754326, at *15 (E.D.N.Y. Sept. 30, 2019). "[T]he relevant practice [must be] so widespread as to have the force of law." 🚩 *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Here, to demonstrate a *de facto* policy of excessive force, Plaintiffs point to several reports—issued by the Office of the Inspector General ("OIG Report") and the Urban Justice Center ("UJC Report")—documenting deficiencies in the City's response to mental health calls and to various incidents where the NYPD has used lethal force against the mentally

disabled. None of these allegations, in totality or in isolation, indicates a custom of excessive force.

Neither the OIG nor the UJC Report sufficiently supports Plaintiffs' claim. The UJC Report was promulgated in 2002, and "[r]esearch reports only support a plaintiff's *Monell* claims 'if those reports are sufficiently connected to the specific facts of the case and are of relatively recent vintage.' " *Breton v. City of New York*, 404 F. Supp. 3d 799, 817 (S.D.N.Y. 2019) (quoting *Isaac v. City of New York*, 16 Civ. 4729, 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018)). As the allegations in the SAC occurred some twenty years after the issuance of the report, the Court cannot consider it as evidence of a widespread practice. *See id.* (dismissing *Monell* claim where "the plaintiff was arrested twenty-two years after the issuance of the Mollen Commission Report").

The OIG Report is similarly unavailing. Judge Nathan considered this very report in *Felix v. City of New York*, where the plaintiff similarly alleged *Monell* liability premised on the NYPD's purported *de facto* policy of using excessive force against those with mental disabilities. 344 F. Supp. 3d at 651. Judge Nathan found that the Report's discussion of "incidents of brute and excessive force towards individuals with mental illness" was scant, that the Report found "such incidents as few in number, and the NYPD's response to 'the overwhelming majority' as occurring without leading to a discharge of weapons or serious injury." *Id.* The Court agrees with and adopts Judge Nathan's well-reasoned analysis.

Plaintiffs' reference to numerous incidents of police violence towards the mentally disabled also fails to support a finding of a *de facto* policy or custom. In addition to the claims brought by the Individual Plaintiffs, the SAC details 24 separate instances since 1984 where officers used lethal force against a mentally ill person. SAC ¶ 82. These 24 instances over some 40 years are too few to establish a *de facto* policy. As alleged in the SAC, the "NYPD responds to approximately 200,000 'EDP' calls a year[, but i]n fact, this number is likely much larger." *Id.* ¶ 398. Even if all 30 incidents alleged in the SAC occurred in a single year, they would represent only a fraction of a percent of all EDP calls responded to by the NYPD annually. Moreover, Plaintiffs do not allege that any of the incidents resulted in findings of liability against the City.

*See Buari v. City of New York*, 530 F. Supp. 3d 356, 399 (S.D.N.Y. 2021) (finding that reliance on similar incidents "must ... result in an adjudication of liability"); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("None of the [16] lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice."). Here, because the number of alleged incidents of excessive force is vanishingly small and because Plaintiffs have failed to show that any resulted in liability against the City, they have failed to demonstrate a *de facto* policy.

### 3. Deliberate Indifference

**\*20**  **[61]**  **[62]** Plaintiffs' deliberate indifference theory fails for the same reasons. To demonstrate deliberate indifference adequately, a plaintiff must plead that the City "had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty*, 361 F.3d at 128 (quotation omitted). As with the *de facto* policy claim, the relatively small number of incidents culled from a nearly forty-year period, none of which is alleged to have resulted in liability, is not sufficient to put the City on notice that its policies caused constitutional violations. Without more, the Court cannot find that Defendants were deliberately indifferent to the rights of the mentally ill. *See Pluma v. City of New York*, No. 13 Civ. 2017 (LAP), 2015 WL 1623828, at *12 (S.D.N.Y. Mar. 31, 2015) ("[A] handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely to commit constitutional violations ...."); *Boddie v. City of New York*, No. 15 Civ. 4275, 2016 WL 1466555, at *4 (S.D.N.Y. Apr. 13, 2016) (finding that a "handful of specific incidents" was insufficient to "plead that the City was deliberately indifferent to a pattern of constitutional violations").

In sum, Plaintiffs have failed adequately to plead "the existence of a municipal policy or custom" under either a formal, *de facto*, or deliberate indifference theory.

*Vippolis*, 768 F.2d at 44. As such, Defendants' motion to dismiss Plaintiffs' *Monell* claim is **GRANTED.**

### D. Class Certification

Defendants urge the Court to dismiss Plaintiffs class allegations because "individualized issues necessarily predominate over any that the putative class members may have in common." Defs.' Mem. 31. The Court finds that these arguments are not properly addressed on a 12(b)(6) motion to dismiss. *See Rojas v. Triborough Bridge & Tunnel Auth.,* No. 18 Civ. 1433, 2020 WL 1910471, at *3 (S.D.N.Y. Apr. 17, 2020) ("[A] proposed class definition is not properly adjudicated at the Rule 12(b)(6) stage, and should be raised in connection with any Rule 23 motion for class certification.");

*Petrosino v. Stearn's Prod., Inc.,* No. 16 Civ. 7735, 2018 WL 1614349, at *5 (S.D.N.Y. Mar. 30, 2018) (collecting cases). Accordingly, the Court defers the consideration of the issue until the class certification stage.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion to dismiss Plaintiffs' claims under the ADA, the Rehabilitation Act, NYCHRL, and *Monell* liability, save for Greene, Sanchez-Esquivel, and Ayu's claims for reasonable accommodation under the ADA and Rehabilitation Act. The Court further **GRANTS** dismissal of Ayu's claims for false arrest arising from his April and May 2022 arrests, and Collins, Ayu, and Amitabh's warrantless entry claims, as well as their corresponding state law claims. As this is the first motion to dismiss, these claims are dismissed without prejudice. The motion is **DENIED** as to all other claims. The Court finds this matter suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b). Plaintiffs may amend their complaint within 30 days in a manner consistent with this opinion.

### All Citations

--- F.Supp.3d ----, 2024 WL 1308434

## Footnotes

1    Plaintiffs comprise two different groups. Individual Plaintiffs—Steven Greene, Giovanna Sanchez-Esquivel, Sarah Arvio, Lisa Collins, Oritseweyimi Omoanukhe Ayu, and Neil Amitabh ("Individual Plaintiffs")—are individuals who have been involuntarily hospitalized by the New York City Police Department ("NYPD") while in mental health crisis. Organizational Plaintiffs—Community Access, Inc., National Alliance on Mental Illness of New York City, Inc. ("NAMI-NYC"), Correct Crisis Intervention Today-NYC ("CCIT-NYC"), and Voices of Community Activists and Leaders New York ("VOCAL-NY") ("Organizational Plaintiffs")—are non-profit organizations focused on mental health advocacy within New York City.

Individual Defendants are: Mayor Eric Adams; former Mayor Bill de Blasio; NYPD Police Commissioner Keechant L. Sewell; former NYPD Police Commissioner Dermot F. Shea; NYPD Police Officers Martin Haber, Carrku Gbain, Vikram Prasad, Andre Dawkins, Tyrone Fisher, Deviendra Ramayya, Julian Torres, April Sanchez, Gabriele Morrone, and John and Jane Does # 1-40. Defendants Mayor De Blasio and Commissioner Shea are no longer in office. Thus, to the extent they are sued in their official capacity, the suit is brought against Mayor Adams and Commissioner Sewell respectively. *See* Fed. R. Civ. P. 25(d).

2    Defendants do not move to dismiss plaintiff Sarah Arvio's excessive force claim under § 1983, her battery claim under New York state law, or her *respondeat superior* claim.

3    Charlotte Moses Fischman et al., *Police Interactions with Individuals in Psychiatric Crisis,* (2002), https://www.kramerlevin.com/images/content/2/1/v4/2161/Police-Interact-Fischman.pdf.

4    OIG-NYPD, *Putting Training into Practice: A Review of NYPD's Approach to Handling Interactions with People in Mental Crisis* (2017), http://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/CIT_Report_01192017.pdf.

5    The officers included Defendants Haber, Gbain, Prasad, Fisher, Ramayya, and Torres. *Id.* ¶ 175.

6    Mr. Baerga passed away on June 28, 2022. ECF No. 107. Mr. Baerga's claims have been voluntarily dismissed. SAC ¶ 3 n.1.

7    The Court considers Plaintiffs' common law claims of false arrest in tandem with their ⚑ § 1983 claims. *See* ⚑ *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

8    The Court notes that Sanchez-Esquivel presents slightly different facts, as there, the 911 call did not actually indicate that she had threatened to harm herself. Her boyfriend had only indicated that she was having a manic episode but explained that she was not violent and had no weapons. As " 'mental illness' alone cannot justify a State's locking a person up against their will," ⚑ *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the existence of probable cause is even more attenuated in her case.

9    Defendants do not move to dismiss Aviro's claim for excessive force. Defs.' Mem. 10. Collins does not allege an excessive force claim. SAC ¶ 79. Additionally, as assault and battery under New York common law is identical to a ⚑ § 1983 claim for excessive force, the Court addresses Plaintiffs' claims simultaneously. *See Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009).

10    The Court declines to decide whether the other organizations have standing, as "the presence of one party with standing is sufficient." ⚑ *Centro*, 868 F.3d at 109. Further, as Community Access has adequately pled direct organizational standing, the Court need not decide whether the Organizational Plaintiffs have associational standing.

11    Indeed, the SAC is shot through with explicit characterizations of the City's policies as "inadequate." *See* SAC § V ("The City's Recent Pilot Program B-HEARD Is Inadequate"); ¶ 324 (alleging organizational injury "[a]s a direct result of the City's inadequate mental health response"); ¶ 336 (alleging organization activity to "address[ ] the NYPD's inadequate response to mental health crises"); ¶ 343 ("NAMI-NYC has organized numerous community events addressing the NYPD's inadequate response to mental health crises"); ¶ 469 (alleging Defendants had notice "that the NYPD was inadequate at responding to mental health crises").

12    United States Department of Justice Civil Rights Division and United States Attorney's Office District of Minnesota Civil Division, *Investigation of the City of Minneapolis and the Minneapolis Police Department* (June 16, 2023), https://www.justice.gov/opa/press-release/file/1587661/download. Defendants argue that the DOJ Report is not a proper subject of judicial notice because it "is not in the SAC, [and] not incorporated by reference therein." Defs.' Reply 8, ECF No. 183. The Court disagrees. *See Paskar v. City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014) (Crotty, J.) ("Official government reports and other types of government records are appropriate for judicial notice.").

13    ⚑ *Tardif*, 991 F.3d at 405 (no ADA claim where "claim relates solely to whether [plaintiffs] received adequate medical treatment in police custody *for* [their] disability"); ⚑ *Pfrommer*, 148 F.3d at 82 (no ADA claim where "plaintiff is in essence challenging the adequacy of his [mental health] services, not illegal disability discrimination"); ⚑ *Univ. Hosp.*, 729 F.2d at 156 ("[S]ection 504 prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper

to consideration of, the services in question."); Cushing, 970 F.2d at 1109 ("[T]he rehabilitation act does not create a cause of action based on a handicap that is directly related to providing the very services at issue."); *Harrell v. New York State Dep't of Corr. & Cmty. Supervision*, No. 15 Civ. 7065, 2019 WL 3821229, at *16 (S.D.N.Y. Aug. 14, 2019) (no ADA violation where plaintiff "merely asserts that his disability was not adequately treated, not that he was treated inadequately because of his disability"); *Bryant v. Steele*, 25 F. Supp. 3d 233, 242 (E.D.N.Y. 2014) ("[A]n accusation that an individual was involuntarily committed on the basis of a mental disability cannot serve as a basis for an ADA or Rehabilitation Act violation for disability discrimination because such a finding would convert every involuntary commitment transport into a civil rights violation." (quotation and alteration omitted)); *Maccharulo*, 2010 WL 2899751, at *4 ("A challenge to the adequacy of services provided, as opposed to a challenge alleging denial of services provided to non-disabled persons, is not a valid claim under the ADA or the Rehabilitation Act."); *Atkins v. Cnty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) (no ADA claim where plaintiff is "in essence challenging the adequacy of the mental health services provided ... not illegal disability discrimination").

14    Arvio, Collins, and Amitabh's allegations are insufficient because they do not allege they suffer from a mental disability. *Williams v. Geiger*, 447 F. Supp. 3d 68, 79 (S.D.N.Y. 2020) (noting that a plaintiff may only sustain a reasonable accommodation claim where the defendant is on notice of an actual, not a perceived, disability).

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.