IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DISABILITY RIGHTS OREGON, on behalf
of its clients and constituents; and JOSHUA
WESLEY,

                    Plaintiffs,

        v.

WASHINGTON COUNTY, a political
subdivision of the State of Oregon; and
WASHINGTON COUNTY
CONSOLIDATED COMMUNITY
AGENCY, an intergovernmental entity in the
State of Oregon,

                    Defendants.

Case No. 3:24-cv-00235-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, U.S. Magistrate Judge.**

       Plaintiffs Disability Rights Oregon ("DRO") and Joshua Wesley ("Wesley") (together,

"Plaintiffs") allege violations of Title II of the Americans with Disabilities Act ("ADA") and

Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") against Defendants

Washington County and Washington County Consolidated Community Agency ("the Agency")

(together, "Defendants").

*///*

PAGE 1 – FINDINGS AND RECOMMENDATION

Now before the Court are Washington County's motion to dismiss for failure to state a claim and motion in the alternative to strike or to make more definite certain allegations in the complaint (*see* Def. Wash. Cnty.'s Mot. Dismiss Pls.' Compl. ("Wash. Cnty.'s Mot."), ECF No. 21) and the Agency's motion to dismiss for failure to state a claim (*see* Def. Agency's Mot. Dismiss Pls.' Compl. ("Agency's Mot."), ECF No. 25). The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, but not all parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636. The Court held oral argument on August 29, 2024. For the following reasons, the Court recommends that the district judge deny both motions.

## BACKGROUND

### I.    REQUEST FOR JUDICIAL NOTICE

The Agency requests that the Court incorporate by reference the Agency's Call Taking Manual. (*See* Agency's Mot. at 4-5.)

#### A.    Applicable Law

The general rule is that "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under [Federal Rule of Civil Procedure ("Rule")] 12(b)(6)[.]" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citing *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001)). However, "[a] court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted).

In *Khoja*, the Ninth Circuit "clarif[ied] when it is proper [for a court] to . . . incorporate by reference documents into a [plaintiff's] complaint, and when it is not." 899 F.3d at 999. The

incorporation-by-reference doctrine is a judicial creation that "treats certain documents as though they are part of the complaint itself" and "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* at 1002 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681-82 (9th Cir. 2006)). The Ninth Circuit has recognized that "a defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *Ritchie*, 342 F.3d at 907). However, "'the mere mention of the existence of a document is insufficient to incorporate the contents of a document' under *Ritchie*." *Id.* (quoting *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).

### B.    Analysis

The Agency argues that Plaintiffs reference the Agency's Call Taking Manual extensively in the complaint and that the document forms the basis of Plaintiffs' claims against the Agency. (*See* Agency's Mot. at 5.) Plaintiffs do not object to the Court's consideration of the manual. (*See id.* at 5, explaining that Plaintiffs take no position as to the Agency's request to incorporate the manual by reference.)

The Court concludes that Plaintiffs base their claims in part on the Agency's written policy (*see, e.g.*, Compl. ¶¶ 9, 18, 84-85, 111-14, 150, 170, referencing and quoting the Call Taking Manual), and that it may consider the Call Taking Manual to evaluate the pending motions. *See CLM Analogs, LLC v. James R. Glidewell Dental Ceramics, Inc.*, No. 8:18-cv-00311-JLS-SS, 2018 WL 6380887, at *2 & n.2 (C.D. Cal. June 19, 2018) (incorporating by reference a surgical manual "because the Complaint references and relies on these materials and neither party questions their authenticity"); *Welch v. Or. Health & Sci. Univ.*, No. 3:23-cv-

01231-SB, 2024 WL 3106930, at *13 (D. Or. May 17, 2024) (incorporating by reference the

plaintiff's religious exemption requests where the complaint referred to and relied on the

paperwork and the defendant did not object), *findings and recommendation adopted*, 2024 WL

3106838 (D. Or. June 20, 2024); *cf. Crapser v. NaphCare, Inc.*, No. 3:23-cv-00725-HZ, 2023

WL 7003701, at *3 (D. Or. Oct. 24, 2023) (incorporating medical records by reference but

declining to incorporate a policy and procedure manual where the plaintiff only challenged the

defendants' customs and practices, not defendants' written policies).

Accordingly, the Court takes judicial notice of the Call Taking Manual. (*See* Decl. Iván

Resendiz Gutierrez Supp. Agency's Mot. Ex. 1 ("Call Taking Manual"), ECF No. 26.)

## II.    THE PARTIES[1]

### A.    Plaintiffs

DRO is the Protection and Advocacy System ("P & A") for the State of Oregon,

established and funded pursuant to the Protection and Advocacy for Individuals with Mental

Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801-10851.[2] (Compl. ¶ 35.) DRO brings the instant

claims on behalf of its clients and constituents with mental health disabilities in Washington

County, Oregon. (*Id.* ¶ 30.)

///

---

[1] Plaintiffs plead these facts in their complaint, and the Court assumes they are true for
the purpose of deciding this motion. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998
(9th Cir. 2010) (noting that when reviewing a motion to dismiss for failure to state a claim, a
court must "accept as true all well-pleaded allegations of material fact, and construe them in the
light most favorable to the non-moving party") (citation omitted).

[2] DRO also notes its authority to advocate for clients with disabilities pursuant to the
Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041, the Protection
and Advocacy for Persons with Traumatic Brain Injury program, 42 U.S.C. § 300d-53, and the
Protection and Advocacy for Individual Rights program, 42 U.S.C. § 794e. (Compl. ¶ 36, ECF
No. 1.)

Wesley was a resident of Washington County at all relevant times. (*Id.* ¶ 39.) He lives with depression, Post Traumatic Stress Disorder ("PTSD"), and occasional bouts of psychosis. (*Id.* ¶¶ 39, 137.) He alleges that those conditions substantially limit one or more of his major life activities, including but not limited to thinking, communicating, caring for himself, and interacting with others. (*Id.* ¶ 39.)

### B.    Defendants

Washington County is a political subdivision of the State of Oregon that receives federal funding. (*Id.* ¶ 41.) The Agency is an intergovernmental entity created pursuant to Oregon Revised Statutes ("ORS") Chapter 190 by agreement of various local governments that also receives federal funding. (*Id.* ¶ 40.) The Agency operates an emergency telecommunications facility (i.e., a dispatch center) and receives all 911 emergency calls from Washington County. (*Id.* ¶¶ 40, 83.)

## III.    PLAINTIFFS' ALLEGATIONS

Plaintiffs' claims arise out of Defendants' 911 emergency response dispatch for people suffering from mental health related emergencies.

Broadly stated, Plaintiffs allege that, in Washington County, when someone suffers a physical health crisis, they can call 911 for emergency help, and Defendants respond with "qualified health professionals, who are specifically trained to assess an emergent health issue, offer stabilization and treatment at the point of contact, and if necessary, transport them to a specialized treatment facility." (*Id.* ¶ 2.) By contrast, when someone suffers a mental health crisis and calls 911 for emergency help, Defendants do not send medical professionals as primary responders but instead respond with "tactically-trained and armed law enforcement officers who are more likely to exacerbate, rather than resolve, the mental health crisis[.]" (*Id.*; *see also id.* ¶ 109.) Plaintiffs assert that Washington County's emergency response to mental health crises

results in danger to the person in crisis, such as the use of force, chemical sedation, involuntary and unnecessary hospitalization, arrest, and jail, and that people with mental health disabilities "frequently do not receive the urgent medical care they require and instead, face an array of adverse outcomes." (*Id.* ¶¶ 3, 11, 71-72, 136.)

More specifically, Plaintiffs allege that the Agency receives information about an emergency, determines the nature and severity of the reported incident, categorizes and prioritizes the situation based on Agency policy, uses a computer-aided dispatch system to create and distribute calls for services, and sends the call to a queue for an Agency dispatcher to, "as needed, route[] the calls to an appropriate public or private safety agency that may then dispatch responding personnel to the scene." (*Id.* ¶¶ 83, 86.) The categories of private or public safety agencies include police, fire, and emergency medical services, such as American Medical Response ("AMR"). (*Id.* ¶ 86.) The Agency trains its call takers pursuant to applicable rules, regulations, policies, and procedures, including the Call Taking Manual. (*Id.* ¶ 84; *see generally* Call Taking Manual.)

The Agency documents all 911 calls received based on call type, including, as relevant to mental health crises, Behavioral Health Incident, Welfare Check or Welfare Check Only, and Suicide Attempt. (Compl. ¶¶ 110, 120; *see also* Call Taking Manual at 36, 53, 80.) For example, a Behavioral Health Incident includes someone "reported to be mentally unstable"; a Welfare Check Only includes someone lying on the sidewalk covered in a blanket; and a Suicide Threat includes someone saying they will take pills but do not have any medication in the house, saying they want to shoot themselves but do not have access to a gun, or saying they want to jump off a bridge while sitting in their house. (Compl. ¶¶ 112-13, 120.)

///

PAGE 6 – FINDINGS AND RECOMMENDATION

In the event of a physical health emergency, the Agency routes 911 calls to AMR, which will dispatch both paramedics and emergency medical technicians ("EMTs"). (*Id.* ¶¶ 87, 99-100.) In the event of a mental health emergency, and where a call is designated as one of the three mental health related categories (Behavioral Health Incident, Welfare Check, and Suicide Attempt), the Agency routes 911 calls to a law enforcement agency.[3] (*Id.* ¶¶ 87, 110, 120.) Where the Agency routes the call "is critical in determining what personnel will actually respond." (*Id.* ¶ 87.)

When responding to a physical health emergency, AMR provides immediate medical treatment by trained medical professionals to stabilize the individual, and AMR personnel may transport the individual to a hospital or other medical facilities. (*Id.* ¶ 99.) Individuals experiencing physical health emergencies face lower risk of criminal legal involvement because law enforcement officers do not respond to the emergencies. (*Id.* ¶¶ 99-105.)

By contrast, Plaintiffs allege that law enforcement officers are not trained "mental health professionals and therefore cannot provide on-site psychiatric assessment and treatment to individuals in crisis." (*Id.* ¶ 59; *see also id.* ¶ 107, explaining that officers are unqualified to make critical medical treatment determinations or to administer stabilizing treatment.) Instead of receiving medical training, officers are taught to command and control and always to be prepared to defend themselves. (*Id.* ¶ 63.) The most relevant training officers receive is Crisis Intervention Training, which is designed to reduce the risk of serious injury or death during interactions between individuals with mental health disorders and law enforcement officers. (*Id.* ¶¶ 61-62.)

---

[3] In the event of a Behavioral Health Incident, the Call Taking Manual directs call takers to dispatch fire, Emergency Medical Services ("EMS"), and law enforcement. (Compl. ¶ 111.) Between March 1, 2022, and February 28, 2023, the Agency dispatched law enforcement officers as the primary responders to all Behavioral Health Incidents, with a staged ambulance nearby. (*Id.* ¶¶ 17, 119.)

Accordingly, officers "use their lay judgment" to decide whether a person in crisis needs immediate care, custody, or treatment. (*Id.* ¶¶ 76, 95.) After the law enforcement agency responds to the scene of a mental health crisis and attempts to stabilize the situation, officers may then determine whether to request assistance from other county services, such as the Washington County Mobile Crisis Team ("MCT"), the Washington County Sheriff's Office Mental Health Response Team ("MHRT"), or EMTs. (*Id.* ¶¶ 87-88.)

As background, each county in Oregon provides local mental health services pursuant to ORS § 430.630, including emergency response services for mental health crises, through a Community Mental Health Program. (*Id.* ¶¶ 41, 125.) Washington County has elected to contract with LifeWorks NW, a mental health service provider, to provide those services. (*Id.* ¶ 126.)

Washington County, through LifeWorks NW, created MHRT and MCT. (*Id.* ¶¶ 13, 87, 89-91, 133.) MHRT is a "co-response team comprised of a law enforcement officer and a clinician outfitted with a ballistic vest[.]"[4] (*Id.* ¶ 133; *see also* Call Taking Manual at 90.) MCT is a non-police response team comprised exclusively of mental health clinicians who respond to behavioral health crises onsite in the community and who provide face-to-face therapeutic responses. (Compl. ¶¶ 13, 90.) As trained mental health professionals, the MCT response team provides expert assessment, psychiatric consultation, emergency medication, stabilization services, and more. (*Id.* ¶¶ 75, 91.)

---

[4] Plaintiffs suggest that the deployment of this co-response team violates Washington County's contract with LifeWorks NW and its duties under ORS § 430.626 ("'Mobile crisis intervention team' means a team of qualified behavioral health professionals that may include peer support specialists, as defined [by statute], and other health care providers such as nurses or social workers who provide timely, developmentally appropriate and trauma-informed interventions, screening, assessment, de-escalation and other services necessary to stabilize an individual experiencing a behavioral health crisis in accordance with requirements established by the authority by rule."). (*See* Compl. ¶ 133.)

MCT "is contractually obligated to be available to respond to mental health crises in the County" at all times. (*Id.* ¶¶ 93, 128.) However, Washington County has not provided the funding or the staffing to render MCT routinely available. (*Id.* ¶¶ 14-15.) Further, MCT "is not integrated into the Agency's dispatch system, though the Agency has the telecommunication capability to do so" and has incorporated other services into its dispatch system. (*Id.* ¶ 93, footnote omitted.) Accordingly, "the Agency cannot directly dispatch the Mobile Crisis Team to mental health crises." (*Id.* ¶ 15.) Instead, between March 1, 2022, and February 28, 2023, the Agency dispatched, and the County sent, armed officers to every call coded as a Behavioral Health Incident, Welfare Check, or Suicide Threat. (*Id.* ¶ 17.) Responding officers have sole discretion whether to contact MCT. (*Id.* ¶¶ 94-95.) Officers infrequently contact MCT, referring MCT to the scene 106 times in 2021 and 2022, and referring MHRT to the scene 865 times during the same period. (*Id.* ¶ 96.)

Plaintiffs allege that mental health crises are, "at base, health emergencies[,]" and that most mental health emergencies arise from mental health disabilities, including depression, anxiety, and PTSD. (*Id.* ¶¶ 50-51.) Mental health emergencies "typically do not present a danger to others[,]" and, if they do, the danger "is to the person in crisis alone." (*Id.* ¶¶ 52, 54-55.) However, stigma and stereotypes characterize people with mental health disabilities as violent. (*Id.* ¶¶ 53, 115-16.) Consequently, according to Plaintiffs, instead of providing emergency health care, Washington County treats mental health crises as a crime. (*Id.* ¶¶ 81-82.)

As examples of Defendants' response to mental health crises, Plaintiffs point to the experiences of Wesley. In August 2022, Wesley had a dispute with his then-partner. (*Id.* ¶ 139.) His partner called the Agency and explained that Wesley was experiencing suicidal ideation and

was contemplating law-enforcement-assisted suicide. (*Id.*) In response, Defendants sent armed deputies. (*Id.* ¶ 141.)

On October 24, 2022, Wesley again experienced suicidal ideation and placed a call to a suicide hotline—the Veterans Crisis Line. (*Id.* ¶¶ 4, 143, 146.) He called the hotline "specifically because he did not want police to be sent to his aid[,] and he thought that calling 911 would almost certainly elicit a police response." (*Id.* ¶ 147.) The hotline call taker asked if he had any weapons in the house or if he had hurt himself recently. (*Id.* ¶ 148.) Wesley stated that he had cut himself recently, that he had knives in the house but not on his person, and that he was suicidal. (*Id.*)

The hotline transferred his call to an Agency dispatcher, from whom Wesley requested that non-police responders be sent to assist him. (*Id.* ¶¶ 5, 149.) The Agency call taker coded the call as a welfare check, priority two, meaning that the incident is "occurring now or just occurred and there appears to be an immediate threat to people or property." (Call Taking Manual at 32; Compl. ¶ 150.) After receiving more information from Wesley and his former partner, who was also on the line, the Agency call taker subsequently changed the call type to Suicide Attempt, priority one, meaning "[a]n emergency where there appears to be an imminent threat to life or property." (Call Taking Manual at 32; Compl. ¶ 150.) Contrary to Wesley's request, but pursuant to Agency policy, the Agency dispatched five armed deputies, and staged an ambulance nearby. (Compl. ¶¶ 9, 11, 152.)

One of the responding officers called Wesley upon arrival. (*Id.* ¶ 154.) Wesley stated he was "feeling anxious, paranoid, and that he wanted to kill himself." (*Id.*) The officer asked Wesley to come outside. (*Id.* ¶ 155.) Wesley explained that he was intimidated by the five officers and was reluctant to come out but agreed. (*Id.* ¶¶ 155-56.) He was compliant with all of

the officers' instructions, did not display any aggression, and did not threaten any violence. (*Id.* ¶ 156.)

The officer did not provide a psychiatric assessment, stabilization, or treatment, nor request assistance from Washington County's mental health crisis services but instead told Wesley that the officer was going to place him under a Police Officer Hold, as authorized by state law,[5] because Wesley had expressed that he wanted to kill himself and because the officer stated that he could see evidence of Wesley cutting himself. (*Id.* ¶¶ 71, 157-58, 161.) The officer informed Wesley that the officer would handcuff him and put him in the back of his patrol car to transport him to the hospital. (*Id.* ¶ 159.) When Wesley said that he did not want to be handcuffed or taken to the hospital, the officer arranged for the ambulance staged nearby to transport Wesley to the hospital with the officer following behind. (*Id.* ¶ 160.)

Upon arrival at the hospital, Wesley, still not stabilized, continued to experience suicidal ideation. (*Id.* ¶¶ 161, 163.) He was taken to an unsecured room in the emergency department, even though the hospital has a secured room for patients experiencing suicidal ideation. (*Id.* ¶ 162.) When a nurse practitioner began taking Wesley's vitals, Wesley walked out of the unsecured room. (*Id.* ¶ 163.) Wesley approached the officer who had followed him to the hospital and attempted to take his firearm while repeating, "let me kill myself." (*Id.* ¶ 164.) In response, the officer stabbed Wesley several times with a knife. (*Id.*) Wesley suffered serious injuries to his chest, stomach, and head. (*Id.* ¶ 165.) He remained in the hospital for nearly three weeks before being transferred to the Washington County Jail for the various criminal charges he

---

[5] "A peace officer may take into custody a person who the officer has probable cause to believe is dangerous to self or to any other person and is in need of immediate care, custody or treatment for mental illness. As directed by the community mental health program director, a peace officer shall remove a person taken into custody under this section to the nearest hospital or nonhospital facility approved by the Oregon Health Authority." OR. REV. STAT. § 426.228(1).

faced arising from his altercation with the officer. (*Id.*) The Mental Health Court of Washington County adjudicated his case, where Wesley pled guilty and was sentenced to five years of probation. (*Id.* ¶ 166.) Although Wesley "will likely need Defendants' emergency response services again in the future, he is hesitant to call for help" because of his experiences. (*Id.* ¶ 167.)

Plaintiffs also recount the experiences of Jane Doe, John Doe, and Mary Roe, unidentified persons in Washington County, based on information from redacted police reports. (*Id.* ¶¶ 169-218.)

On February 6, 2021, multiple people called 911 to report that a woman was walking in traffic and throwing unknown items near passing cars. (*Id.* ¶ 169.) The Agency call taker coded the incident as a Welfare Check, sending four armed officers to the scene. (*Id.* ¶¶ 170-72.) One officer observed Jane Doe walking in the road, and she "appeared to be manic and have either Bipolar or Schizophrenia." (*Id.* ¶ 173.) The officer told Jane Doe to get out of the roadway and that if she did not, she would be arrested. (*Id.* ¶ 174.) The officer then told Jane Doe that she was under arrest and used force to effect the arrest, including a "takedown." (*Id.* ¶¶ 176-77.) As a result, Jane Doe "fell onto her back and screamed while kicking her legs and flailing her arms" and inadvertently kicked the officer. (*Id.* ¶ 178.) One officer grabbed her right arm, another grabbed her left, and they rolled her onto her stomach and handcuffed her. (*Id.* ¶¶ 179-80.) While handcuffing her, the first officer placed his right knee on the small of her back and applied downward pressure. (*Id.* ¶ 180.) After the arrest, the officers requested medical support to "medically sedate her." (*Id.* ¶ 181.) Less than twenty minutes after arrival on the scene, the lead officer placed Jane Doe on a Police Officer Hold and directed the responding paramedics to strap her to an ambulance stretcher and transport her to the hospital, where the officer issued criminal citations to Jane Doe for kicking an officer during the course of her arrest. (*Id.* ¶¶ 182-83.)

PAGE 12 – FINDINGS AND RECOMMENDATION

On January 21, 2022, the Agency dispatched an officer to John Doe's residence in response to a "Behavioral Health Incident." (*Id.* ¶ 187.) The officer had responded to the same location for another mental health related call three days earlier and was aware of John Doe's mental health disability. (*Id.* ¶ 189.) After a brief conversation with John Doe, the officer decided to detain him on a Police Officer Hold out of fear that John Doe was a danger to himself. (*Id.* ¶ 193.) When John Doe moved to go inside, the officer stepped in front of him to prevent him from entering his home. (*Id.* ¶ 194.) However, John Doe brushed by the officer and entered his home. (*Id.*) Immediately, four officers began to use physical force to move John Doe back outside, threatened him with tasers, and handcuffed him. (*Id.* ¶¶ 195-99.) They placed him on a Police Officer Hold, paramedics involuntarily sedated him, and John Doe was involuntarily hospitalized. (*Id.* ¶ 199.)

On June 1, 2022, the Agency received multiple emergency calls about a woman running in the middle of a highway, flagging down cars, and asking drivers to call 911, which the Agency call taker and dispatcher understood to be mental health related. (*Id.* ¶¶ 202-03.) The Agency call taker coded the interaction as a Welfare Check and dispatched law enforcement officers. (*Id.* ¶ 204.) Two officers tried to speak with Mary Roe, but she ran from them. (*Id.* ¶ 207.) The officers requested assistance from Washington County's MHRT, which consisted of a deputy, an officer, and a licensed clinician. (*Id.* ¶¶ 207-08.) Before the MHRT licensed clinician could interact with Mary Roe, the first two officers who had arrived at the scene "apprehended Mary Roe by her arms and forcibly tried to make her keep still." (*Id.* ¶ 209.) Mary Roe became so upset that she attempted to flee. (*Id.* ¶ 211.) The MHRT deputy used a "takedown" to get Mary Roe to the ground, pulled her left arm behind her back, and placed his right knee across her lower back and his left knee on her left shoulder. (*Id.* ¶ 212.) After "some[ ]time passed," the

officers "let [Mary Roe] calm down," handcuffed her, hobbled her legs, and then eventually

released her from the prone restraint hold. (*Id.* ¶ 213; *see also id.* ¶¶ 215-17, describing the

danger of asphyxia from the prone restraint hold.) The licensed clinician placed Mary Roe on a

Director's Hold,[6] she was taken to a hospital via ambulance, and was involuntarily hospitalized.

(*Id.* ¶ 214.)

## IV.    PLAINTIFFS' CLAIMS

DRO alleges that its clients and constituents, including Jane Doe, John Doe, and Mary

Roe, have had their rights violated by Defendants' discriminatory emergency response. (*Id.*

¶¶ 26, 240, 254.) Similarly, Wesley alleges that he received an unequal Agency dispatch and

police response from Washington County because of his mental health disabilities. (*Id.* ¶ 27.)

Accordingly, Plaintiffs allege that Defendants violated Title II of the ADA, 42 U.S.C. § 12131

("Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"). (*Id.* at 2,

52-58.)

Plaintiffs seek a judgment declaring that Defendants' emergency response program and

services violate Title II and Section 504. (*Id.* at 58-59.) Plaintiffs also request a permanent

injunction enjoining Defendants "from continuing their discriminatory provision of mental health

emergency response services" and requiring Defendants to take appropriate steps to ensure that

people in Washington County with mental health disabilities are provided equal access to and

equal opportunity to benefit from Defendants' "emergency response services and programs." (*Id.*

¶ 31.) Specifically, Plaintiffs request an injunction requiring Defendants to "implement and

operate emergency response programs and services that provide comparable responses to

_____

[6] State law authorizes a community mental health program director or a designee of the
director to order custody and hospitalization of persons with a mental illness under certain
circumstances. *See* ORS § 426.233.

physical health emergencies and mental health emergencies, and that ensure that mental health professionals are the default first responders for typical mental health emergencies[.]" (*Id.* at 59.) Plaintiffs also seek costs, expenses, and reasonable attorney's fees and any other relief that the Court may deem just and proper. (*Id.*)

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (simplified).

## DISCUSSION

The Agency moves for dismissal of DRO's claims, arguing that DRO has failed to exhaust its administrative remedies. (*See* Agency's Mot. at 17-19.) Defendants also argue that Plaintiffs have failed to state a claim because Plaintiffs have misidentified the relevant service. (*See id.* at 20-22; Wash. Cnty's Mot. at 17-20.) Further, Defendants argue that they have not denied Plaintiffs meaningful access to a service, Plaintiffs have failed to allege discrimination on the basis of disability, and Plaintiffs instead challenge the adequacy of mental health care services and request a higher standard of care, which do not support an actionable ADA or Rehabilitation Act claim. (*See* Agency's Mot. at 20-33; Wash. Cnty.'s Mot. at 16-24.) Finally, the Agency argues that it does not control emergency services in Washington County, and thus the Court should dismiss the Agency as a defendant. (*See* Agency's Mot. at 22-23.) Defendants

move for dismissal of Plaintiffs' complaint with prejudice. (*See* Agency's Mot. at 14; Wash. Cnty.'s Mot. at 27.) Defendants move in the alternative to strike portions of Plaintiffs' complaint and move to make definite and certain some of Plaintiffs' allegations. (*See* Agency's Mot. at 1 n.1; Wash. Cnty.'s Mot. at 24-27.)

I.    **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

The Agency argues that DRO failed to exhaust its administrative remedies, as required by federal statute. (*See* Agency's Mot. at 17-19.)

A.    **Applicable Law**

When construing a federal statute, courts "begin[ ] with the statutory text, and end[ ] there as well if the text is unambiguous." *Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021) (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)). A court determines "if a statute's meaning is plain or ambiguous by looking to 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). A court may "look to legislative intent when a statute is ambiguous." *Haro v. City of Los Angeles*, 745 F.3d 1249, 1257 (9th Cir. 2014) (citing *Cleveland v. City of Los Angeles*, 420 F.3d 981, 990 n.11 (9th Cir. 2005)).

DRO is the P & A System for the State of Oregon, established and funded pursuant to the PAIMI Act. (Compl. ¶ 35); *see* 42 U.S.C. § 10803 (requiring allotments to eligible systems); *id.* § 10804 (summarizing how eligible systems may use their allotments); *id.* § 10805 (setting system requirements). The PAIMI Act's purpose is to "ensure that the rights of individuals with mental illness are protected[.]" *Id.* § 10801(b)(1). Systems established under the PAIMI Act have the authority to undertake three principal categories of actions, as follows:

(A) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred;

(B) pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and

(C) pursue administrative, legal, and other remedies on behalf of an individual who—

(i) was a[n] individual with mental illness; and

(ii) is a resident of the State,

but only with respect to matters which occur within 90 days after the date of the discharge of such individual from a facility providing care or treatment[.]

*Id.* § 10805(a)(1) (footnote omitted).

The PAIMI Act includes an exhaustion requirement that requires an eligible system, agency, or organization timely to exhaust all administrative remedies prior to instituting legal action in federal court on behalf of an individual with mental illness:

Prior to instituting any legal action in a Federal . . . court on behalf of a[n] individual with mental illness, an eligible system, or a State agency or nonprofit organization . . . *shall exhaust* in a timely manner all administrative remedies where appropriate. If, in pursuing administrative remedies, the system, agency, or organization determines that any matter with respect to such individual will not be resolved within a reasonable time, the system, agency, or organization may pursue alternative remedies, including the initiation of a legal action.

*Id.* § 10807(a) (emphasis added) (footnote omitted). The statute also provides an exception to the exhaustion requirement. The exhaustion requirement "does not apply to any legal action instituted to prevent or eliminate imminent serious harm to a[n] individual with mental illness."

*Id.* § 10807(b) (footnote omitted).

The legislative history of the PAIMI Act is relatively limited. A Senate Report reflects the legislature's preference for exhaustion but explains that the exhaustion requirement should not be burdensome:

> Prior to instituting any legal action in a Federal or State court on behalf of a mentally ill person, it is the Committee's intention that the eligible systems or programs under subcontract with them should exhaust all administrative remedies where appropriate. It is the further intention of the Committee that the exhaustion of administrative remedies be accomplished in a timely manner.
>
> It is the belief of the Committee that conciliation, negotiation, mediation[,] and other administrative procedures can work effectively in providing protection and advocacy of the mentally ill, especially because litigation in most instances is costly and time consuming. The Committee recognizes the experience of the [Developmental Disabilities ("DD")] P&A System in implementing such negotiation and mediation on behalf of persons with disabilities, as well as the system's use of other administrative remedies in lieu of litigation. The Committee further notes that only 5 percent of DD P&A cases in 1984 have resulted in court action. The Committee intends that the DD P&A System in its new role as the eligible protection and advocacy system for mentally ill persons under this Act *should continue this non-litigative approach* to advocacy and dispute resolution and urges the continued use of administrative and alternative remedies prior to the initiation of a legal action.
>
> *It is not the intention of the Committee that administrative remedies must be pursued for an unreasonable duration*, but rather that whenever possible there should be timely and reasonable attempts made to mediate and negotiate approp[]riate admin[i]strative remedies. If the pursuit of administrative remedies has not resolved any matter within a reasonable time, the eligible system may pursue alternative remedies, including the initiation of a legal action. The Committee recommends that a 3-day notification be given to appropriate parties prior to filing any such action. However, legal remedies may be instituted immediately in order to eliminate or prevent imminent serious harm to a mentally ill client.
>
> Finally, the Committee does not intend that the administrative remedies which clients may pursue should affect

> their rights otherwise existing under Federal and State law to full
> judicial consideration of their claims on all matters of fact and law.

S. REP. NO. 109, 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code Cong. & Admin. News 1361,

1371 (emphasis added).

A House Report similarly reflects the legislature's preference for non-burdensome

exhaustion:

> The conferees intend that administrative remedies be exhausted
> before legal action is initiated. The conferees recognize, however,
> that exhaustion of administrative remedies may delay action on
> behalf of mentally ill individuals and have authorized the system to
> proceed with legal action when unreasonable delays exist. If legal
> action is initiated, courts retain their prerogative to determine that
> the issues are not ripe and to remand the matter for further
> administrative consideration.

H.R. CONF. REP. NO. 576, 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code Cong. & Admin.

News 1377, 1382-83.

Courts have explained that the PAIMI Act's exhaustion requirement "is not a strict one."

*Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1173 (M.D. Ala. 2016); *see also Mich. Prot. & Advoc.*

*Serv., Inc. v. Flint Cmty. Sch.*, 146 F. Supp. 3d 897, 905 (E.D. Mich. 2015) ("[T]he PAIMI Act

imposes a limited obligation on a protection and advocacy system to make some efforts to pursue

administrative remedies before filing suit . . . ."). The parties have not cited any cases from the

Ninth Circuit discussing the exhaustion requirement, and the Court's own research reveals that

the scope and application of the PAIMI Act's exhaustion requirement is largely an issue of first

impression in this circuit. *See Dunn*, 219 F. Supp. 3d at 1173 ("There is very little case law

interpreting this provision . . . .").

## B.    Analysis

The Agency argues that DRO failed to allege in the complaint that it exhausted all

administrative remedies. (*See* Agency's Mot. at 19.) DRO responds that (1) the PAIMI Act only

requires exhaustion where a system litigates an action on behalf of an individual and thus the exhaustion requirement does not apply here; (2) if the exhaustion requirement does apply, DRO exhausted administrative remedies before filing; and (3) alternatively, the statutory exemption applies because the instant case seeks to prevent or eliminate serious harm to a mentally ill individual. (*See* Pls.' Resp. Defs.' Mots. Dismiss ("Pls.' Resp.") at 33-36, ECF No. 28.)

### 1.    Applicability of the Exhaustion Requirement

First, DRO argues that the PAIMI Act only requires exhaustion where a system litigates on behalf of an individual and that, here, the exhaustion requirement does not apply. (*See id.* at 34); *see* 42 U.S.C. § 10807(a) ("Prior to instituting any legal action in a Federal . . . court *on behalf of a[n] individual* with mental illness, an eligible system . . . shall exhaust in a timely manner all administrative remedies where appropriate.") (emphasis added); *cf. Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 35 n.22 (1st Cir. 2019) (noting that the exhaustion "provision contemplates suits on behalf of 'an individual with mental illness'" and that the "exhaustion requirement" is phrased "in individual terms"). The Agency replies that DRO brings the current legal action on behalf of its clients, and thus the exhaustion requirement applies.[7] (*See* Agency's Reply at 4.)

The text of the exhaustion statute, 42 U.S.C. § 10807(a), suggests that the exhaustion requirement applies to "any legal action" instituted by DRO. However, because the text does not

---

[7] The Agency also argues that the Court should construe the statute to require exhaustion in actions "on behalf of a[n] individual with mental illness, an eligible system, or a State agency or nonprofit organization which entered into a contract with an eligible system[.]" (Def. Agency's Reply Supp. Mot. Dismiss ("Agency's Reply") at 4, ECF No. 33, citing 42 U.S.C. § 10807.) The Court disagrees with the Agency's truncation of the statute to include a list of three. The Agency's reading would eliminate a subject noun from the sentence. Instead, the statute provides that "an eligible system, or a State agency or nonprofit organization which entered into a contract with an eligible system, shall exhaust in a timely manner all administrative remedies where appropriate." 42 U.S.C. § 10807(a).

unambiguously resolve the instant question, the Court considers the legislative history as well.

Although the exhaustion requirement is not a strict one, the legislative history nonetheless

reveals the legislature's preference for exhaustion. DRO has not pointed to any legislative history

suggesting that the exhaustion requirement should not apply when DRO advocates for systemic

change on behalf of its clients generally. *See Charlene Liberty v. R.I. Dep't of Corr.*, No. 19-cv-

573-JJM-PAS, 2022 WL 18024627, at *3 (D.R.I. Dec. 30, 2022) (suggesting that the exhaustion

requirement applied where the P & A system, a plaintiff in a putative class action, sought to

"ensure that the rights of individuals with mental illness are protected" (quoting

42 U.S.C. § 10801(b)(1))).

DRO cites *Michigan Protection & Advocacy Service, Inc. v. Flint Community Schools* in

support of its argument that the exhaustion requirement does not apply. *See Mich. Prot. &

Advoc. Serv., Inc.*, 146 F. Supp. 3d at 905. There, the court explained that the exhaustion

requirement "only applies where the advocacy organization pursues a claim on behalf of a

particular individual." *Id.* By contrast, the P & A plaintiff had "instituted an action on its own

behalf alleging that the defendants systematically have denied the plaintiff its right to timely

access [] its clients' educational records, as guaranteed by the Protection & Advocacy Acts." *Id.*;

*see* 42 U.S.C. § 10805(a)(4)(A) (requiring that P & As "shall" have access to the records of its

clients if so authorized).

The Court concludes that *Michigan Protection & Advocacy Service, Inc.* is

distinguishable. Here, DRO does not allege a violation of its own rights under the PAIMI Act,

but instead raises ADA and Rehabilitation Act claims on behalf of its clients. (*See* Compl. ¶ 30,

"Plaintiff Disability Rights Oregon, on behalf of its clients and constituents with mental health

disabilities in Washington County . . . bring this action . . . .")

For these reasons, the Court concludes that DRO was required timely to exhaust its administrative remedies pursuant to 42 U.S.C. § 10807(a) or must demonstrate that the 42 U.S.C. § 10807(b) exception applies.

### 2.    Pleading Exhaustion

Second, DRO argues that, if DRO was required to exhaust administrative remedies, it did so. (*See* Pls.' Resp. at 34-36.) The Agency argues that DRO was required affirmatively to plead exhaustion in its complaint under Federal Rule of Civil Procedure 8(a) and that a plaintiff may not raise a new theory of standing by motion. (*See* Agency's Reply at 5.)

In the context of the Prison Litigation Reform Act ("PLRA"), the Ninth Circuit explained that "a plaintiff is not required to say anything about exhaustion in [the plaintiff's] complaint." *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc). "[F]ailure to exhaust is an affirmative defense under the PLRA . . . ." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Accordingly, only "in those rare cases where a failure to exhaust is clear from the face of the complaint, a defendant may successfully move to dismiss under Rule 12(b)(6) for failure to state a claim." *Albino*, 747 F.3d at 1169 (citing, *inter alia*, *Jones*, 549 U.S. at 215-16).

In *Albino*, the Ninth Circuit noted that it previously had approached the issue of exhaustion with "unenumerated Rule 12(b) motions" in other contexts beyond the PLRA. *Id.* at 1171 (citing cases decided under the Individuals with Disabilities Education Act, Labor Management Relations Act, and proceedings with the Food and Drug Administration). However, the Ninth Circuit explained that its amended approach and "the basic procedure outlined here— under which a party may move for summary judgment on the exhaustion question, followed, if necessary, by a decision by the court on disputed questions of material fact relevant to exhaustion—is appropriate in these other contexts as well." *Id.* Accordingly, following *Albino*, courts have extended the same analysis to other contexts. *See Puget Sound Surgical Ctr., PS v.*

PAGE 22 – FINDINGS AND RECOMMENDATION

*Aetna Life Ins. Co.*, No. 17-cv-1190-JLR, 2018 WL 4852625, at *6 (W.D. Wash. Oct. 5, 2018)

(concluding that "*Albino* applies to [Employee Retirement Income Security Act] cases" and

collecting cases); *Tabaddor v. Holder*, 156 F. Supp. 3d 1076, 1080 (C.D. Cal. 2015) (explaining

that "[f]ailure to administratively exhaust should be raised by summary judgment motion except

where that failure is clear on the face of the complaint" in the context of Title VII discrimination

claims) (citations omitted); *Linenbroker v. ITT Educ. Servs. Inc.*, No. 1:14-cv-00207 LJO GSA,

2014 WL 4795169, at *1 (E.D. Cal. Sept. 24, 2014) (concluding that the reasoning in *Albino*

applied to a claim under California's Fair Employment and Housing Act); *see also Hilao v. Est.*

*of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996) (explaining that for the purposes of the Torture

Victim Protection Act "the respondent has the burden of raising the nonexhaustion of remedies

as an affirmative defense and must show that domestic remedies exist that the claimant did not

use").

      Here, in response to the Agency's motion to dismiss, DRO attaches a declaration and

explains that the parties engaged in pre-litigation discussions. (*Id.* at 36; *see* Decl. David Boyer

Supp. Pls.' Resp. ("Boyer Decl.") ¶¶ 11-14, ECF No. 28-1.) On December 4, 2023, DRO's

counsel mailed a letter to Washington County and the Agency summarizing the findings of a

year-long investigation of Washington County's emergency response system and "suggest[ing]

ways that the matter could be resolved without litigation." (Boyer Decl. ¶¶ 4, 11.) The parties

met and discussed on December 19, 2023. (*See id.* ¶ 12.) Following the meeting, "Plaintiffs

agreed to defer the filing of a lawsuit" pending a subsequent conversation. (*Id.*) The parties met

again on January 19, 2024, and conducted "a more in-depth discussion of the emergency

response system in Washington County and more specific requirements from the Plaintiffs

regarding an acceptable resolution." (*Id.* ¶ 13.) Plaintiffs requested that Defendants respond in

writing with a suggested plan of action, and Defendants did so on January 26, 2024. (*See id.*

¶¶ 13-14.) Considering the conversations and the responses, Plaintiffs concluded "that a non-

adversarial approach was not likely to result in the appropriate resolution and litigation would be

necessary to achieve compliance with federal law." (*Id.* ¶ 14.) On February 5, 2024, Plaintiffs

sent a return letter to Defendants documenting the parties' "fundamental disagreement," and

Plaintiffs filed the instant suit the same day. (*Id.* ¶ 15; *see generally* Compl.)

The PAIMI Act does not explicitly require a plaintiff to plead exhaustion. *See*

42 U.S.C. § 10807(a). Although the statute requires exhaustion, the exhaustion requirements are

not strict. *See id.*; *see also Dunn*, 219 F. Supp. 3d at 1173. The Agency does not explain how the

Court should derive a pleading requirement for exhaustion from the text and legislative history of

the statute, nor why *Albino* should not apply here. The Court concludes that *Albino* applies, and

therefore the question of exhaustion is one for summary judgment. *See Albino*, 747 F.3d at 1171

("[A] party may move for summary judgment on the exhaustion question, followed, if necessary,

by a decision by the court on disputed questions of material fact relevant to exhaustion . . . .").

Because a failure to exhaust is not clear from the face of the complaint, the Court

recommends that the district judge deny the Agency's motion to dismiss for failure to exhaust.[8]

*See id.* at 1169 (explaining that only "in those rare cases where a failure to exhaust is clear from

the face of the complaint, a defendant may successfully move to dismiss under Rule 12(b)(6) for

failure to state a claim"); *see also Dunn*, 219 F. Supp. 3d at 1174 (concluding at summary

judgment that "the pretrial efforts of [the P & A] to bring its claims to the attention of defendants

---

[8] For similar reasons, the Court does not reach the parties' dispute over whether DRO would be exempt from the exhaustion requirement under 42 U.S.C. § 10807(b) (exempting legal action instituted to prevent or eliminate imminent serious harm to a mentally ill individual). (*See* Pls.' Resp. at 34-36; Agency's Reply at 5.)

and seek to resolve them without litigation were sufficient to satisfy § 10807" where the P & A

sent "a letter reporting the results of a lengthy investigation" and listing demands).

## II.     FAILURE TO STATE A CLAIM

Defendants argue that the Court should dismiss Plaintiffs' claims for failure to state a

claim. (*See* Agency's Mot. at 20-33; Wash. Cnty.'s Mot. at 16-24.)

### A.     Applicable Law

"Title II of the ADA and § 504 of the [Rehabilitation Act] both prohibit discrimination on

the basis of disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). "The ADA

applies only to public entities, whereas the [Rehabilitation Act] proscribes discrimination in all

federally-funded programs." *Id.*

Title II provides that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities, of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132. Section 504 provides, in relevant part, that "[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794.

To establish a prima facie case under Title II, a plaintiff must show that "(1) she is a

qualified individual with a disability; (2) she was excluded from participation in or otherwise

discriminated against with regard to a public entity's services, programs, or activities, and

(3) such exclusion or discrimination was by reason of her disability." *Lovell*, 303 F.3d at 1052

(citing *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)). To

establish a prima facie case under Section 504, a plaintiff must show that "(1) she is handicapped

within the meaning of the [Rehabilitation Act]; (2) she is otherwise qualified for the benefit or

services sought; (3) she was denied the benefit or services solely by reason of her handicap; and (4) the program providing the benefit or services receives federal financial assistance." *Id.* (citing *Weinreich*, 114 F.3d at 978).

"A disability discrimination claim may be based on 'one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation.'" *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021) (quoting *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016)). "[A]lthough failure to make a reasonable accommodation and disparate impact are two different theories . . . , a public entity may be required to make reasonable modifications to its facially neutral policies which disparately impact people with disabilities." *Id.* (citing *Crowder v. Kitagawa*, 81 F.3d 1480, 1484-85 (9th Cir. 1996)). "The important difference between . . . [disparate impact and reasonable accommodation] theories is that a reasonable accommodation claim is focused on an accommodation based on an individualized request or need, while a reasonable modification in response to a disparate impact finding is focused on modifying a policy or practice to improve systemic accessibility." *Id.* (citations omitted); *cf. Crowder*, 81 F.3d at 1484 ("Rather than attempt to classify a type of discrimination as either 'deliberate' or 'disparate impact,' the Court determined it more useful to assess whether disabled persons were denied 'meaningful access' to state-provided services." (citing *Alexander v. Choate*, 469 U.S. 287, 302 (1985))).

Under both statutes, the "prohibition against discrimination 'is universally understood as a requirement to provide meaningful access.'"[9] *Goodwin*, 675 F. Supp. 3d at 1022 (quoting

---

[9] "In an action for monetary relief under Title II, a plaintiff must additionally allege intentional discrimination by the defendant." *Goodwin v. Marin Cnty. Transit Dist.*, 675 F. Supp. 3d 1016, 1025 (N.D. Cal. 2022) (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001)). "To seek injunctive relief under Title II of the ADA, a plaintiff need only allege that she was denied meaningful access to a public entity's programs, services, or activities." *Martinez v.*

*Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009) and simplified); *see also A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) (applying the "meaningful access" analysis to suits under both Title II and Section 504).

Because Title II was modeled on Section 504, *see Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999), courts often analyze the two claims together and, "for purposes of this [opinion,] the elements of a valid Title II claim do not differ in any material sense from those of a valid section 504 claim and the two may be addressed together." *A.G.*, 815 F.3d at 1204.

## B.    Analysis

The parties dispute what constitutes the relevant service or program at issue in this litigation. (*See* Agency's Mot. at 20-22; Wash. Cnty.'s Mot. at 17-20; Pls.' Resp. at 9-16.) Defendants argue that they have not denied Plaintiffs meaningful access to a service, Plaintiffs have failed to allege discrimination on the basis of disability, and Plaintiffs instead challenge the adequacy of mental health care services and request a higher standard of care, which do not support actionable claims. (*See* Agency's Mot. at 20-33; Wash. Cnty.'s Mot. at 16-24.) Additionally, the Agency argues for its dismissal as a defendant, asserting that the Agency does not control emergency services in Washington County. (*See* Agency's Mot. at 22-23.)

### 1.    Disability

#### a.    Applicable Law

The term "disability" means, "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or

---

*County of Alameda*, 512 F. Supp. 3d 978, 986 (N.D. Cal. 2021) (citation omitted). Here, Plaintiffs seek an injunction and do not seek monetary relief. (*See* Compl. at 58-59.)

(C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1); *see also* 28 C.F.R. § 35.108(a)(2)(i) ("The definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."); 28 C.F.R. § 41.31(a) (listing a similar definition for the Rehabilitation Act); 34 C.F.R. § 104.3(j)(1) (same). The implementing regulations define a "mental impairment" as "[a]ny mental or psychological disorder, such as an . . . emotional or mental illness[.]" 29 C.F.R. § 1630.2(h)(2); *see also* 28 C.F.R. § 41.31(b)(1)(ii) (same); 34 C.F.R. § 104.3(j)(2)(i) (same).

Under subsection (A) of 42 U.S.C. § 12102(1), "major life activities" include "but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" and "also includes the operation of a major bodily function[.]" 42 U.S.C. § 12102(2); *see also* 34 C.F.R. § 104.3(j)(2)(ii) (similar).

Under subsection (C) of 42 U.S.C. § 12102(1), "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," but subsection (C) "shall not apply to impairments that are transitory and minor[,]" meaning "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3); *see also* 34 C.F.R. § 104.3(j)(2)(i) (similar).

### b.    Analysis

Plaintiffs allege that Wesley lives with depression, PTSD, and occasional bouts of psychosis and that those conditions substantially limit one or more of his major life activities, including but not limited to thinking, communicating, caring for himself, and interacting with others. (*See* Compl. ¶¶ 39, 137.) DRO brings the instant claims on behalf of its clients and

PAGE 28 – FINDINGS AND RECOMMENDATION

constituents who have or are regarded as having mental health disabilities in Washington County. (*See id.* ¶¶ 30, 234, 247; *see also id.* ¶ 51, alleging that most mental health emergencies arise from mental health disabilities, including depression, anxiety, and PTSD.); *see also* 29 U.S.C. § 794a(a)(2) (authorizing suit under the Rehabilitation Act by "any person aggrieved" by discrimination); 42 U.S.C. § 12133 (authorizing suit under the ADA by "any person alleging discrimination on the basis of disability"); 1 U.S.C. § 1 (defining "person" to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").

Plaintiffs argue that the majority of people who experience a health emergency associated with mental health disabilities suffer from a qualifying mental impairment and that any remaining "small subset of individuals" who do not have a mental impairment but nonetheless receive a police response to a mental health crisis is "regarded as" having a mental health impairment. (Pls.' Resp. at 31 n.10, 32 n.11, 32-33.) Although Defendants suggest that people who do not have a mental health disability can also experience a mental health crisis and that Agency call takers cannot always discern that "only mental health professionals should be dispatched" (*see* Wash. Cnty.'s Mot. at 17 n.8; Wash. Cnty.'s Reply Supp. Mot. Dismiss ("Wash. Cnty.'s Reply") at 2-3, ECF No. 32), Defendants do not meaningfully dispute that Plaintiffs have alleged that Wesley has a qualifying impairment and DRO's clients and constituents—who suffer from a mental health crisis and utilize the Agency's dispatch for Behavioral Health Incidents, Welfare Checks, and Suicide Attempts—either have a mental impairment or are regarded as having a qualifying impairment.

The Court concludes that Plaintiffs have sufficiently alleged that Wesley and DRO's clients and constituents are individuals with a disability as that term is defined by the relevant

statutes. *See Updike v. Multnomah County*, 870 F.3d 939, 951 (9th Cir. 2017) ("The parties do not dispute that [the plaintiff] is a qualified individual with a disability"); *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1174-75 (9th Cir. 1998) (noting that depression, PTSD, and panic attacks could constitute a disability under the ADA); *Cal. Found. for Indep. Living Centers v. County of Sacramento*, 142 F. Supp. 3d 1035, 1061 (E.D. Cal. 2015) ("Here, as above, the parties agree the plaintiffs are qualified individuals with disabilities or advocate on behalf of qualified individuals with disabilities, and only the second and third elements remain in dispute."); 28 C.F.R. § 35.108(d)(2)(ii) (noting that major depressive disorder and PTSD, among other mental impairments, "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity"); *see also Rodde v. Bonta*, 357 F.3d 988, 997 (9th Cir. 2004) (recognizing the plaintiffs' likelihood of success on the merits of their Title II claim challenging the closure of a hospital "that provides services disproportionately required by the disabled and available nowhere else in the County").

## 2.    Public Entities and Federal Funding

The parties do not dispute that Defendants are public entities that receive federal funding, and the Court concludes that Plaintiffs have plausibly alleged that Defendants satisfy those two criteria. (Compl. ¶¶ 40-41, alleging that Washington County is a political subdivision of the State, the Agency is an intergovernmental entity created by local governments, and both entities receive federal financial assistance); *see* 42 U.S.C. § 12131(1) (defining "public entity" to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government").

///

///

///

### 3.    The Service

The parties' key arguments revolve around the relevant "service" at issue.[10] The parties dispute how much deference the Court should give to Plaintiffs' construction of the relevant service or program and how the relevant service should be defined.

Plaintiffs argue that, where a service is not defined by a federal regulation or a statutory entitlement, the service is defined by "its benefits, its purpose, and the functions that it takes to achieve that purpose." (Pls.' Resp. at 10.) According to Plaintiffs, because the benefits, purpose, and functions "are generally questions of fact, which are defined by the Complaint at the motion to dismiss stage, the Court must accept as true Plaintiffs' factual allegations." (*Id.*) The Agency responds that Plaintiffs are asking the Court to defer to the Plaintiffs' definition of what constitutes a service. (*See* Agency's Reply at 7.) The Agency argues that the scope of the service is not a question of fact and that the Court in its discretion should narrowly define the scope of the service at issue. (*See id.* at 10.)

Relatedly, the parties dispute the relevant service at issue. Plaintiffs allege that the relevant service is "one unified emergency response system that is defined by the common purpose of receiving information about emergencies and delivering the benefit of emergency medical intervention to patients facing *any* type of health emergency." (Pls.' Resp. at 10-11.) Defendants argue that the Court should construe the relevant services more narrowly and that an emergency response consists of separate services. (*See* Agency's Mot. at 20; Wash. Cnty.'s Mot. at 19-20.)

///

---

[10] The ADA uses the terms "service" and "program," and the Rehabilitation Act uses the term "program." The parties appear to agree that the terms can be used interchangeably in this context.

a.    **Applicable Law**

The relevant statutes provide that qualified individuals shall not be denied or excluded from the benefits of governmental services, programs, or activities. *See* 29 U.S.C. § 794; 42 U.S.C. § 12132. "Program or activity" includes "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government[.]" 29 U.S.C. § 794.

The "prohibition on discrimination in public programs 'bring[s] within its scope anything a public entity does.'" *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 860 (9th Cir. 2022) (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002)). "The focus of the inquiry, therefore, is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Barden*, 292 F.3d at 1076 (simplified).

Courts must consider the "parameters of the 'service, program, or activity' at issue" and the service's benefits. *Cal. Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1237 (N.D. Cal. 2013) (citing 42 U.S.C. § 12132); *see also Where Do We Go Berkeley*, 32 F.4th at 860 ("[W]e must first define the [defendant's] 'programs' subject to the ADA."); *Rodriguez v. County of San Diego*, No. 14-cv-949-JLS-RBB, 2016 WL 4515860, at *6 (S.D. Cal. Feb. 9, 2016) ("Because Title II pertains to services, programs, or activities, the Court must analyze [the plaintiff]'s claims and the current record with regard to the service to which [the plaintiff] claims he was denied access.") (simplified).

"The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified . . . individuals the meaningful access to which they are entitled[.]" *Choate*, 469 U.S. at 301. "Antidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit." *Id.* at

PAGE 32 – FINDINGS AND RECOMMENDATION

301 n.21; *see also Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1172 (9th Cir. 2002) ("Courts must construe the language of the ADA broadly in order to effectively implement the ADA's fundamental purpose of 'provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" (quoting *Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 861 (1st Cir. 1998))).

The Court highlights several relevant cases below.

> 1)    *Where Do We Go Berkeley v. California Department of Transportation*

Reviewing a preliminary injunction in *Where Do We Go Berkeley*, the Ninth Circuit noted, "[t]he district court never explicitly described the scope of [the defendant]'s 'program' that serves as the basis for Plaintiffs' ADA claim." *Where Do We Go Berkeley*, 32 F.4th at 860. Instead, "[i]t seemingly accepted Plaintiffs' definition: a 'program regarding the removal of homeless encampments[.]'" *Id.* "On its face, this tells us little about what [defendant]'s programs do and do not entail—and therefore what could be a 'reasonable modification' of that program." *Id.* at 860-61; *see also id.* at 861 ("[I]t is not enough to say that [the defendant] interacts with homeless people on its properties. We must also define the scope of the program . . . ."). The Ninth Circuit then considered the actual actions that the defendant took and the services it provided. *See id.* at 861-62 (explaining that the defendant itself did not provide social services or relocation assistance but merely provided notice that it planned to clear an encampment and then cleared the encampments). Ultimately, the court concluded that the defendant's "programs . . . include clearing the encampments" and providing 72 hours' notice before clearing "level 1 encampments[.]" *Id.* at 861-62.

///

///

2)      *Does 1-5 v. Chandler*

In *Chandler*, the class action plaintiffs challenged Hawaii's amendment to a "general assistance" program. *Does 1-5 v. Chandler*, 83 F.3d 1150, 1151 (9th Cir. 1996). Before the amendment, the relevant statute had provided benefits to people "with dependent children, able-bodied persons at least 55 years of age, and disabled persons who were unable to provide sufficient support for themselves and who were not otherwise provided for under Hawaii law or eligible for federal assistance." *Id.* After the amendment, the statute eliminated benefits for able-bodied persons aged fifty-five and older and limited benefits for disabled persons to no more than one year. *See id.* Benefits for people with dependent children remained "durationally unlimited." *Id.* at 1152. The Ninth Circuit reviewed the district court's denial of a preliminary injunction. *See id.* at 1151.

The Ninth Circuit concluded that, because the programs were separate with distinct purposes, there was no Title II violation. *Id.* at 1155. The court explained, "[t]he key issue in this case, therefore, is one of characterization." *Id.* "The Court concludes that the Hawaii [general assistance] program is, functionally, made up of a program of support for needy families and a separate program of support for the needy disabled." *Id.* "Although Appellants argue that the Hawaii [general assistance] program is essentially a single, unified program with the single essential purpose of providing income support for the needy, we conclude otherwise." *Id.* "The Hawaii [general assistance] program does not provide benefits to all needy residents who cannot receive federal aid—only those who are disabled or who have dependent children." *Id.* "Non-disabled needy without dependent children are not entitled to receive any funds." *Id.* "This restriction cuts against viewing the program as having the unified purpose of providing for the needy as opposed to viewing it, functionally if not formally, as two discrete forms of benefit providing for two discrete subgroups of the needy population." *Id.*

PAGE 34 – FINDINGS AND RECOMMENDATION

3)    *Alexander v. Choate*

Following a bench trial, the Supreme Court considered whether Tennessee's proposed reduction in the number of annual days of inpatient hospital care covered by the state Medicaid program (reduced to fourteen days) violated Section 504. *See Choate*, 469 U.S. at 289. The Supreme Court concluded, "[t]he 14-day limitation will not deny respondents meaningful access to Tennessee Medicaid services or exclude them from those services." *Id.* at 302. The Supreme Court turned to the federal Medicaid Act for the definition of the benefit at issue. *See id.* at 303. Ultimately, the Supreme Court rejected the notion "that the benefit provided through state Medicaid programs is the amorphous objective of 'adequate health care.'" *Id.* "Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to [the recipient's] particular needs." *Id.* "Instead, the benefit provided through Medicaid is a particular package of health care services, such as 14 days of inpatient coverage." *Id.*

4)    Other Cases

The Supreme Court has instructed that the benefit of the relevant program or service "cannot be defined in a way that effectively denies otherwise qualified . . . individuals the meaningful access to which they are entitled[.]" *Id.* at 301.

In some instances, an expansive definition might obscure discrimination. For example, in *National Federation of the Blind v. Lamone*, the Fourth Circuit focused specifically on absentee voting, rejecting the defendants' argument that the voting program in its entirety was the relevant program. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503-04 (4th Cir. 2016). The Fourth Circuit considered the text of Title II: "a disabled individual may not be 'excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Id.* at 503 (quoting 42 U.S.C. § 12132). The court explained, "Defendants' proposed focus on voting in its entirety effectively reads out

much of this language, suggesting that Title II prohibits only complete exclusion from participation in broadly-defined public programs." *Id.* However, "Title II does not only prohibit 'exclusion from participation' in a public program; it also separately prohibits 'den[ying] the benefits' of that program."[11] *Id.* (quoting 42 U.S.C. § 12132).

Accordingly, a narrower scope of the relevant program or service applies in some cases. *See Cal. Council of the Blind*, 985 F. Supp. 2d at 1238 (concluding at the motion to dismiss stage, where the defendants framed the public service as "voting" while the plaintiffs contended that defendants offered the service of voting privately and independently, that "one of the central features of voting, and one of its benefits, is voting privately and independently"); *Cal. Found. for Indep. Living Ctrs.*, 142 F. Supp. 3d at 1062-64 (reviewing the "physical evacuation plan," "communication plan," and "recovery plan" aspects of the defendant's emergency evacuation plan).[12]

---

[11] The Fourth Circuit explained, "Title II is disjunctive." *Nat'l Fed'n of the Blind*, 813 F.3d at 503. "By its own terms it is not limited only to public 'programs'; it applies to 'services, programs, *or* activities.'" *Id.* (quoting 42 U.S.C. § 12132). In addition to prohibiting exclusion from participation in a public program and denying the befits of that program, "Title II separately generally prohibits 'discrimination by any [public] entity.'" *Id.* at 504 (quoting 42 U.S.C. § 12132).

[12] *See also L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1302 (11th Cir. 2022) (noting that "[t]he Supreme Court instructs courts to focus on narrow programs and benefits offered by a public entity when evaluating claims under the ADA and Section 504" and considering "in-person education" to be the relevant program, not education generally (citing *Choate*, 469 U.S. at 301 & n.21)); *Jones v. City of Monroe, Michigan*, 341 F.3d 474, 477 (6th Cir. 2003) ("[W]e must first examine the nature of the benefit offered by [the defendant]. Initially, we note that the benefit is not appropriately defined as free downtown parking generally, but rather as the provision of all-day and one-hour parking in specific locations.") (simplified), *abrogated in part on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc); *Greene v. City of New York*, No. 21-cv-05762 (PAC), 2024 WL 1308434, at *16 (S.D.N.Y. Mar. 26, 2024) ("Plaintiffs' argument, as expressed by the DOJ, only works if pitched at a level of generality which treats mental and medical health calls as equivalent 'emergency services.' But this is not the law. The State of New York has

PAGE 36 – FINDINGS AND RECOMMENDATION

Conversely, in other instances, too narrow of a definition might obscure discrimination. For example, the statutes' requirement that students with disabilities have equal opportunity to participate in a school's program of instruction would be meaningless if the program or benefit was defined as "oral education in English" and found equally available to students who are deaf and communicate using American Sign Language. *See* Notice of Statement of Interest by United States at 9, Bread for the City v. District of Columbia, No. 1:23-cv-01945-ACR (D.D.C. Feb. 22, 2024), ECF No. 50 (highlighting this example).

Accordingly, a broader scope of programs or services applies in some cases. *See Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020) ("The district court defined the benefit as an entitlement 'to obtain HIV/AIDS medication for favorable prices at non-CVS pharmacies,' but Does argue the denied benefit is meaningful access to 'the prescription drug benefit as a whole[.]' Construing the allegations in the light most favorable to Does [at the motion to dismiss stage], we agree with Does' articulation of the benefit."); *Townsend v. Quasim*, 328 F.3d 511, 527 (9th Cir. 2003) (categorizing the service at issue as "long term care," with the dissent disputing the majority's redefinition of the services at issue "at a broad level of generality"); *Cmties. Actively Living Indep. & Free v. City of Los Angeles*, No. 09-cv-0287 CBM RZX, 2011 WL 4595993, at *13 (C.D. Cal. Feb. 10, 2011) ("[T]he City provides a governmental program— its emergency preparedness program—to its residents.");[13] *cf. Boyd v. City of San Rafael*, No.

---

determined that those with mental disabilities who pose a substantial risk of danger to themselves or others require a discrete emergency service . . . .").

[13] *See also Henrietta D. v. Bloomberg*, 331 F.3d 261, 264, 283 (2d Cir. 2003) (reviewing the plaintiffs' claim based on "adequate access to public benefits," meaning "public assistance, Medicaid, Food Stamps, housing, and other benefits and services available to qualifying members of the general public comparable to public assistance and welfare benefits") (simplified); *Am. Council of Blind of Metro. Chi. v. City of Chicago*, 667 F. Supp. 3d 767, 774 (N.D. Ill. 2023) (concluding that the "network of pedestrian signals amounts to a public service or program" and rejecting the defendant's argument that each pedestrian signal should be viewed

23-cv-04085-EMC, 2023 WL 6960368, at *23 (N.D. Cal. Oct. 19, 2023) ("[W]hat constitutes the scope of an applicable 'program' appears nebulous."), *op. clarified*, 2023 WL 7283885 (N.D. Cal. Nov. 2, 2023).

In sum, the scope of the program or service must comport with the statutes' goals of eliminating discrimination against those with disabilities.

### b.    Analysis

The Court does not understand Plaintiffs to argue that the Court must accept whole cloth Plaintiffs' definition of the relevant service. Instead, the Court concludes that defining the relevant service is a mixed question of law and fact. *See Where Do We Go Berkeley*, 32 F.4th at 861-62 (rejecting the plaintiffs' framing of a "program regarding the removal of homeless encampments" and concluding that the defendant's "programs . . . include clearing the encampments" and providing seventy-two hours' notice before clearing "level 1 encampments"); *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 753 (N.D. Tex. 2014) (explaining that the relevant service or benefit is a "legal conclusion"); *Jarzynka v. UPMC Health Sys.*, No. CIV.A. 10-1594, 2011 WL 4565612, at *5 (W.D. Pa. Sept. 29, 2011) ("[T]he Rehabilitation Act leaves the task of defining the relevant benefit to the courts . . . .") (simplified); *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995) (explaining that, for mixed questions of law and fact, "it is the court's duty to define the appropriate standard" and that "[i]f reasonable persons, applying the proper legal standard, could differ as to" the application, "it is a question for the jury") (citations omitted).

---

in isolation because the defendant "fail[ed] to explain how its thousands of traffic signals could exist and function without being part of a City program or service"); *Brooklyn Ctr. for Ind. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 642 (S.D.N.Y. 2013) (evaluating the "public entity's emergency preparedness and planning") (citation omitted).

Washington County argues that the relevant service is defined by regulation, pointing to Oregon Administrative Rule 104-080-0000.[14] (*See* Wash. Cnty.'s Mot. at 19-20; Wash. Cnty.'s Reply at 6; *see also* Agency's Mot. at 28; Agency's Reply at 10-11.) That rule provides the purpose of Oregon's 911 program:

> The purpose of the State of Oregon's 9-1-1 program in establishing the emergency communications system is to:
>
> (1) Provide for the continued operation of 9-1-1 and emergency communications services statewide.
>
> > (a) *Provide consistent statewide access to police, fire, and emergency medical service through the emergency communications system* when an emergency call is made to 9-1-1.
> >
> > (b) Support 9-1-1 jurisdictions by continuing to pursue technologies and solutions that improve levels of service and promotes efficiencies in the statewide emergency communications system.

OR. ADMIN. R. 104-080-0000 (2018) (emphasis added).

The Court finds the Oregon Administrative Rule instructive.[15] The rule requires consistent access to police service *and* consistent access to fire service *and* consistent access to emergency medical service through the emergency communications system when an emergency call is made to 911.[16] However, the parties appear to agree that Plaintiffs do not allege that they

---

[14] The parties agree that federal statutes and regulations do not define the relevant service. *Cf. Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591 (1999) ("Congress instructed the Attorney General to issue regulations implementing provisions of Title II") (citation omitted).

[15] At oral argument, Plaintiffs' counsel agreed that the Court should consider the administrative rule and that the rule is relevant.

[16] The Court does not read the rule only to require that the emergency communications system itself be consistently accessible, such as through accommodations for the hearing impaired to request emergency assistance. Instead, the Court understands the rule to require

receive inconsistent access to police or fire services through the emergency communication

system (although Plaintiffs suggest that police are dispatched with too much frequency). (*See*

Agency's Mot. at 25, arguing that law enforcement officers arrived in all of the instances

described in the complaint; Wash. Cnty.'s Mot. at 23, arguing that Plaintiffs are not excluded

from law enforcement response.) Accordingly, the Court construes the relevant service more

narrowly and concludes that the relevant service at issue here is the provision of consistent

access to emergency medical service through the emergency communications system when an

emergency call is made to 911.[17]

Consideration of Defendants' offerings and the benefits and purpose of Defendants'

service support the Court's conclusion. At the motion to dismiss stage, the supporting factual

allegations are found in the complaint. *See Daniels-Hall*, 629 F.3d at 998 (noting that when

reviewing a motion to dismiss for failure to state a claim, a court must "accept as true all well-

pleaded allegations of material fact, and construe them in the light most favorable to the non-

moving party" (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031-32 (9th

Cir. 2008))); *cf. Rodriguez*, 2016 WL 4515860, at *7 (explaining that, at summary judgment,

"[n]either party has identified evidence in the record to create a dispute of fact over what

services, if any, the County offers at the Park" and "determin[ing] as a matter of law" the

relevant programs).

///

_____

consistent statewide access to the police, fire, and emergency medical services that the
emergency communications system dispatches.

[17] Although Plaintiffs mention that Washington County provides additional services, such
as through its operation of the Washington County Sheriff's Office (*see* Compl. ¶¶ 15, 88, 134),
the focus of Plaintiffs' claim is on Defendants' provision of consistent access to emergency
medical service through the emergency communication system.

Here, Plaintiffs allege that Washington County, through the Agency, provides a 911 dispatch center. (*See* Compl. ¶ 83.) Defendants provide emergency dispatch for all emergencies that pose "an immediate threat to life safety such as potential for physical harm or medical emergencies and immediate threat to property safety such as fire, theft[,] or robbery." (Call Taking Manual at 6.) The Agency receives all 911 calls and routes them to an appropriate agency. (*See* Compl. ¶ 83.) To do so, the Agency call taker listens to the call and gathers information about the emergency, determines the nature and severity of the incident, categorizes and prioritizes the situation, and sends the call to a queue for dispatch. (*Id.* ¶ 86.) The call types are categorized as police, fire, or emergency medical dispatch. (*See* Call Taking Manual at 31.) Call takers trained and certified as Emergency Medical Dispatchers handle requests for medical assistance, including for behavioral, emotional, and psychological needs. (*Id.* at 62, 77.) The Agency then routes 911 calls to a private or public agency, including the Washington County Sheriff's Office, Cornelius Police Department, North Plains Police Department, Gaston Police Department, Banks Police Department, Forest Grove Fire & Rescue, Banks Fire District, Gaston Fire, Tualatin Valley Fire & Rescue, Hillsboro Fire & Rescue, and AMR. (Compl. ¶ 86 nn. 33-34; *see also* Call Taking Manual at 83-86, 92.) In sum, Defendants offer consistent access to police and fire services and, as relevant here, emergency medical service through the emergency communications system when an emergency call is made to 911. *See Where Do We Go Berkeley*, 32 F.4th at 861-62 (examining the defendant's specific offerings); *Cmties. Actively Living Indep. & Free*, 2011 WL 4595993, at \*14 ("The purpose of the City's emergency preparedness program is to *anticipate* the needs of its residents in the event of an emergency and to *minimize* . . . last-minute, individualized requests for assistance . . . , particularly when the City's infrastructure may be substantially compromised or strained by an imminent or ongoing emergency or

disaster."); *cf. Wright v. Giuliani*, 230 F.3d 543, 548-49 (2d Cir. 2000) (explaining upon review of the district court's denial of a preliminary injunction that "[e]vidence concerning the condition of congregate housing for the able-bodied may assist the court to determine whether the concept of 'adequate emergency housing' is amorphous in the sense that 'adequate health care' was held to be amorphous in *Alexander*" (citing *Choate*, 469 U.S. at 303)).

The Agency argues that each dispatched entity that provides a form of emergency response offers its own set of services. (*See* Agency's Mot. at 20.) Although that may be true, *Where Do We Go Berkeley* instructs that courts must look at the actual offerings provided by *this specific defendant*, and the Agency provides a dispatch service. (*See* Compl. ¶ 83); *Where Do We Go Berkeley*, 32 F.4th at 861 ("The Interim Guidance states that [the defendant] collaborates with local partners to help people at the encampments connect with critical services and housing solutions. But [the defendant] itself does not provide those services[.]"). In other words, the Agency does not provide police, fire, or emergency medical services. (*See, e.g.*, Call Taking Manual at 82, 91, providing an overview of the law enforcement activities, fire suppression, rescue, and emergency medical services that the other agencies provide.) To the extent that the Agency suggests that it does not offer a service, the statutes' prohibition on discrimination in public programs "bring[s] within its scope anything a public entity does" and "[t]he focus of the inquiry, therefore, is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Barden*, 292 F.3d at 1076 (simplified). A 911 dispatch is a normal function of a governmental entity. *See* OR. ADMIN. R. 104-080-0000 (2018).

To the extent Plaintiffs argue that the relevant service is "emergency response" in the abstract, independent of Defendants' actual offerings, that definition is too broad. *See Where Do*

*We Go Berkeley*, 32 F.4th at 861-62 (explaining that the defendant itself did not provide social services or relocation assistance but merely provided notice that it planned to clear an encampment and then cleared the encampments). Defendants provide emergency response related to public safety, specifically "an immediate threat to life safety such as potential for physical harm or medical emergencies and immediate threat to property safety such as fire, theft[,] or robbery." (Call Taking Manual at 6; *see also* Compl. ¶ 86.)

The benefits of the service add support. The dispatch generally is available to everyone, not just a small subset of people, suggesting that the dispatch is meant to provide consistent access and stabilizing services for all. (*See* Compl. ¶ 83, alleging that the Agency "receives all 911" calls; Wash. Cnty.'s Reply at 7, explaining that "the 911 system . . . serves *all* emergency situations with immediate interventions to stabilize the primary safety concerns at the scene"; *see also* Agency's Reply at 11-12, similar); *see Nat'l Fed'n of the Blind*, 813 F.3d at 504 ("Maryland allows *any* voter to vote by absentee ballot. Absentee ballots are not provided only to a limited set of voters with a demonstrated need to vote absentee; they are instead provided to the entire Maryland electorate at the option of each individual voter. On the whole, then, we think it is far more natural to view absentee voting—rather than the entire voting program—as the appropriate object of scrutiny for compliance with the ADA and the Rehabilitation Act.") (citation omitted); *cf. Chandler*, 83 F.3d at 1155 (rejecting the argument that the program had a unified purpose of providing income support for the needy because the program only provided support to "those who are disabled or who have dependent children").

Defendants argue that the purpose and benefit of the service or services is safety, i.e., immediate access to police, fire, and emergency medical services to stabilize the relevant safety issues. (*See* Agency's Mot. at 6, 28; Wash. Cnty.'s Mot. at 19-20; Wash. Cnty.'s Reply at 4; *see*

*also* Compl. ¶ 83, explaining that the Agency routes 911 calls to appropriate public or private

safety agencies; Call Taking Manual at 6, describing emergency response to life safety and

property safety.) Accepting Plaintiffs' allegations in the complaint as true and drawing

reasonable inferences in Plaintiffs' favor, as the Court must, Plaintiffs allege that the primary

safety issue (or one of the primary safety issues) for mental health crises is the subject's health,

and that the safety issue is not significantly different from a physical health crisis.[18] (*See* Compl.

¶¶ 7, 28, 42, 50-55, 58, 79, 158.)

      Further, Plaintiffs allege that people suffering from a mental health crisis do not receive

the safety benefit of stabilizing emergency medical treatment but instead face additional danger.

(*See id.* ¶¶ 3, 11, 24, 71-72, 136; *see also id.* ¶ 24, explaining that experts opine that dispatching

law enforcement officers in response to mental health crisis calls is more likely to exacerbate

rather than alleviate the mental health issue for which help is sought; *id.* ¶ 65, noting that the

presence of law enforcement can exacerbate a mental health crisis because officers have been

trained to use aggressive tones, crowd someone, touch them without consent, and attempt to

assert control over them; *id.* ¶ 67, reporting that police nationwide are twelve times more likely

to use force against people with serious mental health disabilities than other individuals and

---

[18] To the extent Defendants argue that Plaintiffs concede that mental health emergencies typically involve and are limited to public safety concerns (*see* Agency's Mot. at 8; Wash. Cnty.'s Mot. at 6-7), the Court views the facts in the light most favorable to Plaintiffs and disagrees with Defendants' construction of the complaint. Similarly, to the extent Defendants argue that it is implausible that mental health related emergencies pose a health concern and require a "health response" (*see* Wash. Cnty.'s Reply at 4), the Court disagrees, viewing the facts in the light most favorable to Plaintiffs and drawing reasonable inferences in Plaintiffs' favor. Finally, even accepting Defendants' argument that mental health crises, when compared to physical health emergencies, pose "qualitatively different emergency safety concerns" that require a law enforcement response (Wash Cnty.'s Reply at 10), Plaintiffs have nonetheless adequately pled that those suffering from a mental health crisis *also* require emergency medical services.

sixteen times more likely to kill people with untreated mental health disabilities than other

individuals.) Accordingly, Plaintiffs seek consistent and immediate access to emergency medical

services through the emergency communication system to stabilize the relevant safety issue.

Defendants argue that the ADA and Rehabilitation Act do not require distinct programs

to provide the same or similar discrete services.[19] (*See* Wash. Cnty.'s Mot. at 17-18.) In other

words, Defendants suggest that just because they provide consistent access to medical care for

physical health emergencies does not mean that Defendants must provide, through a separate

program, consistent access to medical care for mental health emergencies. (*See id.*) The Court

agrees with Defendants' premise about distinct programs generally. However, Defendants'

argument conflicts with the purpose and benefits of the 911 dispatch. In other words, the 911

dispatch is not a service limited to people with physical health emergencies. Instead, anyone

suffering from a health emergency, or any other emergency, is eligible. Defendants dispatch

agencies to ameliorate the danger. Defendants need not provide consistent access to emergency

---

[19] Defendants have not specified what they believe is the relevant service or program. Even if the Court were to define the service more narrowly, such as consistent access to AMR generally, consistent access to EMTs, or consistent access to paramedics through the emergency communications system, Plaintiffs have nonetheless alleged that Defendants do not consistently dispatch those services as a primary response to all mental health related emergencies. (*See* Compl. ¶ 87); *see Boyd,* 2023 WL 6960368, at *24 ("Even assuming the [defendant's] narrow description of its program is appropriate, there are viable modifications available here that can accommodate the ADA needs of disabled campers."). To the extent Defendants argue that the relevant service should be defined at the call type level (for example, consistent access to police, fire, and emergency medical service in response to a suicide attempt) (*see* Agency's Mot. at 8; Wash. Cnty.'s Mot. at 8, 17), the Court concludes that such a narrow service definition would define the benefit of the service in a way that effectively denies otherwise qualified individuals the meaningful access to which they are entitled. *See Choate,* 469 U.S. at 301. For example, if Defendants chose to send emergency medical services to all medical emergencies except for call type DI, the code for diabetes, affected persons would not have meaningful access to the benefit of Defendants' service to which they are entitled. (*See* Call Taking Manual at 77, listing medical call types.)

PAGE 45 – FINDINGS AND RECOMMENDATION

medical services to everyone, but once they do, they may not do so in a discriminatory manner.[20]
*See Olmstead*, 527 U.S. at 603 n.14 (holding that "[s]tates must adhere to the ADA's
nondiscrimination requirement with regard to the services they in fact provide").

In sum, the Court concludes that the relevant service at issue here is the provision of
consistent access to emergency medical service through the emergency communications system.
*Cf. Cmties. Actively Living Indep. & Free*, 2011 WL 4595993, at *13 (concluding that "the City
provides a governmental program—its emergency preparedness program" and that "[n]either the
City nor the individual departments [such as the fire department, police department, and
Department of Parks and Recreation] have assessed whether they have the capacity to respond to
the needs of individuals with disabilities during an emergency or disaster"); *Van Velzor*, 43 F.
Supp. 3d at 759 (explaining that, "[t]aken as true, [the plaintiff]'s allegations show that he was
denied the benefit of the police department's enforcement of parking and traffic laws" when the
police department enforced all laws except disability-related violations); *Brooklyn Ctr. for Indep.
of Disabled*, 980 F. Supp. 2d at 642 (examining "a public entity's emergency preparedness and
planning for compliance with the ADA and the Rehabilitation Act") (citation omitted).

---

[20] Plaintiffs argue that the Court should take into consideration the Department of
Justice's ("DOJ") characterization of the relevant service. (*See* Pls.' Resp. at 11.) Washington
County does not dispute that the Court should take the DOJ's guidance into consideration but
argues that Plaintiffs' position conflicts with the DOJ's position. (*See* Wash. Cnty.'s Reply at 7.)
The Agency argues that Plaintiffs' reliance on the DOJ's Statement of Interest, filed in a
different case, is misplaced because the DOJ only recently adopted a new interpretation of the
ADA. (*See* Agency's Reply at 20-22.) In 2022, pursuant to Executive Order 14074, the DOJ
issued guidance related to emergency response to people with behavioral health or other
disabilities and opined that "[t]he ADA also applies to public entities' emergency response and
law enforcement systems." DOJ and Dep't of Health & Human Servs., Guidance for Emergency
Responses to People with Behavioral Health or Other Disabilities 3 (2023),
https://www.justice.gov/d9/2023-05/Sec.%2014%28a%29%20-%20DOJ%20and%20HHS%
20Guidance%20on%20Emergency%20Responses%20to%20Individuals%20with%
20Behavioral%20Health%20or%20Other%20Disabilities_FINAL.pdf [https://perma.cc/QPB4-
87RQ]. The DOJ's guidance does not change the Court's analysis.

4.      **Meaningful Access to the Service**

a.      **Applicable Law**

The ADA and Rehabilitation Act provide that qualified individuals shall not be "denied" or "excluded from" the benefits of services, programs, or activities. 42 U.S.C. § 12132; 29 U.S.C. § 794. More specifically, "[i]f a public entity denies an otherwise qualified individual meaningful access to its services, programs, or activities solely by reason of his or her disability, that individual may have an ADA [or Rehabilitation Act] claim against the public entity." *Lee,* 250 F.3d at 691 (simplified); *see also Choate,* 469 U.S. at 301 ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers."); *Updike,* 870 F.3d at 951 ("A public entity may be liable for damages under Title II of the ADA or § 504 of the Rehabilitation Act 'if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons.'" (quoting *Mark H. v. Lemahieu,* 513 F.3d 922, 937-38 (9th Cir. 2008))); *Lonberg,* 571 F.3d at 851 ("This prohibition against discrimination is universally understood as a requirement to provide 'meaningful access.'") (citation omitted); *Crowder,* 81 F.3d at 1484 ("Rather than attempt to classify a type of discrimination as either 'deliberate' or 'disparate impact,' the Court determined it more useful to assess whether disabled persons were denied 'meaningful access' to state-provided services." (citing, *inter alia, Choate,* 469 U.S. at 302)). In other words, a plaintiff must plead that they have been denied meaningful access but need not "prove that they have been disenfranchised or otherwise 'completely prevented from enjoying a service, program, or activity.'" *Disabled in Action v. Bd. of Elections in N.Y.,* 752 F. 3d 189, 198 (2d Cir. 2014) (quoting *Shotz v. Cates,* 256 F.3d 1077, 1080 (11th Cir. 2001)). "[T]he 'meaningful access' standard incorporates . . . applicable interpretive regulations . . . ." *K.M. ex rel. Bright v. Tustin*

*Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013); *see also Martinez*, 512 F. Supp. 3d at

981 ("28 C.F.R. § 35.130 . . . is an implementing regulation for § 12132 . . . .").

"A public entity, in providing any aid, benefit, or service, may not . . . [a]fford a qualified

individual with a disability an opportunity to participate in or benefit from the aid, benefit, or

service that is not equal to that afforded others . . . [or p]rovide a qualified individual with a

disability with an aid, benefit, or service that is not as effective in affording equal opportunity to

obtain the same result, to gain the same benefit, or to reach the same level of achievement as that

provided to others[.]" 28 C.F.R. § 35.130(b)(1) (ADA implementing regulation); *see also*

28 C.F.R. § 41.51(b)(1) (providing the same under the Rehabilitation Act implementing

regulations); *Payan*, 11 F.4th at 738 ("Prohibited forms of disability discrimination include

denying individuals with disabilities the opportunity to participate in a program or service,

providing an unequal opportunity to participate in the program or service, or providing the

entity's program or service in a way that is not effective in affording the individual with a

disability an equal opportunity to obtain the same result as provided to others." (citing

28 C.F.R. § 35.130(b)(1))); *Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1171 (8th Cir. 2019)

("A person with a disability receives meaningful access if she receives an 'equal opportunity to

gain the same benefit' as a person without her disability.") (citation omitted).

Further, "[a] public entity may not . . . utilize criteria or methods of administration . . .

[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the

objectives of the public entity's program with respect to individuals with disabilities[.]"[21]

---

[21] Defendants cite the interpretive regulation applicable to facilities, which provides that "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." (*See* Agency's Mot. at 24; Wash. Cnty's Mot. at 22, citing 28 C.F.R. § 35.150(a).) The Court considers that regulation of limited relevance because of its grounding in the context

28 C.F.R. § 35.130(b)(3) (ADA implementing regulation); *see also* 28 C.F.R. § 41.51(b)(3)

(providing the same under the Rehabilitation Act implementing regulations); *Cal. Council of the*

*Blind*, 985 F. Supp. 2d at 1236 (analyzing whether the plaintiffs had alleged that they had been

denied meaningful access to the County's services and explaining that "[s]everal regulations

promulgated under the ADA are relevant to this case" (citing 28 C.F.R. § 35.130(b)(1)(ii) and

28 C.F.R. § 35.130(b)(3)(ii))).

### b.    Analysis

Plaintiffs argue that, in order to provide meaningful access to emergency medical

dispatch, Defendants may not deny Plaintiffs an equal opportunity to obtain the same result, gain

the same benefit, or reach the same level of achievement on the basis of disability nor utilize

criteria or methods of administration that defeat the purpose of the service for people with

disabilities. (*See* Pls.' Resp. at 16-17.)

Defendants argue that Title II and Section 504 do not guarantee that disabled individuals

achieve "equal results" from the services provided; instead, the statutes only guarantee an

opportunity to participate in and receive the services offered. (*See* Agency's Mot. at 16-17;

Wash. Cnty.'s Mot. at 15.) Defendants have not explained whether the Court should consider

---

of existing facilities. *See Payan v. L.A. Cmty. Coll. Dist.*, No. 2:17-cv-01697-SVW-SK, 2019
WL 9047062, at *1 (C.D. Cal. Apr. 23, 2019) ("Plaintiffs are correct that 28 C.F.R. § 35.150(a)
and its 'in its entirety' standard does not apply to the instant case. *Cohen* and other cases cited by
the parties that rely on § 35.150(a) are cases involving physical barriers to program access, rather
than deficiencies in the public entity's programs or services themselves.") (collecting cases); *see
also Nat'l Fed'n of the Blind*, 813 F.3d at 504 ("[T]he cited regulation [28 C.F.R. § 35.150(a)]
expressly pertains to 'existing facilities.' On its face, this regulation simply provides that a public
entity does not have to make each of its facilities accessible as long as individuals with
disabilities have access to that entity's offered public services. This regulation is targeted
principally at physical accessibility and allows a public entity to provide accessibility alternatives
that would not require large-scale architectural modifications of existing facilities.") (citations
omitted).

28 C.F.R. § 35.130(b)(1) and 28 C.F.R. § 41.51(b)(1) and, if the Court may consider those

regulations, the significance of the guarantee of an equal *opportunity* to obtain the same result.

The Court concludes that 28 C.F.R. § 35.130(b)(1) and 28 C.F.R. § 41.51(b)(1) are relevant to

whether Defendants have denied Plaintiffs meaningful access. *See K.M.*, 725 F.3d at 1102; *see*

*also* 42 U.S.C. § 12101(a)(7) ("[T]he Nation's proper goal[] regarding individuals with

disabilities [is] to assure equality of opportunity . . . ."); *Nat'l Fed'n of the Blind*, 813 F.3d at 503

("Title II does not only prohibit 'exclusion from participation' in a public program; it also

separately prohibits 'den[ying] the benefits' of that program.").

     Plaintiffs allege facts suggesting that people with mental health disabilities do not have

an equal opportunity to participate in Defendants' service nor an equal opportunity to obtain the

same result, gain the same benefit, or reach the same level of achievement. (*See* Compl. ¶¶ 2-3,

58, 65, 76, 99, 158, 192, alleging facts suggesting that people who suffer mental health related

emergencies do not have an opportunity to receive emergency medical services nor an equal

opportunity to stabilize their health condition.) Plaintiffs allege that people with mental health

disabilities do not have an equal opportunity to benefit from the safety associated with consistent

access to emergency medical service because they do not receive on-site stabilizing treatment in

response to a mental health crisis but instead face dangers and obstacles such as the use of force,

chemical sedation, involuntary and unnecessary hospitalization, arrest, and jail. (*Id.* ¶¶ 3, 11, 24,

65, 67, 71-72, 136.) Plaintiffs also allege that in order to receive *any* emergency medical services

in response to a mental health crisis, they must first be screened by law enforcement, who use

their "lay judgment" to decide whether treatment is necessary. (*Id.* ¶¶ 76, 95); *see also Cal.*

*Council of the Blind*, 985 F. Supp. 2d at 1239 ("Defendants argue that, with the assistance of a

third party, Plaintiffs were provided an equal opportunity to vote . . . . However, requiring blind

and visually impaired individuals to vote with the assistance of a third party, if they are to vote at all, at best provides these individuals with an inferior voting experience 'not equal to that afforded others.'" (quoting 28 C.F.R. § 35.130(b)(1)(ii))); *Munson v. California*, No. 2:09-cv-0478 JAM EFB, 2012 WL 3260453, at *6 (E.D. Cal. Aug. 8, 2012) ("[U]nder the applicable regulations it was defendant's obligation not simply to offer the transport service to plaintiff, but to offer it to him in such a way that he could derive equal benefit from it as persons who do not suffer from plaintiff's disability and who therefore do not face pain and injury as a consequence of using the service." (citing 28 C.F.R. § 35.130(b)(1))), *report and recommendation adopted*, 2012 WL 5304757 (E.D. Cal. Oct. 25, 2012); *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008) ("Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit."); *Henrietta D.*, 331 F.3d at 279 (considering whether the plaintiffs "face[d] conditions that are more onerous for them because of their particular disabilities"); *cf. Est. of LeRoux v. Montgomery County, Maryland*, No. 8:22-cv-00856-AAQ, 2023 WL 2571518, at *11 (D. Md. Mar. 20, 2023) (denying the defendant's motion to dismiss the plaintiffs' ADA claim where the plaintiffs, surviving family members of a man killed by police officers while suffering a mental health crisis, had "alleged that there were a number of reasonable accommodations that could have been implemented . . . such as dispatching the Mobile Crisis Team [or] the Crisis Intervention Team").

Even if people with mental health disabilities can access some of the benefits of Defendants' dispatch, such as consistent access to firefighters in the case of a fire or even access to EMTs and paramedics in the case of a physical health emergency, Plaintiffs have adequately alleged that they do not have equal opportunity to gain the benefits of consistent access to

emergency medical service for all health emergencies.[22] *See Van Velzor*, 43 F. Supp. 3d at 759

("It is true that even given [the plaintiff's allegations that the police did not enforce disability-

related laws, the plaintiff] would still have access to some of the benefits of the City's

enforcement of parking and traffic laws, such as the regulation of speed limits and the

enforcement of stop-sign and traffic-light laws. However, [the plaintiff]'s allegations show that

the benefit he received from the City was 'not equal to that afforded others.'" (citing

28 C.F.R. § 35.130(b)(1)(ii))); *Allah v. Goord*, 405 F. Supp. 2d 265, 280 (S.D.N.Y. 2005)

("Although plaintiff is not wholly precluded from participating in this service, if he is at risk of

incurring serious injuries each time he attempts to take advantage of outside medical attention,

surely he is being denied the *benefits* of this service.").

   Further, Plaintiffs allege facts suggesting that Defendants use criteria or methods of

administration that defeat the purpose of the service. (*See* Compl. ¶¶ 2-3, 7, 11, 16, 98-99, 158,

alleging that the Agency dispatches police to health emergencies associated with mental health

disabilities instead of EMTs, paramedics, MCT, or MHRT and, as a result, those suffering from

mental health emergencies do not receive medical assessment, stabilization, or treatment); *see*

*Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach*, 846 F. Supp. 986, 990

(S.D. Fla. 1994) ("[A]lthough the City is not required to offer to the public (disabled or non-

---

   [22] Even though Defendants argue for a narrow definition of the relevant service, Defendants argue that Plaintiffs are not completely excluded from receiving Defendants' emergency response services generally. (*See* Agency's Mot. at 25; Wash. Cnty.'s Mot. at 23.) Defendants point out that an emergency response service (the police) arrived in all of the instances described in the complaint. (*See* Agency's Mot. at 25.) Similarly, Defendants highlight the interconnected nature of the 911 dispatch that responds to all emergency situations and argue that Plaintiffs improperly ignore the other stabilizing services beyond emergency medical intervention. (*See* Wash. Cnty.'s Reply at 7-8.) However, as noted, the Oregon regulation requires that Defendants provide consistent access to police *and* medical service, not police or medical service. *See* OR. ADMIN. R. 104-080-0000 (2018).

disabled) any type of recreational or leisure programs in the first place, when it does provide and administer such programs, it must use methods or criteria that do not have the purpose or effect of impairing its objectives with respect to individuals with disabilities."). Defendants argue that Plaintiffs have failed to allege that they have not received meaningful access to the same service that individuals without disabilities would access *when facing the same emergency*. (*See* Agency's Mot. at 21.) However, Plaintiffs appear to challenge the criteria used for categorizing what constitutes a similar emergency. In other words, Defendants respond with emergency medical services to many different types of emergencies, as they do with police and fire services. (*See* Call Taking Manual at 77-80, listing dozens of call codes for police, fire, or emergency medical services.) Plaintiffs allege that Defendants administer the 911 dispatch such that emergency medical services are never primary responders to mental health crises and that in so doing Defendants defeat the purpose of providing consistent access to emergency medical services.

Accordingly, Plaintiffs have plausibly alleged that people suffering from a mental health crisis do not have meaningful access to a service: consistent access to emergency medical service through the emergency communications system.

### 1)    Defendants' Arguments

Defendants argue that Plaintiffs are asking for a new service or a higher standard of care and that either request does not support an actionable discrimination claim under Title II and Section 504. (*See* Agency's Mot. at 28-34; Wash. Cnty.'s Mot. at 20-24.)

### a)    New Service

Defendants argue that Plaintiffs are asking for a new service and that a request for a new service does not support a viable disability discrimination claim under Title II and Section 504. (*See* Agency's Mot. at 32-34; Wash. Cnty.'s Mot. at 23-24.)

PAGE 53 – FINDINGS AND RECOMMENDATION

The ADA and the Rehabilitation Act do not require states "to provide new programs or services to the disabled which it has not previously provided to any group." *Buchanan v. Maine,* 469 F.3d 158, 173 (1st Cir. 2006); *see also Chandler*, 83 F.3d at 1155 (concluding that there was no Title II violation where the defendant provided separate programs with distinct purposes benefiting people with dependent children and disabled persons but did not offer a unified program with the purpose of providing income support for the needy); *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2nd Cir. 1999) ("[T]he ADA requires only that a particular service provided to some not be denied to disabled people . . . . New York cannot have unlawfully discriminated against appellees by denying a benefit that it provides to no one.") (citation omitted).

The Court finds *Smith v. City of Oakland* instructive. *See Smith v. City of Oakland*, 612 F. Supp. 3d 951 (N.D. Cal. 2020). In *Smith*, the plaintiffs—disabled renters in Oakland—alleged that the City of Oakland's rent program, which regulated rent increases for private units built before 1983, violated the ADA. *Id.* at 956. "The City characterizes Plaintiffs' claim as seeking 'an additional benefit to disabled persons, in order to ensure not equal treatment, but equal results.'" *Id.* at 963 (citation omitted). The court noted that "[c]ontrary to the City's claim, however, Plaintiffs allege that they *are* excluded from the City's regulation of pre-1983 units, because every standard governing the accessibility of the City's private rental housing went into effect after January 1, 1983—thus leaving all or nearly all of Oakland's accessible rental units outside the Program's scope[.]" *Id.* (simplified). The court then explained, "[t]he problem with the City's definition of the benefit is that it is constructed 'in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled.'" *Id.* (quoting *Choate*, 469 U.S. at 301). "Here, Oakland has chosen to provide a particular package

of services—regulation of rent increases on private housing units, but only as to a subset that is largely inaccessible to mobility-disabled renters." *Id.* (simplified). Put differently, "Oakland has chosen to provide a service to all renters that, in practice, is allegedly denied to disabled people." *Id.* at 964 (simplified). "Oakland attempts to muddy the waters by framing Plaintiffs' claim as a request for an 'additional benefit,'—access to rent-controlled post-1983 housing—but Plaintiffs here have not in fact received the offered benefit: access to rent-controlled pre-1983 housing." *Id.* (simplified).

As discussed, the relevant service is the provision of consistent access to emergency medical service through the emergency communications system. As in *Smith*, Defendants have chosen to provide a service to all residents of Washington County that, in practice, is allegedly denied to mentally disabled residents. Plaintiffs do not seek a new service but instead seek meaningful access to Defendants' existing service.

To the extent Defendants argue that the contours of the injunctive relief requested by Plaintiffs would fundamentally alter Defendants' existing program or that incorporating mental health clinicians into any remedy would require creation of a new service, both arguments fail at the motion to dismiss stage.

Defendants suggest that meaningful access does not require a public entity to fundamentally alter existing programs. (*See* Agency's Mot. at 16; Wash. Cnty.'s Mot. at 15.) "Whether an accommodation fundamentally alters a service or facility is an affirmative defense." *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004) (citing *Colo. Cross Disability Coal. v. Hermanson Fam. Ltd.*, 264 F.3d 999, 1003 (10th Cir. 2001), and *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997)); *see also* 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies,

practices, or procedures when the modifications are necessary to avoid discrimination on the

basis of disability, unless the public entity can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity."). Accordingly, the Court will

not decide whether Plaintiffs are asking for a fundamental alteration at this stage of the litigation.

*See Lentini*, 370 F.3d at 845 ("[W]hether an accommodation causes a fundamental alteration is

'an intensively fact-based inquiry.'" (quoting *Martin v. PGA Tour, Inc.*, 204 F.3d 994, 999 (9th

Cir. 2000)); *Hindel v. Husted*, 875 F.3d 344, 347 (6th Cir. 2017) ("[T]he court erred in making a

fact-specific determination on the basis of the pleadings alone that plaintiffs' proposed

accommodation would fundamentally alter Ohio's voting system. . . . [T]his determination

should have been made only after discovery, expert testimony, an evidentiary hearing, or trial.").

Further, Plaintiffs allege that Defendants have already created MHRT and MCT, that

MCT is contractually obligated to be available to respond to mental health crises in the County at

all times, and that those groups respond to a small portion of mental health related emergencies

in Washington County. (*See* Compl. ¶¶ 13, 87, 89-91, 96, 133.) Accordingly, those are existing

services. To the extent that Defendants argue that they do not offer mental health clinicians as

the *sole* first responders to anyone (*see* Wash. Cnty.'s Mot. at 2), the Court concludes that this

fact is not dispositive at this stage of the litigation. In other words, Defendants prematurely

dispute the proper remedy.[23] (*See* Agency's Mot. at 26-27; Wash Cnty.'s Mot. at 18; *see also*

---

[23] For similar reasons, the Court need not decide at this stage of the litigation whether a
police response to a mental health crisis where the subject of the call is believed to be
"dangerous to self or to any other person" is a separate service authorized by state law, *see*
OR. REV. STAT. § 426.228(1) and *Greene*, 2024 WL 1308434, at *16, to which Plaintiffs request
a "right to refuse," *see Jarzynka*, 2011 WL 4565612, at *5 (concluding that the plaintiff "was not
denied a benefit" because the defendant "was not offering the services of refusing treatment"), or
whether Plaintiffs merely identify the presence of police as an obstacle that impedes meaningful
access to consistent access to emergency medical care. *See Am. Council of the Blind*, 525 F.3d at
1267 ("Where the plaintiffs identify an obstacle that impedes their access to a government

Pls.' Resp. at 26, stating that expanding access to the MCT is "one possible way to address Plaintiffs' claims[.]") Given that the relevant service is the provision of consistent access to emergency medical service through the emergency communications system (not, for example, provision of mental health clinicians as sole first responders), the scope of Plaintiffs' requested injunctive relief does not determine the preliminary question: whether Defendants violated Title II or Section 504.[24]

b)     Higher Standard of Care

Defendants argue that Plaintiffs request a higher standard of care, and that inadequate mental health care is not actionable discrimination. (*See* Agency's Mot. at 28-32; Wash. Cnty.'s Mot. at 20-23.) Specifically, Defendants argue that Plaintiffs allege that the services provided by law enforcement officers fail to provide adequate mental health treatment. (*See* Wash. Cnty.'s Mot. at 23.)

Defendants argue that "meaningful access does not require a defendant to provide services in the exact manner preferred by the plaintiff." (*Id.* at 22, citing *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1017-21 (9th Cir. 2002) (affirming a jury verdict in favor of the defendant where the plaintiff used a wheelchair, the defendant had accommodated her in many regards, and the plaintiff enjoyed many of the benefits offered by a study abroad program even though the defendant had failed to provide her with wheelchair access on a number of discrete occasions));

---

program or benefit, they likely have established that they lack meaningful access to the program or benefit. By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access.").

[24] For similar reasons, the Court need not resolve the parties' dispute over the import of *Rodde v. Bonta* and whether Defendants must dispatch mental health clinicians alone to provide "specialized medical expertise." 357 F.3d at 995.

*see also Choate*, 469 U.S. at 303 (explaining that the relevant programs did "not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs"). Further, Defendants argue that the statutes "do not provide a general cause of action for challenging the medical treatment of their underlying disabilities." (Agency's Mot. at 28-29.)

"[A] disability discrimination claim may not be premised upon allegations that defendants failed to meet a particular standard of care with regard to the services provided . . . ." *Lane v. Kitzhaber*, 841 F. Supp. 2d 1199, 1207 (D. Or. 2012) (citing *Olmstead*, 527 U.S. at 603 n.14). The Supreme Court has explained, "[w]e do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" *Olmstead*, 527 U.S. at 603 n.14.

Additionally, the relevant statutes do not support a claim for "inadequate treatment for disability." *Simmons v. Navajo County, Arizona*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("[T]o the extent that the [plaintiffs] argue that [the defendant] violated the ADA by depriving [the decedent] of 'programs or activit[ies] to lessen his depression,' such argument is not actionable under the ADA [because t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996))), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc); *cf. Buchanan*, 469 F.3d at 174 ("By the time of the summary judgment motions, plaintiff's claim came down to specifics that demonstrated that the claim was not about discriminatory denial of services, but rather about the adequacy of treatment."). The statutes do "not create a remedy for medical malpractice." *Barker v. Osemwingie*, No. 23-15479, 2024 WL 2890180, at *2 (9th Cir. June 10, 2024) (quoting *Simmons*, 609 F.3d at 1022); *see also*

*Washington v. Cal. Dep't of Corr. & Rehab.*, No. 19-cv-169-VAP (KK), 2019 WL 1206487, at

*6 (C.D. Cal. Mar. 14, 2019) ("To the extent [the plaintiff] seeks to sue Defendants for alleged

inadequate healthcare under the ADA or Rehabilitation Act, such a claim fails as a matter of

law.") (citation omitted), *aff'd*, 2019 WL 3295644 (C.D. Cal. Apr. 22, 2019); *Gordy v. Agamyan*,

No. 18-cv-2590-GW (JPR), 2018 WL 3129779, at *4 (C.D. Cal. June 22, 2018) ("Plaintiff's

ADA/[Rehabilitation Act] claim is based squarely on Defendants' alleged failure to provide

adequate treatment for his alleged mental illness after he continued to express suicidal thoughts.

. . . That claim fails as a matter of law.") (citations omitted); *Figueira by & through Castillo v.*

*Cnty. of Sutter*, No. 2:15-cv-00500-KJM-AC, 2015 WL 6449151, at *9 (E.D. Cal. Oct. 23, 2015)

(similar).

In sum, there is a "distinction between ADA claims based on negligent medical care and

those based on discriminatory medical care." *Buchanan*, 469 F.3d at 174 (collecting cases). "[A]

claim survives only if it truly alleges a 'discriminatory denial of services' and must be dismissed

if it instead concerns the 'adequacy' of the services provided." *Lane*, 841 F. Supp. 2d at 1207

(citing *Buchanan*, 469 F.3d at 174-75).

Plaintiffs acknowledge that they include allegations related to the outcomes that result

from Defendants' responses to mental health emergencies, but they argue that they challenge the

"disparate *type of response* that Defendants' [s]ervice assigns to health emergencies associated

with mental health disabilities[.]" (Pls.' Resp. at 23.) Plaintiffs explain that the allegations related

to the poor outcomes resulting from Defendants' response solely serves to illustrate how

Defendants deny people with mental health disabilities equal opportunity to access the benefits

that others receive. (*See id.* at 24); *cf. Lane*, 841 F. Supp. 2d at 1208 ("[S]ome of [the] allegations

in the Complaint go beyond the clarification offered by plaintiffs at the hearing and seek the

forbidden remedy of requiring defendants to provide an adequate level of employment services to enable plaintiffs to obtain a competitive job."). Plaintiffs further argue that it is impossible for their complaint to challenge the adequacy and effectiveness of mental health treatment because currently *no* treatment is provided. (*See* Pls.' Resp. at 24-25.) Instead, Plaintiffs seek access to such emergency medical intervention. (*See id.* at 25.)

The Court agrees with Plaintiffs. It is clear that the gravamen of Plaintiffs' claim is that they receive discriminatory services. Instead of EMTs, paramedics, or licensed mental health professionals, Defendants dispatch police officers, who according to the allegations in the complaint, do not provide *any* medical care (not merely negligent medical care). (*See* Compl. ¶¶ 2, 58-59, 76, 81, 87, 99, 107, 120, 158.) The Court concludes that Plaintiffs do not allege a medical malpractice claim but instead allege that Defendants discriminatorily deny Plaintiffs meaningful access to the benefit of consistent access to emergency medical service through the emergency communications system.

### 5.      Otherwise Qualified

"Qualified individuals" are persons with disabilities who, "with or without reasonable modifications to rules, policies, or practices, . . . mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). "[T]he question of who is 'otherwise qualified' and what actions constitute 'discrimination' . . . would seem to be two sides of a single coin." *Choate*, 469 U.S. at 299 n.19.

Plaintiffs argue that Wesley and DRO's clients and constituents are otherwise qualified individuals. (*See* Pls.' Resp. at 9 n.4, 32.) Together with the conclusion that Plaintiffs have plausibly alleged that they have been denied meaningful access to the relevant service, the Court concludes that Plaintiffs have plausibly alleged that Wesley and DRO's clients and constituents

are otherwise qualified to receive consistent access to emergency medical service through the

emergency communications system. (*See* Compl. ¶ 83, alleging that the Agency "receives all

911" calls and routes the call to the appropriate public or private safety agency); *cf. Olmstead,*

*527 U.S. at 602* (explaining that "[c]ourts normally should defer to the reasonable medical

judgments of public health officials" when considering whether an individual meets essential

eligibility requirements for a program (quoting *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273,

*288 (1987)*); *Haberle v. Troxell*, 885 F.3d 170, 179 (3d Cir. 2018) (explaining that people can be

"a qualified individual under the ADA despite not having volunteered" for the service, in the

context of police arrests (quoting *Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998)))).

### 6.    Causation

Under the ADA, a plaintiff must plead that the defendant denied the plaintiff a benefit

"by reason of such disability," while under the Rehabilitation Act a plaintiff must plead that the

defendant denied the plaintiff a benefit "solely by reason of [the plaintiff's] disability." *See*

*42 U.S.C. § 12132*; *29 U.S.C. § 794(a)*.

Defendants argue that a but-for standard of causation applies here. (*See* Agency's Mot. at

15; Wash. Cnty.'s Mot. at 13, citing *Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019).)

Plaintiffs argue that the analysis of *Murray* was limited to the context of Title I of the ADA, does

not apply to Title II cases, and instead a motivating factor standard of causation applies. (*See*

Pls.' Resp. at 8 n.3, citing *K.M.*, 725 F.3d at 1099.)

In *K.M.*, the Ninth Circuit explained, "Title II's prohibition of discrimination or denial of

benefits by reason of disability establishes a motivating factor causal standard for liability when

there are two or more possible reasons for the challenged decision and at least one of them may

be legitimate." *K.M.*, 725 F.3d at 1099 (quoting *Martin v. Cal. Dep't of Veterans Affairs*, 560

*F.3d 1042, 1048-49 (9th Cir. 2009)* and simplified); *see also Martin*, 560 F.3d at 1048-49 (citing

PAGE 61 – FINDINGS AND RECOMMENDATION

*Head v. Glacier Nw., Inc.*, 413 F.3d 1053 (9th Cir. 2005) for the same). "By contrast, the causal standard for the Rehabilitation Act is even stricter, requiring a plaintiff to show a denial of services solely by reason of disability." *K.M.*, 725 F.3d at 1099 (simplified).

Subsequently, in *Murray*, the Ninth Circuit concluded that *Head v. Glacier Northwest, Inc.* was no longer good law in light of the Supreme Court's decisions in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), and *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). *See Murray*, 934 F.3d at 1105. In *Head*, the Ninth Circuit had explained that, where the ADA stated "because of," "by reason of," and "because," the "[c]ausation analysis" was a motivating factor standard. 413 F.3d at 1063-65. In *Gross* and *Nassar*, the Supreme Court held that a but-for standard applied to the Age Discrimination in Employment Act and to Title VII retaliation claims. *See Gross*, 557 U.S. at 177-78; *Nassar*, 570 U.S. at 350, 360 (explaining that *Gross* held that "because of," "by reason of," and "on account of" all indicate a but-for standard). Against the backdrop of *Gross* and *Nassar*, "circuits have retreated from the motivating factor standard of causation in ADA cases." *Murray*, 934 F.3d at 1105 (quoting *Bukiri v. Lynch*, 648 F. App'x 729, 731 n.1 (9th Cir. 2016)). Ultimately, the Ninth Circuit overruled *Head*, explaining "[w]e hold instead that an ADA discrimination plaintiff bringing a claim under [Title I] must show that the adverse employment action would not have occurred but for the disability." *Id.*

Although *Murray* was decided in the context of Title I, the Court concludes that the analysis of *Murray*, *Gross*, and *Nassar* apply in the context of Title II as well. *See Mehta v. City of Sunnyvale*, No. 23-cv-03193-PCP, 2024 WL 950165, at *3 (N.D. Cal. Mar. 5, 2024) ("*Murray*'s analysis applies with equal force to Title I and Title II of the ADA and provides the Ninth Circuit's current governing standard as to the causation standard that applies to such

claims. Accordingly, to state a valid Title II claim, [the plaintiff] must plead facts plausibly

suggesting that his disability was a but-for cause of his arrest."); *Uhuru v. Bonnifield*, No. 2:19-

cv-10449-JVS-KES, 2021 WL 3870479, at *9 n.6 (C.D. Cal. June 21, 2021) ("Earlier Ninth

Circuit cases holding that Title II ADA discrimination claims should be evaluated under the less

strict 'motivating factor' standard, appear to have been overruled by the Supreme Court." (citing

*K.M.*, 725 F.3d at 1099 and *Nassar*, 570 U.S. at 350)), *report and recommendation adopted*,

2021 WL 3857456 (C.D. Cal. Aug. 30, 2021); *Miller v. Aranas*, No. 3:17-cv-00068-MMD-

WGC, 2021 WL 1397230, at *6 (D. Nev. Feb. 5, 2021) ("The 'more stringent' 'but-for'

causation standard articulated in [*Nassar*] (and not the motivating factor causal standard) applies

to retaliation claims under Title I and II of the ADA."), *report and recommendation adopted*,

2021 WL 1041912 (D. Nev. Mar. 17, 2021).

    But-for causation "is established whenever a particular outcome would not have

happened 'but for' the purported cause." *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656

(2020) (citing *Gross*, 557 U.S. at 176). "In other words, a but-for test directs us to change one

thing at a time and see if the outcome changes." *Id.*; *see also Comcast Corp. v. Nat'l Ass'n of*

*Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020) ("[I]f the defendant would have responded

differently but for the plaintiff's [protected status], it follows that the plaintiff has not received

the same right . . . ."). If the outcome changes, "we have found a but-for cause." *Bostock*, 590

U.S. at 656. "Often, events have multiple but-for causes." *Id.* "So, for example, if a car accident

occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his

turn at the intersection, we might call each a but-for cause of the collision." *Id.* (citing *Burrage v.*

*United States*, 571 U.S. 204, 211-12 (2014)). "[A] defendant cannot avoid liability just by citing

some *other* factor that contributed to its challenged" actions. *Id.* "So long as the plaintiff's

[protected status] was one but-for cause of that [action], that is enough to trigger the law." *Id.* A but-for cause does not mean the sole cause or the primary cause. *See id.* Here, Plaintiffs also allege a Rehabilitation Act claim and must additionally plead denial of a benefit "solely by reason of . . . disability[.]" 29 U.S.C. § 794.

Defendants argue that Plaintiffs have not plausibly alleged discrimination on the basis of disability. (*See* Agency's Mot. at 25-28; Wash. Cnty.'s Mot. at 16-20.) The Agency argues that Plaintiffs do not allege facts suggesting that the Agency call takers actually knew that callers were individuals with disabilities or that the subjects of the calls had a disability.[25] (*See* Agency's Mot. at 25.) The Agency cites the Call Taking Manual, which states that a call taker will only obtain basic information. (*See id.* at 25-26, citing Call Taking Manual at 7.) The Agency also argues that the kinds of emergencies are different and that the services necessarily vary. (*See id.* at 22.)

However, Plaintiffs allege facts suggesting that the kinds of emergencies are not different, but that the differential treatment is instead discrimination due to disability. (Compl. ¶¶ 42-43, 50, 53-55, 113-16, suggesting that mental health crises are health emergencies and generally do not involve criminal conduct, violence, use or possession of a weapon, or threats, but that the categorization of people with mental health disabilities as violent and in need of a police response alone arises from stigma and stereotypes); *see MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 342 (6th Cir. 2002) ("[W]here the discrimination results from

---

[25] A plaintiff seeking injunctive relief need not allege intentional discrimination. *See Midgett v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 851 (9th Cir. 2001) ("We have never held that a plaintiff must prove an intentional violation of the ADA in order to obtain an injunction mandating compliance with its provisions."). In other words, a plaintiff need not prove that the desire or intent to discriminate was the but-for cause of the denial of a benefit. *Cf. Nassar*, 570 U.S. at 352 ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." (citing *Gross*, 557 U.S. at 176)).

unfounded fears and stereotypes that merely because [the drug treatment provider plaintiff]'s

potential clients are recovering drug addicts, they would necessarily attract increased drug

activity and violent crime to the city, such discrimination violates the ADA and Rehabilitation

Act." (citing *Teahan v. Metro-N. Commuter R. Co.*, 951 F.2d 511, 518 (2d Cir. 1991))). In other

words, Defendants, through the emergency communications system, send emergency medical

services to some health-related emergencies, but do not send emergency medical services to

health emergencies associated with mental health disabilities.[26] (*See* Compl. ¶ 112, alleging that

"anyone who appears to be experiencing a mental health crisis, or who is otherwise categorized

as having a behavioral health incident, is treated automatically as a threat . . . [and t]hey are not

treated as a person in need of health care services.") Plaintiffs have alleged that but for a mental

impairment that substantially limits one or more major life activities or being regarded as having

such an impairment, Wesley and DRO's clients and constituents would have received

meaningful access to the service: consistent access to emergency medical services through the

emergency communications system.

The Court concludes that Plaintiffs have plausibly alleged that, but for a disability, people

suffering from a mental health crisis would receive meaningful access to the benefit and that they

were denied meaningful access to a benefit solely by reason of disability. *Cf. Olmstead*, 527 U.S.

at 600 (concluding that "unjustified institutional isolation of persons with disabilities is a form of

---

[26] Defendants argue that 911 callers do not describe the circumstances of a mental health
crisis such that "a need for mental health services *only*" would be obvious. (Wash. Cnty.'s Reply
at 5, emphasis added.) The Court need not reach that issue. Plaintiffs have plausibly alleged that
Agency call takers who code a call as one of the mental health related emergencies have
regarded the subject as suffering from a mental impairment and that the related Agency policy
that does not require consistent access to emergency medical services is discriminatory, whether
or not the call taker perceives an obvious and distinct health emergency that would not also
require a police response.

PAGE 65 – FINDINGS AND RECOMMENDATION

discrimination," in part because "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life") (citations omitted).

### 7.    Conclusion

The relevant service that Plaintiffs challenge in this litigation is the provision of consistent access to emergency medical service through the emergency communications system when an emergency call is made to 911. The Court concludes that Plaintiffs have plausibly alleged that Defendants have denied meaningful access to that service to otherwise qualified individuals solely by reason of disability. Accordingly, the Court recommends that the district judge deny Defendants' motions to dismiss for failure to state a claim.

### 8.    The Agency's Involvement

The Agency argues that Washington County, not the Agency, is responsible for the emergency response services available in Washington County. (*See* Agency's Mot. at 22-23.)

A complaint must "describe facts sufficient to demonstrate [each defendant's] personal involvement in a specific . . . statutory violation." *Swanson v. Dep't of Just.*, No. 6:22-cv-01304-MK, 2022 WL 19693710, at *3 (D. Or. Dec. 13, 2022), *findings and recommendation adopted*, 2023 WL 3168696 (D. Or. Apr. 28, 2023).

The Agency argues that, according to the complaint, "the County has not incorporated the Mobile Crisis Team into the Agency's dispatch system" and "[t]hus, the Agency cannot directly dispatch the Mobile Crisis Team to mental health crises." (Compl. ¶ 15.) Further, "the County's failure to fully integrate its Mobile Crisis Team into the Agency's dispatch system has deprived people with mental health disabilities in the County of direct, immediate, and meaningful access to the emergency medical services that are provided to people without such disabilities." (*Id.*

PAGE 66 – FINDINGS AND RECOMMENDATION

¶ 19.) In sum, the Agency argues that Washington County, not the Agency, is responsible for the emergency response services that are available. (*See* Agency's Mot. at 23.)

However, Plaintiffs allege that the Agency controls how it categorizes calls and to which agency or agencies it routes calls. (Compl. ¶¶ 83, 86-87; *see also* Call Taking Manual at 36, directing call takers to use the medical call type to create a call when there is a need for both police and medical, otherwise medical will not respond.) The Agency routes calls to AMR in the case of physical health emergencies and to law enforcement agencies in the case of mental health emergencies. (Compl. ¶ 87.) Plaintiffs also allege that "the LifeWorks NW call center is not integrated into the Agency's dispatch system, though the Agency has the telecommunication capability to do so." (*Id.* ¶ 93, footnote omitted.) "The Agency currently incorporates other services, such as the Washington County Sheriff's Office, into its dispatch system and could do the same for LifeWorks NW." (*Id.*; *see also id.* ¶¶ 241, 255, explaining that Washington County has the mobile crisis team available to dispatch to mental health crises yet the Agency routes calls to law enforcement agencies as default primary responders.)

Accordingly, the Court concludes that Plaintiffs have plausibly alleged that the Agency has control over providing consistent access to emergency medical service through the emergency communications system. For these reasons, the Court recommends that the district judge deny the Agency's motion to dismiss.

## III.    MOTION TO STRIKE

Washington County, joined by the Agency, move in the alternative to strike portions of Plaintiffs' complaint. (*See* Agency's Mot. at 1 n.1; Wash. Cnty.'s Mot. at 24-26.)

### A.    Applicable Law

Rule 12(f) provides that a "court may strike from a pleading . . . any . . . immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).

A matter is "immaterial" if it "has no essential or important relationship to the claim for relief or the defenses being plead." *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 967 (9th Cir. 2014) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)). "Impertinent material," on the other hand, "consists of statements that do not pertain, and are not necessary, to the issues in question." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (quoting *Fantasy, Inc.*, 984 F.2d at 1527). Further, a matter is "scandalous" if "it generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Ogdon v. Grand Canyon Univ. Inc.*, No. 22-cv-00477, 2023 WL 5046242, at *1 (D. Ariz. Aug. 8, 2023) (quoting *Jud. Watch v. U.S. Dep't of Com.*, 224 F.R.D. 261, 263 (D.D.C. 2004)).

Ultimately, "[t]he function of a [Rule] 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone*, 618 F.3d at 973 (simplified) (quoting *Fantasy, Inc.*, 984 F.2d at 1527). "The disposition of a motion to strike is within the discretion of the district court." *Kim v. Beaverton Sch. Dist. 48J*, No. 3:20-cv-2025-SI, 2022 WL 594421, at *1 (D. Or. Feb. 28, 2022) (citing *Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990)). Courts view with disfavor and infrequently grant motions to strike because striking a portion of a pleading is a drastic remedy and motions to strike are often "considered purely cosmetic or 'time wasters,'" 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed. June 2024 update), and pleadings in federal practice are of "limited importance." *Kim*, 2022 WL 594421, at *1 (quoting *Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014)).

B.      Analysis

The Court recommends that the district judge deny Defendants' motion to strike.

Defendants move to strike from Plaintiffs' introduction the statement, "[t]ragically, Mr. Wesley's horrific experience with Defendants' discriminatory emergency response system is not an anomaly." (Wash. Cnty.'s Mot. at 24-25, citing Compl. ¶ 10.) Defendants argue that the statement is inflammatory, immaterial, and distracts from the claims at issue. (*See id.*)

Defendants also move to strike paragraphs alleging the shortcomings of police responses to mental health crises, such as data about the number of people with mental health disabilities killed by police and allegations that dispatching law enforcement officers to mental health crisis calls is more likely to exacerbate the underlying mental health issue. (*See id.* at 25, citing Compl. ¶¶ 22-24.) Defendants argue that the paragraphs are immaterial public policy arguments that rely on unauthenticated hearsay regarding the effectiveness of dispatching law enforcement officers. (*See id.*)

Further, Defendants move to strike paragraphs suggesting that mental health experts agree that police should not respond to typical mental health emergencies, that mental health emergencies typically arise from mental health disabilities, that the idea that people with mental health disabilities are violent arises out of stigma and not data, that law enforcement officers are not qualified mental health professionals, that law enforcement responses to mental health crises can exacerbate the problem, describing collateral consequences of involuntary detention, describing the services a trained mental health professional could provide, and explaining that law enforcement officers in Washington County use their lay judgment to decide whether a person in crisis needs immediate care or treatment. (*See id.*, citing Compl. ¶¶ 42-59, 65-68, 72-73, 75-76.) Defendants argue that the paragraphs are immaterial commentary, unauthenticated hearsay, do not pertain to the claims at issue, and pose a risk of prejudice to Defendants. (*See id.*)

PAGE 69 – FINDINGS AND RECOMMENDATION

Finally, Defendants move to strike paragraphs describing the functions and effectiveness of mobile crisis teams. (*See id.* at 26, citing Compl. ¶¶ 220-30.) Defendants argue that the paragraphs are immaterial commentary and unauthenticated hearsay about public policy issues and the implementation of programs in different jurisdictions that are not under scrutiny. (*See id.*)

As an initial matter, the Court rejects Defendants' suggestion that the Court should strike certain paragraphs in part because they are unauthenticated hearsay. "The allegations in the complaint are not evidence, and need not meet any evidentiary standard." *Remington v. Mathson*, No. 17-cv-02007-JST, 2017 WL 2670747, at *6 (N.D. Cal. June 21, 2017). "That an allegation is hearsay is not a basis for striking pursuant to Rule 12(f)." *Belle v. Chrysler Grp., LLC*, No. SACV 12-00936 JVS, 2013 WL 949484, at *9 (C.D. Cal. Jan. 29, 2013); *see also Kristiansen v. Aldaoud*, No. 22-cv-01976-PHX-DJH, 2023 WL 4031964, at *5 (D. Ariz. June 15, 2023) ("The Court thus joins the authorities in this district and circuit that have held it improper for a party to use a motion to strike, especially with respect to allegations in a complaint, as a means of raising evidentiary objections."); *In re Arris Cable Modem Consumer Litig.*, No. 17-cv-01834-LHK, 2018 WL 288085, at *12 (N.D. Cal. Jan. 4, 2018) (denying a motion to strike "unreliable double hearsay" from the complaint).

Further, "allegations that provide background information, historical material, 'or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant.'" *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1085 (S.D. Cal. 2017) (quoting *In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 773 (N.D. Cal. 2010)). The Court concludes that the paragraphs subject to the motion to strike are arguably relevant to Plaintiffs' claims, providing context and background information. *See Maney v. Brown*, No. 6:20-cv-00570-SB,

2021 WL 4449266, at *3 (D. Or. Sept. 28, 2021) (denying motion to strike paragraphs describing actions taken in other jurisdictions around the United States because they provided relevant background); *Menchu v. Multnomah Cnty. Health Dep't*, No. 3:20-cv-00559-AC, 2021 WL 2450780, at *6 (D. Or. May 3, 2021) ("Allegations in a complaint should not be stricken when they provide relevant background information or are 'arguably relevant' to an actionable claim.") (citation omitted), *findings and recommendation adopted*, 2021 WL 2446173 (D. Or. June 14, 2021); *Epstein v. United States*, No. 16-cv-2929-BAS (WVG), 2017 WL 4227054, at *4 (S.D. Cal. Sept. 21, 2017) ("[S]triking this material from the [complaint] is unnecessary because the Court regards such material as providing background information only.") (citation omitted); *Dettrich v. Shinseki*, No. 1:10-cv-434 WBS, 2011 WL 3204729, at *7 (D. Idaho July 26, 2011) ("The court is not convinced that inclusion of these allegations is redundant, immaterial, impertinent, or scandalous. Simply because a particular word, phrase, or fact in a complaint might not entitle plaintiff to recover does not bar plaintiff from asserting additional historical or background information."). Defendants have not explained why the paragraphs at issue would be *unduly* prejudicial.

Accordingly, the Court recommends that the district judge deny Defendants' motion to strike. *See Martin v. City of Portland*, No. 3:19-cv-1647-SI, 2020 WL 363391, at *2 (D. Or. Jan. 2, 2020) (noting that motions to strike are disfavored and infrequently granted).

## IV.    MOTION TO MAKE MORE DEFINITE AND CERTAIN

Washington County, joined by the Agency, move in the alternative to make more definite and certain portions of Plaintiffs' complaint. (*See* Agency's Mot. at 1 n.1; Wash. Cnty.'s Mot. at 2, 5, 26-27.)

///

///

### A.    Applicable Law

Federal Rule of Civil Procedure 12(e) provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." "A Rule 12(e) motion for more definite statement is disfavored and is proper only if the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted, meaning the complaint is so vague that the defendant cannot begin to frame a response." *Martin*, 2020 WL 363391, at *2 (quoting *Barnes v. Olive*, No. 2:15-cv-00520-HZ, 2015 WL 5813193, at *2 (D. Or. Sept. 30, 2015)). "Rule 12(e) is designed to strike at unintelligibility, rather than want of detail." *Id.* (citing *Barnes*, 2015 WL 5813193, at *2). "The Court must deny the motion if the complaint is specific enough to notify defendant of the substance of the claim being asserted." *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1170, 1191 (E.D. Cal. 2010) (citations omitted).

### B.    Analysis

Defendants argue that Plaintiffs should clarify four references to "Defendants" and should instead specify which defendant is the subject of those allegations. (*See* Wash. Cnty.'s Mot. at 26-27, citing Compl. ¶¶ 82(a), 98, 107, 107(b).) Washington County argues that it does not have control over dispatch of emergency services, and so Plaintiffs should clarify related allegations. (*See id.* at 2.) Plaintiffs respond that their complaint is sufficiently clear and specific such that Defendants could reasonably prepare a response, that the complaint notifies Defendants of the substance of Plaintiffs' claims, and that "there is nothing unintelligible where the Plaintiffs allege that the Agency and the County are jointly liable." (Pls.' Resp. at 38-39, citing Compl. ¶ 83, alleging that the Agency operates a dispatch center "for the County.") The Court agrees with Plaintiffs. "There is nothing in [the] Complaint that is so indefinite that Defendants cannot ascertain the nature of the claims being asserted." *Martin*, 2020 WL 363391, at *7. Further,

PAGE 72 – FINDINGS AND RECOMMENDATION

Plaintiffs have confirmed in their briefing that they meant to reference both Defendants because they assert that Defendants are jointly liable for the dispatch of emergency services. "[T]o the extent that Defendants seek greater detail, that is available to them through discovery." *Id.*

The Court recommends that the district judge deny Washington County's motion to make more definite and certain.

**CONCLUSION**

For the reasons stated, the Court recommends that the district judge DENY Washington County's motion to dismiss (ECF No. 21) and DENY the Agency's motion to dismiss (ECF No. 25).

**SCHEDULING ORDER**

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 30th day of August, 2024.

HON. STACIE F. BECKERMAN
United States Magistrate Judge